UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

      -v-                              :

MARK ALAN SHAPIRO,                :
IRVING STITSKY,
WILLIAM B. FOSTER,               :

      Defendants.      :

- - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: APR 2 4 2006

**INDICTMENT**

06 Cr.

# 06CRIM. 357

JUDGE WOOD

## COUNT ONE

(Conspiracy to Commit Securities Fraud, Mail Fraud, and Wire Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

1.    At all times relevant to this Indictment, Cobalt Multifamily Investors I, LLC ("CMFI-I") was purportedly a limited liability company organized under Delaware law with its principal place of business in Springfield, Massachusetts.  CMFI-I was purportedly engaged in the acquisition and development of multifamily real estate properties throughout the United States, including the rehabilitation and conversion of such properties into condominium-hotels.  CMFI-I raised capital for its purported operations through sales of securities to public investors.  Such securities included so-called "Units" of "Class A Membership Interests" (the "Units").

2.    At all times relevant to this Indictment, Cobalt Multifamily Co. I, LLC ("Cobalt Co.") was purportedly a limited

liability company organized under Delaware law and was identified in offering materials as the "Manager" of CMFI-I.

3.   At all times relevant to this Indictment, Cobalt Capital Funding, LLC ("Cobalt Funding") was purportedly a limited liability company organized under Delaware law with its principal place of business in Great Neck, New York.  Cobalt Funding's primary business was marketing and selling the CMFI-I Units to the investing public.  According to marketing materials distributed by Cobalt Funding, Cobalt Funding was a part-owner and so-called "Class B Member" of CMFI-I.

4.   At all times relevant to this Indictment, Cobalt Capital Partners, L.P. ("Cobalt Capital") was purportedly a limited partnership organized under Delaware law with its principal place of business in Springfield, Massachusetts.

5.   At all times relevant to this Indictment, Cobalt Financial, Inc. ("Cobalt Financial") was purportedly a corporation organized under Delaware law with its principal place of business in Springfield, Massachusetts, and was identified in certain offering materials as the "Manager" of Cobalt Co. which, in turn, was identified as the "Manager" of CMFI-I.  Cobalt Financial was purportedly owned and controlled by WILLIAM B. FOSTER, the defendant, but was in fact controlled by MARK ALAN SHAPIRO, the defendant.

6.    At all times relevant to this Indictment, Cobalt Construction Services, LLC ("Cobalt Construction") was purportedly a limited liability company organized under Delaware law with its principal place of business in Springfield, Massachusetts.

7.    At all times relevant to this Indictment, Cobalt Property Services, LLC ("Cobalt Property") was purportedly a limited liability company organized under Delaware law with its principal place of business in Springfield, Massachusetts.

8.    At all times relevant to this Indictment, Vail Mountain Trust ("Vail") was a trust established under Connecticut law which was under the control of MARK ALAN SHAPIRO, the defendant.  Vail purportedly owns approximately 80 percent of Cobalt Financial and owns approximately 79 percent of Cobalt Capital, the two entities that purportedly control other Cobalt entities including Cobalt Funding, and Cobalt Construction Services, LLC.  (These entities, along with other "Cobalt"-affiliated entities, are collectively referred to herein as "Cobalt.")

9.    At all times relevant to this Indictment, MARK ALAN SHAPIRO, the defendant, controlled the Cobalt entities either personally or through Vail and exercised day-to-day management decisions as the de facto Chief Executive Officer of

the Cobalt entities.  SHAPIRO was convicted of bank fraud and conspiracy to commit tax fraud on or about December 9, 1998.

10.  At all times relevant to this Indictment, IRVING STITSKY, the defendant, supervised operations at the Cobalt Funding offices in Great Neck, New York, and was responsible for recruiting, training, and overseeing the Cobalt employees who marketed the CMFI-I Units to the public.  STITSKY was convicted of two counts of conspiracy to commit securities fraud, wire fraud and commercial bribery on or about August 10, 2001, and was convicted of conspiracy to commit securities fraud and making false statements on or about August 24, 2001.

11.  At all times relevant to this Indictment, WILLIAM B. FOSTER, the defendant, was identified in Cobalt marketing materials and private placement memoranda as the owner, president and chief executive officer of Cobalt Financial, Inc. ("Cobalt Financial"), the entity that purportedly runs CMFI-I, and as the individual responsible for overseeing all aspects of the operations of all of the Cobalt entities.

### The Scheme to Defraud

12.  From at least as early as in or about November 2003 to on or about March 27, 2006, MARK ALAN SHAPIRO, IRVING STITSKY and WILLIAM B. FOSTER, the defendants, perpetrated a scheme to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds

as promised, and misappropriating and converting investors' funds
to their own benefit and the benefit of others without the
knowledge or authorization of the investors.  In furtherance of
the scheme, SHAPIRO, STITSKY and FOSTER solicited and caused
others to solicit more than approximately 150 victim-investors
who purchased approximately $16.3 million of CMFI-I Units.
SHAPIRO, STITSKY and FOSTER fraudulently induced victims to
invest by, among other things:  (a) misrepresenting Cobalt's
operating history; (b) failing to inform prospective investors
that Cobalt was owned and controlled by SHAPIRO, a convicted
felon; and (3) causing others to misrepresent to prospective
investors Cobalt's purported ownership interests in certain
properties.  In truth and in fact, as SHAPIRO, STITSKY and FOSTER
well knew, Cobalt was a new company with little or no record of
real estate investment success, Cobalt was controlled by SHAPIRO,
not FOSTER, and Cobalt did not own all the properties that it
claimed to own.

### The Private Placement Memoranda and Marketing Materials

13.  In connection with the scheme, MARK ALAN SHAPIRO,
IRVING STITSKY and WILLIAM B. FOSTER, the defendants, distributed
and caused others to distribute various materials to potential
investors.  Among those materials were at least two versions of a
private placement memorandum which described the investment being
offered.  One private placement memorandum was dated July 1, 2004

(the "July PPM") and a second private placement memorandum was
dated December 15, 2004 (the "December PPM).  Other materials
distributed to potential investors included glossy brochures that
described Cobalt and some of the properties in which investors
would be investing, including a property located at 321 Ocean
Drive, Miami Beach, Florida, that was purportedly owned by
Cobalt, and that was formerly known as the "Simone Hotel."

   14.  Both the July PPM and the December PPM informed
prospective investors, among other things, that CMFI-I:

> intends to pursue and promote investment
> opportunities in the acquisition and
> development, . . . of well-chosen multifamily
> properties throughout the United States, with
> the primary focus being the acquisition and
> development of residential apartment
> properties ranging in size from approximately
> 150 to 500 units and vacant land suitable for
> development of multifamily units[;]

The PPMs further represented that:  (a) CMFI-I was selling Class
A limited liability company membership interests in CMFI-I in
$100,000 "units" in an offering of between 20 and 250 units; (b)
until the minimum offering of $2 million (or 20 units) was sold,
all checks received from investors would be held in escrow; and
(c) WILLIAM B. FOSTER, the defendant, "is the owner, President
and CEO of Cobalt Financial, Inc." and "is in charge of
overseeing all aspects" of the operations of Cobalt Financial and
its "Affiliates," including all Cobalt entities.

15.  The July PPM made no mention of either MARK ALAN
SHAPIRO or IRVING STITSKY, the defendants, or their roles at
Cobalt.  The December PPM made no mention of STITSKY, and falsely
stated that SHAPIRO was merely a "consultant" who

> assists in structuring of [sic] the financing
> for the Cobalt Capital Companies.  He has
> extensive experience in corporate finance and
> real estate and provides an eye for finding
> "diamond in the rough" properties.  Mr.
> Shapiro has over twenty years of real estate
> construction, development and finance
> experience.  He has on his own and on behalf
> of others, owned, managed, constructed and/or
> converted over 10,000 apartments and
> condominium units throughout the United
> States.  He received his undergraduate degree
> from the University of Miami and a Masters in
> Finance from Harvard University.

In fact, SHAPIRO was not a Cobalt "consultant."  SHAPIRO owned
and controlled Cobalt through his interest in Vail.  Moreover,
representations about SHAPIRO's educational background were also
false.  SHAPIRO did not attend or receive any degree from Harvard
University.

16.  Both the July PPM and the December PPM indicated
that certain Cobalt entities were permitted to receive fees
equivalent to approximately 21 percent of the proceeds from the
sale of each CMFI-I Unit, if certain services were performed,
including: (a) a "Sales Commission" of approximately 8 percent,
and an approximately 1 percent "non-accountable Expense
Allowance" payable to Cobalt Funding; (b) an approximately nine
percent "acquisition fee" payable to Cobalt Capital for its

7

services in "selecting, acquiring and financing properties"; and (c) an approximately three percent "Property Analysis, Construction and Reposition Fee" payable to Cobalt Property so that "each property will have a plan to bring it back to its original position."  Documents appended to both the July PPM and December PPM stated that, "The Manager shall have a fiduciary duty for the safekeeping and use of all funds and assets of [CMFI-I], whether or not in the Manager's possession and control; and, . . . the Manager shall not employ or permit another to employ such funds or assets in any manner except for the exclusive benefit of [CMFI-I]."

### Cobalt's Deceptive Marketing Practices
### And The Misappropriation Of Investor Funds

17.  In furtherance of their scheme, and in order to sell the Units, MARK ALAN SHAPIRO, IRVING STITSKY and WILLIAM B. FOSTER, the defendants, established a Cobalt Funding office in Great Neck, Long Island.  That office was primarily used by salesmen paid by Cobalt to solicit prospective investors in CMFI-I.  STITSKY was responsible for hiring, training and supervising the Cobalt sales force, and also directly participated in selling the CMFI-I investment.  Over the course of the scheme, the Cobalt sales force made tens of thousands of telephone calls, including interstate telephone calls, from the Cobalt Funding office.

18.  Among other things, members of the Cobalt sales force told investors that:  (a) Cobalt had been in business for

two decades or longer, when in truth and in fact, the Cobalt
entities were recently formed and had a minimal operating
history; and (b) Cobalt owned certain properties described in its
marketing materials, including the Hotel Simone, when in truth
and in fact, as the defendants well knew, no Cobalt entity has
ever owned the Hotel Simone.  These false claims were also
included in certain marketing materials distributed by Cobalt to
prospective investors.

      19.  Investors were not informed by the sales force, by
the PPMs or by the marketing materials distributed by Cobalt, of
the fact that MARK ALAN SHAPIRO, the defendant, owned and
controlled Cobalt, and were instead misled into believing that
WILLIAM B. FOSTER, the defendant, actually ran Cobalt.

      20.  Investors were not informed that MARK ALAN
SHAPIRO, the defendant, had previously been convicted of bank
fraud and conspiracy to commit tax fraud.

      21.  Most prospective investors were not informed of
the involvement of IRVING STITSKY in raising funds from
investors, and were likewise not informed of STITSKY's criminal
history.

      22.  Contrary to the representations made in both the
July PPM and the December PPM, Cobalt did not hold investor funds
in escrow until the minimum offering of $2 million was sold.  In
fact, MARK ALAN SHAPIRO, IRVING STITSKY and WILLIAM B. FOSTER,

the defendants, deposited and caused others to deposit all
investor checks into various Cobalt bank accounts from which the
investor funds were either promptly spent or transferred to other
bank accounts for the benefit of Cobalt, SHAPIRO, STITSKY,
FOSTER, and others.

      23.   During the period between in or about July 2004
through in or about December 2005, Cobalt raised approximately
$16.3 million from investors.  The PPMs disclosed that Cobalt
Capital would be paid an "acquisition fee" of approximately 9
percent for its services in "selecting, acquiring and financing
properties."  The PPMs fraudulently omitted to disclose that, in
reality, the nine percent "acquisition fee" was simply personal
compensation that would be paid to SHAPIRO, FOSTER and STITSKY.
In fact, at the direction of MARK ALAN SHAPIRO, the defendant,
approximately $3.1 million, or approximately 19 percent of the
investor funds, were deposited in a bank account held in the name
of Cobalt Capital (the "Cobalt Capital Account"), which funds
were largely used for the benefit of SHAPIRO, IRVING STITSKY and
WILLIAM B. FOSTER, the defendants.

      24.   For example: (a) the company performing
construction work at SHAPIRO's Glastonbury, Connecticut home
received approximately $240,000 directly from the Cobalt Capital
Account; (b) FOSTER, and a trust established by FOSTER for the
benefit of himself and others, collectively received

approximately $646,000 from the Cobalt Capital Account; (c)
SHAPIRO received more than approximately $31,000 from the Cobalt
Capital Account; and (d) STITSKY, and a trust established by
STITSKY for the benefit of himself and others, collectively
received approximately $185,000 directly from the Cobalt Capital
Account.

     25.   Other funds raised from the sale of CMFI-I Units
were transferred from the Cobalt Capital Account to a bank
account held in the name of Vail (the "Vail Account") from which
further transfers were made for the benefit of MARK ALAN SHAPIRO,
IRVING STITSKY and WILLIAM B. FOSTER, the defendants.   Vail
received approximately nearly $2.3 million from the Cobalt
Capital Account.   Funds in the Vail Account were used to pay for:
(a) hundreds of thousands of dollars of construction costs for
SHAPIRO's Glastonbury, Connecticut home; (b) hundreds of
thousands of dollars in restitution obligations owed by SHAPIRO
arising from his criminal bank fraud and conspiracy convictions;
and (c) and hundreds of thousands of dollars of other personal
expenses including, for example, jewelry, automobiles, and
doctors' fees.   In addition, STITSKY received approximately
$55,400 from the Vail Account, and FOSTER received more than
approximately $36,000 from the Vail Account.

     26.   Notwithstanding language in the July PPM and the
December PPM that investor funds would only be used for the

11

benefit of Cobalt, MARK ALAN SHAPIRO, and IRVING STITSKY, the defendants, received loans and advances totaling more than approximately $136,000.  SHAPIRO also caused tens of thousands of dollars of personal expenses that he charged on Cobalt corporate credit cards to be paid for with investor funds.

## STATUTORY ALLEGATIONS

### The Conspiracy

27.  From at least in or about November 2003 to on or about March 27, 2006, in the Southern District of New York and elsewhere, MARK ALAN SHAPIRO, IRVING STITSKY, and WILLIAM B. FOSTER, the defendants, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely, (a) to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to commit mail fraud, in violation of Title 18, United States Code, Section 1341; and (c) to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

## The Objects of the Conspiracy

### Fraud In Connection With The Purchase Or Sale Of Securities

28.  It was a part and an object of the conspiracy that MARK ALAN SHAPIRO, IRVING STITSKY, and WILLIAM B. FOSTER, the

defendants, unlawfully, willfully, and knowingly, directly and
indirectly, by use of the means and instrumentalities of
interstate commerce, the mails, and the facilities of national
securities exchanges, would and did use and employ manipulative
and deceptive devices and contrivances in connection with the
purchase and sale of securities, in contravention of Title 17,
Code of Federal Regulations, Section 240.10b-5, by (a) employing
devices, schemes, and artifices to defraud; (b) making and
causing to be made untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engaging in acts, practices,
and courses of business which operated and would operate as a
fraud and deceit upon persons who purchased the CMFI-I Units, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff.

## **Mail Fraud**

29.  It was further a part and an object of the
conspiracy that MARK ALAN SHAPIRO, IRVING STITSKY, and WILLIAM B.
FOSTER, the defendants, unlawfully, willfully and knowingly,
having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, would
and did cause to be deposited any matter or thing whatever to be

13

sent and delivered by any private and commercial interstate carrier, and would and did take and receive therefrom, any such matter and thing, and knowingly would and did cause to be delivered by such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of Title 18, United States Code, Section 1341.

### Wire Fraud

30.  It was further a part and an object of the conspiracy that MARK ALAN SHAPIRO, IRVING STITSKY, and WILLIAM B. FOSTER, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Means And Methods Of The Conspiracy

31.  Among the means and methods by which MARK ALAN SHAPIRO, IRVING STITSKY, and WILLIAM B. FOSTER, the defendants, would and did carry out the conspiracy were the following:

14

a.    SHAPIRO and FOSTER caused bank accounts to be opened in the names of various Cobalt entities, which accounts were controlled by SHAPIRO and FOSTER.

b.    SHAPIRO, STITSKY and FOSTER established a telemarketing center in Great Neck, New York, from which they caused tens of thousands of telephone calls to be made to prospective Cobalt investors.

c.    SHAPIRO caused the Vail Mountain Trust to be established for his benefit, and caused a bank account in the name of Vail Mountain Trust to be opened, which account was controlled by SHAPIRO.

d.    SHAPIRO, STITSKY and FOSTER solicited funds from investors and caused funds to be solicited from investors by making false and misleading oral and written representations about the investment for which the investors' funds were solicited, including false representations about (i) the amount of fees to be taken by Cobalt entities from the investor funds; (ii) the uses of the fees taken by Cobalt entities from the investor funds; (iii) the real estate properties in which investor funds were to be invested; (iv) the historical performance of the Cobalt entities; and (v) the identities of the individuals controlling the Cobalt entities.

e.    SHAPIRO, STITSKY and FOSTER caused the money obtained from investors to be deposited into bank accounts in the

15

names of Cobalt entities, and further caused millions of dollars of those funds to be transferred to other accounts that they and others controlled for the benefit of SHAPIRO, STITSKY, FOSTER, and others.

f.   SHAPIRO, STITSKY and FOSTER used, and caused others to use, facilities of interstate and foreign commerce, including the mails and interstate wire transfers, in furtherance of the objects of the conspiracy.

### Overt Acts

32.   In furtherance of the conspiracy and to effect the illegal objects thereof, MARK ALAN SHAPIRO, IRVING STITSKY, and WILLIAM B. FOSTER, the defendants, and others, caused the following overt acts, among others, to be committed in the Southern District of New York and elsewhere:

a.   On or about January 19, 2005, a Cobalt Funding employee caused a letter to be sent by facsimile machine to a prospective investor (the "Victim") in New York, New York.

b.   On or about January 26, 2005, the Victim was induced by one and more Cobalt Funding employees to send a check in the amount of approximately $50,000 from New York, New York, to Cobalt Funding for an investment in CMFI-I.

c.   On or about February 9, 2005, FOSTER caused Cobalt marketing materials to be sent to the Victim in New York, New York.

16

d.   On or about March 22, 2005, SHAPIRO placed a telephone call from Massachusetts to an individual in New York, New York.

e.   On or about March 24, 2005, SHAPIRO and STITSKY attended a meeting of Cobalt Funding employees in East Norwich, New York.

f.   In or about July 2005, a Cobalt employee caused a check to be sent to the Victim in New York, New York.

g.   On or about September 26, 2005, Cobalt caused an advertisement designed to induce inquiries from prospective Cobalt investors to be published in the New York Times in New York, New York.

h.   On or about October 20, 2005, a Cobalt Funding employee caused Cobalt marketing materials including the December PPM to be sent to an address in New York, New York.

i.   In or about February or March 2006, a Cobalt employee caused a check to be sent from Cobalt in Springfield, Massachusetts, to the Victim in New York, New York.

(Title 18, United States Code, Section 371).

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

33.   The allegations contained in paragraphs 1 through 26 and 31 through 32 above are hereby repeated, realleged and

17

incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

34. From in or about November 2003 through on or about March 27, 2006, in the Southern District of New York and elsewhere, MARK ALAN SHAPIRO, IRVING STITSKY and WILLIAM B. FOSTER, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, as set forth above, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, namely purchasers of the CMFI-I Units.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

## FORFEITURE ALLEGATIONS

36.   As a result of committing one or more of the offenses charged in Counts One and Two of this Indictment, to wit, conspiracy to commit fraud in the sale of securities, mail fraud and wire fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 371, 1341, 1343 and 2 (Count One), and fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 (Count Two), MARK ALAN SHAPIRO, IRVING STITSKY and WILLIAM B. FOSTER, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the said offenses, including but not limited to the following:

a.   A sum of money equal to $16.3 million in United States currency, representing the proceeds obtained as a result of the charged conspiracy and securities fraud offenses alleged in this Indictment, for which the defendants are jointly and severally liable;

b.   All right, title and interest of MARK ALAN SHAPIRO, the defendant, in all that lot or parcel of land,

19

together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 518 Chimney Sweep Hill Road, Glastonbury, Connecticut; and

        c.   All right, title and interest of MARK ALAN SHAPIRO, IRVING STITSKY and WILLIAM B. FOSTER, the defendants, in any and all United States currency, funds or other monetary instruments credited to the following bank accounts:

| Account No. | Name in Which Account is Held | Financial Institution |
| --- | --- | --- |
| 9483623069 | Vail Mountain Trust | Bank of America |
| 9520214177 | FFT I Trust | Bank of America |
| 2000013072531 | Cobalt Financial, Inc. | Wachovia Bank |
| 2000012236970 | Cobalt Financial Inc. | Wachovia Bank |
| 2000013072887 | CMF Houston Acquisition, LLC | Wachovia Bank |
| 2000012237416 | Cobalt Capital Funding, LLC | Wachovia Bank |
| 2000022214092 | Cobalt Multfamily Investors I, LLC | Wachovia Bank |

### Substitute Asset Provision

       37.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.   cannot be located upon the exercise of due diligence;

20

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c)).

_____
FOREPERSON

_____
MICHAEL J. GARCIA

21