**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
**UNITED STATES OF AMERICA**

        -against-                                       S2 06 CR 357 (KMW)

**IRVING STITSKY,**

                        *Defendant*.

-------------------------------------------------------X

## SENTENCING MEMORANDUM

### Preliminary Statement

Irving Stitsky ("Stitsky" or "defendant") submits this sentencing memorandum to the Court in advance of his sentencing date scheduled for June 21, 2010. The Pre-Sentence Investigation Report ("PSR") calculated the advisory sentencing guidelines ("USSG") range at life and recommends the Court impose 85 years. By this memorandum, Stitsky objects to certain facts and calculations contained within the PSR, and ultimately asks the Court to impose a reasonable sentence of non-guidelines of 108 months pursuant to *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 US 85 (2007) and *United States v. Booker*, 543 US 220 (2005).

### Procedural History

On March 27, 2006 Stitsky with his two co-defendants were arrested pursuant to arrest warrants issued upon a complaint. On or about April 24, 2006, a grand jury returned a two-count indictment charging the three defendants with one count of conspiracy to commit securities fraud, mail fraud and wire fraud and one substantive count of securities fraud. After rejecting a plea offer and shortly before our scheduled trial of October 19, 2009, a grand jury

returned a superseding indictment on or about August 31, 2009 now charging one conspiracy count and four substantive counts. The superseding indictment now raised the statutory maximum from 25 years to 85 years due to the stacking of additional substantive counts.

Prior to trial in a *Pimental* letter dated September 25, 2009, the government set forth the Guidelines calculation for this case should Stitsky not proceed to trial. Exhibit A. As the trial was 3 weeks away at that juncture, the government did not believe a third point for acceptance of responsibility was warranted, and arrived at a guidelines calculation of 41. Jury selection began on November 2, 2009, and on November 23, 2009 Stitsky was convicted on all five counts. The PSR, while different in some of the enhancements, comes to the same total offense level of 43 as the government's *Pimental* letter equaling a life sentence without any reduction for acceptance. PSR at ¶¶ 75-89.

## **The Sentencing Guidelines**

Following *Booker*, district courts are no longer required to impose Guidelines-range sentences. Rather, "*Booker* rendered the Guidelines 'effectively advisory,' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir 2008)(quoting *Booker*, 543 U.S. at 245). Indeed, a sentencing court cannot even "presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors." *Cavera*, 550 F.3d at 189.

While the guidelines are only advisory, "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range." *Id.* Even following *Booker* and its progeny, the Guidelines should

still "provide the 'starting point and the initial benchmark' for sentencing." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596 (2007)).

However, in this case as in so many white-collar cases, it has become impossible for a sentencing court to use the Guidelines – strictly applied – as a meaningful "starting point" or "initial benchmark." *See United States v. Parris*, 573 F. Supp. 2d 744, 751 (EDNY 2008) (in white collar case with similar Guidelines calculation, holding that "it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance."). This is because the Guidelines flatly advise a sentence of "life" based almost entirely on the loss chart in Section 2B1.1(b)(1) and overlapping enhancements. In many white collar cases, as here, the Section 2B1.1(b)(1) enhancement so overwhelms all other guidelines factors that it renders the sentencing table irrelevant and forces sentencing courts to essentially "begin from scratch" in any sentencing proceeding where it applies. *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (stating, in white collar case, that where "the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a)"); *see also Parris*, 573 F. Supp. 2d at 751 ("My search for more relevant guidance, therefore, had to proceed in other directions, although I would have much preferred a sensible guidelines range to give me some semblance of real guidance.").

Therefore, Stitsky proposes the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Loss of more than $1,000,000 (§ 2B1.1(b)(1)(I) | +16 |
| 250 or more victims (§ 2B1.1(b)(2)(c)) | +6 |
| Adjusted Offense Level | 29 |

Offense level 29, Criminal History Category ("CHC") IV, provides a Guidelines sentencing range of 121-151 months. This is a sentencing range with a rational basis. It is a sentencing range firmly rooted in the Guidelines but not beholden to their strict application, in an instance where strict adherence would contravene any sense of fundamental fairness. We submit that such a sentence range harmonizes the spirit of the Guidelines with the goals of sentencing. However, based upon all the factors, we request the Court impose a sentence of 108 months. This is a reasonable and "sufficient sentence, not greater than necessary" to achieve the objectives codified under 3553(a).

## Loss

The amount of pecuniary loss attributed to the defendant, whether actual or intended, must be reasonably foreseeable. The Court is also required to make two particularized findings under the so-called *Studley* prongs: (1) the scope of the specific criminal activity to which the defendant agreed and (2) the relevant conduct on the part of the co-conspirator was foreseeable to the defendant. *United States v. Studley,* 47 F.3d 569 (2d Cir.1995). In *Studley,* the Second Circuit identified several principles and factors relevant to determining the scope of jointly undertaken criminal activity. Mere "knowledge of another participant's criminal acts" or "of the scope of the overall operation" will not make a defendant criminally responsible for his co-defendants' acts. *Id.* at 575. Also, it is more likely that an activity has been jointly undertaken if "the participants pool their profits and resources". *Id.*

Here, the evidence at trial clearly established several things relevant to this inquiry. First, Stitsky had no signatory authority over any of the money raised, and he had no authority to direct where monies were transferred. Second, as conceded by the government at trial, Stitsky had no knowledge that Shapiro had falsified the Vail Mountain Trust ("VMT") account. Gov't

summation Trial Transcript ("TT") p. 2184; see also, PSR ¶30. Third, Stitsky did not pool profits with his co-defendants. Government Exhibit 900 reflects that Stitsky gained only approximately $500,000 over the approximate 3-year time frame of Cobalt while Shapiro took several million dollars. This distinction clearly does not comport with the purported "40-40-20 split" (TT p. 2176) supposedly agreed to by the defendants as the government suggested at trial, and it further invalidates any notion that Stitsky was an actual "partner" in Cobalt. Although there was some evidence that Stitsky subjectively thought he was or may have been a partner, virtually every Cobalt employee who testified knew that was not objectively accurate or true as the leader of Cobalt Mark Shapiro made it abundantly clear to them. McPherson TT p.1096-7, Clark TT p. 1576, Ervolina 2108-9.

When these factors are coupled with the fact that even according to the government Cobalt had legitimate aspects to the business and had properties (Gov't opening TT p. 81), calculating loss based upon every dollar raised is not an accurate estimation of loss caused by the "offense". Some circuit and district courts have held that the loss estimations in securities fraud cases need to consider the loss that was actually caused by the fraud and parse out factors that did not. In *United States v. Ebbers*, 458 F3d 110 (2d Cir 2006), the Second Circuit acknowledged the complexities inherent in calculating the loss amount but emphasized that "[t]he loss must be the result of the fraud." Id. at 128. Many factors can contribute to the decline in share price between the time of the fraud and the revelation of the fraud. In such cases, "[l]osses from causes other than the fraud must be excluded from the loss calculation." Id. *See also United States v. Rutkoske*, 506 F3d 170 (2d Cir 2007).

"[W]e see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss

caused by a fraud is a critical determinant of the length of a defendant's sentence" *Rutkoske*, 506 F3d at 179. *Rutkoske* also relied on *United States v. Olis*, 429 F.3d 540 (5th Cir 2005) as well as *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) in making their ruling that loss causation principles in civil securities fraud cases have a place when estimating loss in a criminal case.

The Fifth Circuit in *Olis* stated that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines" and that the portion of a price decline caused by other factors must be excluded from the loss calculation. 429 F3d at 546; *see also, United States v. Zolp*, 479 F3d 715, 719 (9th Cir 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes.").

Although this is not a securities fraud case where publicly traded shares on a regulated national market being were manipulated, these cases hold that the Court must determine the loss caused by the actual fraud and separate other factors that were not part of the fraud that could have contributed to the loss. Here, there were properties purchased by Cobalt during a real estate boom in the United States. Also, the bank records introduced by the government show that a substantial portion of the money raised by Cobalt was used to pay for overhead and acquisitions. This combined with the concession by the government that Cobalt had legitimate parts to it means that all the money raised is not an accurate estimation of loss under *Rutkoske* and *Studley*.

Therefore, the more appropriate estimation of loss for Stitsky based on the evidence in this case comes from the excessive fees that were charged under the private placement. Agent Lauria provided this testimony (TT p. 1276):

```
7   Q. And so after that reduction, what is the total amount of
8   investor money that went to Cobalt Capital Partners LP?
9   A. $3,304,121.81.
10  Q. What percent of the investors monies did that amount to?
```

```
11  A.  20.64 percent.
12  Q.  That is assuming -- how much above 12 percent is that
13  number?
14  A.  It's excess is 8.64 percent.
15  Q.  And how much of investors money is that 8.64 percent.
16  A.  If you multiply the total investor funds of $16,002,168.09
17  by 8.64 percent, the excess comes to $1,382,587.32.
```

The government also highlighted this loss figure in their summation to the jury. TT p.2178. Accordingly, the guideline calculation should be enhanced 16 levels for more than $1,000,000 in loss pursuant to 2B1.1(b)(1)(I).

## Sophisticated Means

The Court should not impose a two-level adjustment for sophisticated means. Even under the theories advanced by the government at trial, there was nothing complex about the fraud. According to the government, Stitsky and his co-defendants omitted their criminal histories, lied about the operating history of Cobalt, lied about some of the properties they owned and took excessive fees all while they ran a "partially" legitimate business. That does not make the fraud complex. There was no evidence of hiding assets or transactions through the use of fictitious entities, corporate shells, or offshore financial accounts. In fact, Shapiro and Foster allowed two outsiders, McPherson and Garth, to see all the bank statements and see the flow of money. Accordingly, this Court should not impose an upward adjustment for sophisticated means. *See, United States v. Tin Yat Chin*, 371 F.3d 31, 41-2 (2d Cir 2004).

## Role

As the application note makes clear under § 3B1.1, a "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant. There are no other "participants" mentioned in the

PSR; there are no other "participants" mentioned at trial by the government. No cooperators or informants testified. Thus, there are only three participants. Also, based on the evidence established at trial, Stitsky was considered by some to be Shapiro's "puppet", logically meaning he could not be a leader or organizer. TT p. 2108-9. Thus, this enhancement should not be imposed.

### **Abuse of Trust**

This Court should not impose a two-level adjustment for abuse of trust because Stitsky did not hold a position of trust vis-à-vis the investors as that phrase is used in Guidelines § 3B1.3. *See United States v. Broderson*, 67 F.3d 452 (2d Cir 1995); *United States v. Caplinger*, 339 F.3d 226 (4th Cir. 2003); *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001). The mere fact that Stitsky held a position at Cobalt did not place him in a position of trust with regard to the investors, even the ones who testified that he spoke with them. ""§ 3B1.3's critical term -- "position of public or private trust" -- is "a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary."" *United States v. Garrison*, 133 F.3d 831, 839 n.18 (11th Cir. 1998) (internal quotation marks and citation omitted)." *Caplinger*, 339 F.3d at 237. There was no evidence or testimony that Stitsky was given any type of discretion as contemplated by this enhancement. "It is not sufficient that a defendant enjoyed a position of trust, and thus had an opportunity to commit a difficult-to-detect wrong. That would merely satisfy the first of the two prongs of § 3B1.3. Rather, (1) the defendant must have enjoyed a "superior" position, relative to other potential perpetrators, as a result of a trust relationship, *see United States v. Castagnet*, 936 F.2d 57, 62 (2d Cir. 1991); and (2) the defendant must have capitalized on that superior position in committing the offense conduct, see U.S.S.G. § 3B1.3, comment.(n. 1)."

8

*United States v. Nuzzo*, 385 F.3d 109, 115-6 (2d Cir. 2004). These facts are just not present. Accordingly, this Court should not impose an upward adjustment for abuse of trust.

**The Advisory Guidelines as Calculated, Provide for a
Fundamentally Unreasonable and Irrational Sentence.**

In the event the Court follows all or most of the PSR's enhancements, the Court should grant a variance. This type of variance from a strict application of the guidelines is supported by case law. "[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *Cavera,* 550 F.3d at 191 (citing *Kimbrough*, 128 S.Ct. at 574-75). This is especially true in cases where a district court disagrees with a Guidelines provision that was not "formulated based on special expertise, study, and national experience." *Cavera,* 550 F.3d at 192 n.9 (citing *Kimbrough*, 128 S.Ct. at 575).

While the guidelines may be intended to provide a sentencing range based on empirical research, not all do. District courts readily may vary from guidelines that do not exemplify the Commission's exercise of its characteristic institutional role as an expert agency tasked with promulgating empirically-based guidelines (see 28 U.S.C. §§ 991(b)(1)(C), 994(m, o). *Kimbrough,* 552 U.S. at 106-09; *Spears v. United States,* 129 S. Ct. 840, 843 (2009). Guidelines not supported by empirical data are entitled to less deference than are guidelines that exhibit the Sentencing Commission's "exercise of its characteristic institutional role." *Spears*, 129 S.Ct. at 843.

While in *Kimbrough* and *Spears*, the Supreme Court was discussing the guidelines for crack cocaine, the rationale of these decisions applies equally to other guidelines. For example, other courts have applied these decisions to the guidelines for child pornography,

9

U.S.S.G. §2G2.2, which have been amended 11 times since their promulgation. *See United States v. Dorvee*, 2010 U.S. App. LEXIS 9574, *26 (2d Cir. May 11, 2010)("Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography.")

The amendments largely resulted from Congressional directives, legislative fiats that required the Commission to modify the guideline per Congress' requirements. Such Congressional directives, while legally permissible, do not comport with the institutional role of the Commission as an expert sentencing agency tasked with developing empirically-based sentencing guidelines in consultation with penological and sociological experts. The resulting guidelines are suspect, if not irrational, in the sense that no sentence resulting from the utilization can possibly be consistent with the principle of parsimony and fairness. Sentences based on such guidelines are manifestly unreasonable.

As with the guidelines for drugs and child pornography, Section 2B1.1 is not the result of considered, data-driven U.S. Sentencing Commission penological expertise. In fact, U.S.S.G. §2B1.1 and its predecessor 2F1.1 have been amended 35 times since its first iteration in 1987, with the majority of amendments occurring since 2000. *See, e.g.,* USSG App. C. amends. 596 (amending §2B1.1 in response to directive in Pub. L. 105-318 and 105-172); 637 (amending §2B1.1 in response directive in to the "USA PATRIOT Act". Pub. L. 107-56); 647 (amending §2B1.1 in response to directive in the "Sarbanes-Oxley Act of 2002". Pub. L. 107-204); 653 (same); 654 (amending §2B1.1 in response to directive in the "Homeland Security Act of 200". Pub. L. 107-296); 655 (amending §2B1.1 in response to directive in *inter alia* the USA PATRIOT Act". Pub. L. 107-56); 665 (amending §2B1.1 in response to directive in the 'CAN-

SPAM Act". Pub. L. 108-187); (amending §2B1.1 in response to directive in the "PATRIOT Act". Pub. L. 108-21); 685 (amending §2B1.1 in response to directive in Pub. L. 108-29); (amending §2B1.1 in response to directive in *inter alia* the 'PATRIOT Reauthorization Act". Pub. L. 109-177). "As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors. See generally Kate Stith & Jose A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 69 (1998)" *Adelson*, 441 F.Supp 2d at 509.

To this end, the statistical comparison considered last year by Judge Block in *United States v. Parris* is instructive. 573 F. Supp. 2d at 752-54. The information collected in *Parris* showed 18 financial fraud cases dating back to 2001 where the estimated loss amount exceeded $50 million. In ten of those cases, the defendant received a sentence of less than 10 years. In the eight cases where the sentence was 10 years or greater, the defendant pleaded guilty. In those two cases, the sentences were 141 months (*United States v. Cotaggio*, E.D.N.Y. 2007, loss amount of $80 million) and 144 months (*United States v. Kumar*, E.D.N.Y. 2006, loss amount of $2.2 billion, recommended life sentence under the Guidelines).

The advisory guidelines applicable to this case as calculated in the PSR also provide for an unreasonable sentence because of the applicability of multiple overlapping adjustments. The Second Circuit has noted that multiple overlapping enhancements can justify a downward departure, particularly if they merely provide multiple ways of characterizing closely related aspects of the offense conduct. *United States v. Laursen*, 362 F.3d 160, 164-165 (2d Cir.), *cert. denied*, 541 U.S. 1044 (2004), *on rehearing vacated and remanded in light of Booker*, 543 U.S.

11

1097 (2005); *United States v. Jackson*, 346 F.3d 22, 26 (2nd Cir. 2003). Furthermore, "[w]hile one might theorize as to why the Sentencing Commission promulgated each of these additions, "the [Sentencing] Commission has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." Stith & Cabranes, supra, at 69. Here, their combined effect -- an added 20 points under the Government's approach -- ill-fits the situation of someone like Adelson. It represents, instead, the kind of "piling-on" of points for which the guidelines have frequently been criticized." *Adelson*, 441 F.Supp 2d at 510.

In this case, as in *Jackson* and *Adelson*, the multiple adjustments applicable to the fraud offense merely provide multiple ways of characterizing closely related aspects of a fraudulent scheme. The fraud of over $20,000,000 could not have been executed without numerous individuals at Cobalt assisting. Without a sales force, the amount of money could not have been raised and also there could not be more than 250 victims. The application of multiple, overlapping adjustments equaling 14 levels (not including loss) has resulted in the PSR calculating an advisory sentencing range of life imprisonment. Such a sentence would be manifestly unreasonable.

In sum, Section 2B1.1 as applied to this case results in a sentence that is manifestly unreasonable and grossly in excess of the Congressional mandate that a court has the duty to impose a sentence which is "sufficient but not greater than necessary", 18 U.S.C. § 3553(a) to fulfill the purposes of sentencing. *United States v. Booker*, 543 U.S. 220, 259-60 (2005). This Court should impose a sentence significantly below the advisory guidelines range contained in the PSR. Despite Stitsky's criminal history, he has a family that cares deeply about him, and need his emotional support as evidence by letters submitted. Exhibit B. He is 55 years old with

a family that cares and loves him where a 9 year jail sentence would achieve all the objectives under 3553(a). Stitsky would request 108 months in light of his prior history and sentences, the nature of the offense as well as all the other factors codified in 3553(a).

## **CONCLUSION**

For the reasons set forth above, we respectfully request that the Court impose a reasonable and principled sentence in this case, "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

Dated: New York, NY
       June 4, 2010

Respectfully submitted,

By:     /s/
Denis Patrick Kelleher, Esq. (DK-1414)
17 Battery Place 11th Floor
New York, NY 10004