UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                                   :

UNITED STATES OF AMERICA       :
                                   :
            - v.-           :   S1 06 Cr. 357 (KMW)
                                   :
                                   :
IRVING STITSKY,              :
                                   :
                                   :
              Defendant.     :
- - - - - - - - - - - - - - - - X

**GOVERNMENT'S SENTENCING MEMORANDUM**

 

**PREET BHARARA**
**United States Attorney for the**
**Southern District of New York**
**Attorney for the United States**
**     of America.**

**ALEXANDER J. WILLSCHER**
**MARC P. BERGER**
**Assistant United States Attorneys**
**    - Of Counsel -**

## TABLE OF CONTENTS

I.    Introduction  . . . . . . . . . . . . . . . . . . . . 1

II.   Relevant Facts  . . . . . . . . . . . . . . . . . . . 4

III.  Loss Amount  . . . . . . . . . . . . . . . . . . . . 9

      A.  Applicable Law  . . . . . . . . . . . . . . . . 10

      B.  Discussion  . . . . . . . . . . . . . . . . . . 12

IV.   Sophisticated Means  . . . . . . . . . . . . . . . . 17

      A.  Applicable Law  . . . . . . . . . . . . . . . . 17

      B.  Discussion  . . . . . . . . . . . . . . . . . . 19

V.    Organizer or Leader  . . . . . . . . . . . . . . . . 24

      A.  Applicable Law  . . . . . . . . . . . . . . . . 24

      B.  Discussion  . . . . . . . . . . . . . . . . . . 27

VI.   Abuse of Trust  . . . . . . . . . . . . . . . . . . 34

      A.  Applicable Law  . . . . . . . . . . . . . . . . 35

      B.  Discussion  . . . . . . . . . . . . . . . . . . 36

VII.  Stitsky's Motion For a Downward Departure
      Should Be Denied  . . . . . . . . . . . . . . . . . 38

VIII. Section 3553(a) Factors  . . . . . . . . . . . . . . 40

      A.  Nature and Circumstances of the Offense, History and
          Characteristics of the Defendant  . . . . . . . . . 40

          1.  Nature and Circumstances of the Offense  . . . 41

          2.  History and Characteristics of the Defendant . 42

          3.  Stitsky's Family Circumstances . . . . . . . . 43

      B.  Need to Protect the Public from Further Crimes of the
          Defendant and Afford Adequate Deterrence  . . . . . 46

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . 47

## TABLES OF AUTHORITIES

<u>Lauersen</u> v. <u>United States</u>, 543 U.S. 1097 (2005) . . .  18, 38, 39

<u>United States</u> v. <u>Allen</u>, 87 F.3d 1224 (11th Cir. 1996). . . . . 43

<u>United States</u> v. <u>Allen</u>, 201 F.3d 163, 166 (2d Cir. 2000) . . 35

<u>United States</u> v. <u>Barrett</u>, 178 F.3d 643 (2d Cir. 1999) .35, 36, 38

<u>United States</u> v. <u>Bennett</u>, 252 F.3d 559 (2d Cir. 2001) . . . . 25

<u>United States</u> v. <u>Birkin,</u> 366 F.3d 95 (2d Cir. 2004) . . . . . 26

<u>United States</u> v. <u>Blount</u>, 291 F.3d 201 (2d Cir. 2002) . . . . 26

<u>United States</u> v. <u>Burse</u>, 531 F.2d 1151 (2d Cir. 1976) . . 23, 24

<u>United States</u> v. <u>Bryant</u>, 128 F.3d 74 (2d Cir. 1997) . . . . 12

<u>United States</u> v. <u>Byors</u>, 586 F.3d 222

        (2d Cir. 2009) . . . . . . . . . . . . . . 10, 14, 15, 16

<u>United States</u> v. <u>Carrozzella</u>, 105 F.3d 796

        (2d Cir. 1997) . . . . . . . . . . . . . 25, 26, 33, 34

<u>United States</u> v. <u>Cornielle</u>, 171 F.3d 748 (2d Cir. 1999) . . . 42

<u>United States</u> v. <u>Ebbers</u>, 458 F.3d 110 (2d Cir. 2006) . . . . 13

<u>United States</u> v. <u>Evano</u>, 553 F.3d 109 (1st Cir. 2009) . . . . 18

<u>United States</u> v. <u>Faria</u>, 161 F.3d 761 (2d Cir. 1998) . . . . . 42

<u>United States</u> v. <u>Finck</u>, 407 F.3d 908 (8th Cir. 2005) . . . . 18

<u>United States</u> v. <u>Garcia</u>, 413 F.3d 201 (2d Cir. 2005) . . . . 12

<u>United States</u> v. <u>Goff</u>, 20 F.3d 918, 921 (8th Cir. 1994) . . . 43

<u>United States</u> v. <u>Greenfield</u>, 44 F.3d 1141

        (2d Cir. 1995) . . . . . . . . . . . . . . . 11, 26, 27

<u>United States</u> v. <u>Guang</u>, 511 F.3d 110 (2d Cir. 2007) . . . . . 12

<u>United States</u> v. <u>Jackson</u>, 346 F.3d 22

(2d Cir. 2003) . . . . . . . . . . . 18, 19, 20, 38, 39

United States v. Lauersen, 348 F.3d 329 (2d Cir. 2003) . . . 38

United States v. Lauersen, 362 F.3d 160 (2d Cir. 2004) . . . 38

United States v. Lauersen, 363 F.3d 160 (2d Cir. 2004) . . . . 3

United States v. Leonard, 529 F.3d 83 (2d Cir. 2008) . . . . 14

United States v. Lewis, 93 F.3d 1075 (2d Cir. 1996)   18, 19, 20

United States v. Madrigal, 331 F.3d 258 (2d Cir. 2003) . . . 43

United States v. Manas, 272 F.3d 159 (2d Cir. 2001) . 25, 26, 32

United States v. Martinez-Rios, 143 F.3d 662 (2d Cir. 1998) . 12

United States v. Nolan, 136 F.3d 265 (2d Cir. 1998) . . . . 25

United States v. Paccione, 202 F.3d 622

(2d Cir. 2000) . . . . . . . . . . . . . . 25, 26, 29

United States v. Regensberg, Docket 09-2704,

(2d Cir. June 18, 2010)(Summary Order) . . . . . . . . 20

United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007) . 12, 13

United States v. Rybicki, 96 F.3d 754, 759 (4th Cir. 1996) . 43

United States v. Rushby, 936 F.2d 41, 42-43 (1st Cir. 1991) . 43

United States v. Schiller, 264 Fed. Appx. 44 (2d Cir. 2008)   37

United States v. Sprei, 145 F.3d 528, 535 (2d Cir. 1998) . . 42

United States v. Studley, 47 F.3d 569 (2d Cir. 1995) . . . . 16

United States v. Wayland, 549 F.3d 526 (7th Cir. 2008) . . . 18

United States v. Wright, 160 F.3d 905 (2d Cir. 1998) . . . . 36

United States v. Zichettello, 208 F.3d 72 (2d Cir. 2000). .26,.32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
                                  :
UNITED STATES OF AMERICA          :
                                  :
            - v.-                 :    S1 06 Cr. 357 (KMW)
                                  :
                                  :
IRVING STITSKY,                   :
                                  :
            Defendant.            :
                                  :
- - - - - - - - - - - - - - - - - X


        The Government respectfully submits this memorandum in
response to defendant Irving Stitsky's sentencing memorandum of
June 5, 2010 (cited herein as "Br."). Stitsky's sentencing is
scheduled for June 30, 2010, at 11:00 a.m.

**I.      Introduction**

        Irving Stitsky and co-defendants Mark Alan Shapiro and
William Foster were charged by a Grand Jury in a Superseding
Indictment (the "Indictment") in five counts. Count One charged
the defendants with participating in a conspiracy to commit
securities fraud, mail fraud, and wire fraud. Specifically, the
Indictment charged that the defendants agreed to defraud
investors through the sale of "Units" that the Cobalt Capital
Companies offered for sale. Counts Two and Three of the
Indictment charged each defendant with committing securities
fraud. Specifically, Count Two charged that each defendant

1

engaged in a scheme to defraud investors in connection with the purchase of Units of Cobalt Capital Partners I, LLC, or "CCP-LLC Units".  Count Three charged that each defendant engaged in a scheme to defraud investors in connection with the purchase of Units of Cobalt Multifamily Investors I, LLC, or "CMFI Units". Counts Four charged each defendant with committing wire fraud. Counts Five charged each defendant with committing mail fraud.

A jury trial was held from November 2 through November 23, 2009.  After less than two hours of deliberations, the jury convicted each of the defendants of all counts in the Indictment. (Trial Transcript ("Tr.") 2424-25).

In his brief, Stitsky objects to the offense level computation in the Presentence Report ("PSR"), contending that the United States Probation Office ("Probation") improperly enhanced his offense level by: (1) calculating the loss amount attributable to Stitsky's role in the scheme as between $20 million and $50 million, pursuant to § 2B1.1(b)(1)(L) of the United States Sentencing Guidelines (the "Sentencing Guidelines" or "U.S.S.G."); (2) imposing a two-level upward adjustment, pursuant to U.S.S.G. § 2B1.1(b)(9)(c), because his fraudulent scheme involved the use of sophisticated means; (3) imposing a four-level upward adjustment, pursuant to U.S.S.G. § 3B1.1(a), because Stitsky was an organizer or leader of a criminal activity that involved five or more participants or was otherwise

2

extensive; and (4) imposing a two-level upward adjustment, pursuant to U.S.S.G. § 3B1.3, because Stitsky abused a position of private trust.[1]  Additionally, Stitsky urges the Court to exercise its discretion to grant a "cumulative effects" downward departure, pursuant to the Second Court's decision in United States v. Lauersen, 363 F.3d 160 (2d Cir. 2004).

        For the reasons stated below, the Government respectfully submits that the Court should adopt Probation's findings with regard to loss amount, the use of sophisticated means, Stitsky's leadership role in the offense, and abuse of trust.  Accordingly, the Government respectfully submits that under the Sentencing Guidelines, the adjusted offense level is 43 and Stitsky's criminal history category is IV, resulting in a Guidelines range of life imprisonment.[2]  Stitsky's profound greed, his striking

---

[1]    Stitsky concedes that the PSR properly increased his offense level by six levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(C), because his offenses involved 250 or more victims.  (Br. 3).

[2]    Indeed, the PSR's Guidelines computation is conservative. Although it is probably warranted, the Government is not seeking an enhancement, pursuant to U.S.S.G. § 3C1.1, on the ground that Stitsky obstructed justice.  On March 29, 2006, two days after his arrest in connection with this case, Stitsky deleted all of the files on his Cobalt work email account for the dates between December 1, 2005 (the day the FBI searched Cobalt's offices) and March 29, 2006.  Stitsky's destruction of email was designed to frustrate the Government's investigation.

    In addition, as the Court recalls, when Anne Ervolina was initially contacted by the FBI for an interview, Stitsky instructed Ervolina not to speak with the FBI.  (Tr. 1230).  When Ervolina indicated that she intended to meet with the FBI, Stitsky said "don't tell them that I'm a partner here."  (Tr.

history of recidivism, and his callous indifference to the harm
he has wrought upon his victims all weigh in favor of a sentence
of a significant term of imprisonment that will ensure the
financial safety of the community and accomplish the other
factors set forth in Title 18 United States Code, Section
3553(a).

## II.   Relevant Facts

The Government's evidence at trial consisted of several
categories of proof that overwhelmingly demonstrated a concerted
effort among the defendants to defraud investors who purchased
"Units" in the Cobalt's private offerings.  The same scheme to
defraud formed the basis of the securities fraud, wire fraud,
mail fraud, and conspiracy charges for which each defendant was
found guilty beyond a reasonable doubt.

First, Cobalt employees uniformly described how Shapiro
and Stitsky ran Cobalt and made the critical business decisions
in Cobalt's Massachusetts, New York, and Florida offices,
notwithstanding the fact that the defendants disclosed only
Foster as a member of Cobalt's "Senior Management" in the
offering materials that were sent to Cobalt investors.  (GXs 1-
3).  The defendants did this in order to avoid disclosing the
prior criminal convictions of Shapiro and Stitsky.  In addition,
Cobalt's in-house accountants, Steven Garth and Kimberly

---

1230).

McPherson, described how Shapiro abused the company credit cards by purchasing personal items; how Shapiro and Stitsky "borrowed" large sums of investor money from Cobalt entities contrary to the terms of the Private Placement Memorandum ("PPM"); and how Foster and Shapiro were put on notice as early as the summer of 2005 that they were taking management fees far in excess of what was allowed under the terms of the PPMs. (Tr. 1012-18, 1028-30, 1354-72, 1376-78). Steven Garth testified, however, that neither Foster nor Shapiro did anything to remedy this theft when they were initially told. (Tr. 1365-66). In fact, Shapiro threatened to fire Garth from the company if he did not continue to allocate the excess fees in this way. (Tr. 1371-72).

Second, investors who lost money as a result of the defendants' scheme testified about the defendants' misrepresentations. For example, Shapiro falsely told victim-investor June Miller that he owned and had developed the Mercury Hotel and that other properties Cobalt presently owned, such as the Simone Hotel, would look like the Mercury after Cobalt had completed renovations. (Tr. 701-02). Stitsky falsely told Patricia Zebrowski that Cobalt owned the Simone Hotel and that Zebrowski's investment would generate returns over the course of many years by virtue of the profits generated from the "front-desk" at the Simone. (Tr. 903-17). Aimar Dontenville testified that after he sent Foster a letter threatening to report the

defendants' conduct to legal authorities, he was quickly repaid
his money. (Tr. 972-75). An email from Foster attaching a
settlement agreement with Dontenville further showed that Foster
directed that the situation be resolved immediately. (GX 1228).
These investors, among many others who testified at trial,
provide examples of steps that the defendants took in furtherance
of the scheme to defraud.

Third, emails and documents seized during the searches of
the Cobalt offices provided powerful evidence of the defendants'
participation in the scheme. Foster's computer, for example,
contained documents demonstrating how the equity of certain
Cobalt entities was shared between Shapiro (40%), Stitsky (40%),
and Foster (20%).[3] (GXs 113, 2119). This information, as the
documents demonstrated Foster well knew, was contrary to the
facts that the defendants reported to an outside law firm,
Certilman Balin, for the purpose of securing an opinion letter
regarding the scope and legality of Stitsky's employment at
Cobalt. (GXs 119-A, 119-B, 2247). Foster's computer also
contained financial statements that falsely claimed that Vail

---

[3]     The Government objects to Probation's modification to the
PSR, at Stitsky's insistence, at paragraphs 26 and 130 to
"reflect that the defendant was not an equity partner in Cobalt."
(PSR p. 29). The Government's evidence, including emails in
which Stitsky is described as a "partner" and spreadsheets where
Stitsky is allocated a 40% equity partnership share, as well as
the jury's verdict, repudiated this defense argument. (GXs 113,
430-A, 2119, 2220).

Mountain Trust held roughly $3 million in liquid assets. (GXs 2304-05). The defendants used these documents to convince lenders to loan money to Cobalt and individuals to invest in Cobalt. Stitsky's computer contained emails between himself and his co-defendants discussing Stitsky's equity partnership in Cobalt (GX 430-A); an email in which Stitsky directed his son to falsify his professional biography for purposes of Cobalt's marketing materials (GX 2120); a PowerPoint presentation that Stitsky sent to Cobalt's Florida office, which contained a fraudulent chart purporting to show Cobalt's impressive prior track record (GX 431); and an email forwarding a script, filled with material misrepresentations, that Cobalt fund-raisers were to read to potential investors (GX 2125). Documents from Shapiro's office, his computer, and the United States Probation Department demonstrated how Shapiro used Vail Mountain Trust to deceive others for Cobalt's benefit; how he lied to his Probation Officer as part of the scheme to defraud; and how greed motivated his fraud. (GX 2102, GX 127-B, GXs 1533-36).

Fourth, bank records, Cobalt's own internal accounting records, and summary financial analysis showed that Foster, Shapiro, and Stitsky, took a larger percentage of investor funds than the 12% that was permitted by the terms of the PPM. (GXs 702-20, 755, 900-02, 903-26, 928-37). Charts showed how, at the direction of Foster and Shapiro, this excess investor money was

transferred into personal trusts of the defendants, or, in other cases, how the money was used to pay for certain luxury items on behalf of the defendants.  (GXs 900-02, 903-26, 928-37).  The Government also demonstrated how Shapiro and Foster fraudulently generated "loan guarantee" fees for themselves, often backed by the fictitious assets of Vail Mountain Trust, to reduce amounts they personally "borrowed" from Cobalt entities.  (Tr. 1378-86).

Finally, additional evidence submitted for the jury's consideration made it clear that the defendants made and caused to be made false representations in marketing materials and letters to Cobalt's investors.  For example, on Cobalt's "Affiliated Professionals" insert, Cobalt misrepresented the entities with which it conducted business.  (GX 110, GX 1300-F, GX 2200).  The marketing materials falsely claimed Shapiro received degrees from Harvard University and the University of Miami.  (GX 3, GX 1900).  And, testimony from individuals who owned and managed the Mercury Hotel and the Simone Hotel clearly established that at no time did Cobalt have an interest in the Mercury and that Cobalt did not own the Simone Hotel notwithstanding the representations that Shapiro, Stitsky, and Foster made to investors either orally or through Cobalt marketing materials.  (Tr. 674-87, 962-67, 1617-27; GX 431, GX 2100).  A representative from Fidelity Investments testified that documents that appeared to reflect that Vail Mountain Trust had

over $3 million in liquid assets were actually forgeries and were entirely false. (GX 127A, 127B, 323A; Tr. 872-84). Finally, Phillip Chapman, Cobalt's outside legal counsel, testified that: (i) the defendants issued the July 2004 PPM without Chapman's knowledge or approval (Tr. 2065-69); (ii) in approving the December 2003 PPM, Chapman relied upon false representations made by Foster and Shapiro about Shapiro's limited role at Cobalt (Tr. 2084-86); and (iii) in approving the December 2004 PPM, Chapman relied upon false representations made by Foster and Shapiro about Stitsky's limited role at Cobalt (Tr. 2077-78).

## III. The Loss Amount Attributable to Stitsky's Scheme Was Between $20 Million and $50 Million

As the appendix to the PSR demonstrates, Cobalt's victims lost approximately $23,152,235 based on the defendants' misrepresentations.[4] Following the defendants' arrests, a court-appointed receiver recovered for investors approximately $1,322,161 (comprised of $1,167,232 in cash and a securities account valued at $154,929). (Ex. A, p.2). In addition, the United States Attorney's Office seized approximately $457,110. (Ex. A, p.1). Offsetting the total amount recovered and seized ($1,779,271) from the total net loss to victims ($23,152,235),

---

[4]     The dollar amounts contained in the PSR already have been reduced by any payments that respective victims received back from Cobalt prior to the defendants' arrests, whether it be for interest payments, a refund, or something else. The loss amount stated, therefore, is a total net loss.

yields a loss amount of $21,372,964.  This loss amount –
$21,372,964 – is the appropriate loss in this case.

Stitsky contends that this loss amount is erroneous for
two reasons.  First, he argues that the figure does not account
for the fact that the defendants spent a portion of investors'
money on the "legitimate" aspects Cobalt's business.  (Br. 5-6).
Second, he claims that the total losses from the scheme were not
reasonably foreseeable to him.  (Br. 4).  Stitsky is incorrect.

The loss amount should not be reduced by "legitimate"
expenses because those expenses ultimately "conferred nothing of
value and no benefit on [Cobalt's] victims."  <u>United States</u> v.
<u>Byors</u>, 586 F.3d 222, 226 (2d Cir. 2009).  Moreover, the total
losses from the scheme were reasonably foreseeable to Stitsky,
who played a central role from the inception of the scheme,
including by concealing his involvement in Cobalt because he knew
that people would not invest if they knew the truth about who was
running the company.

### A.  <u>Applicable Law</u>

For Guidelines purposes, "actual loss" refers to the
reasonably foreseeable pecuniary harm that resulted from the
offense.  U.S.S.G. § 2B1.1, comment. (n.3(A)).  Under "relevant
conduct" principles, the amount of loss attributable to a
particular defendant is determined under Guidelines Section
1B1.3(a), and includes the loss from:

10

(1) (A) all acts and omissions committed,
aided, abetted, counseled, commanded, induced,
procured, or willfully caused by the defendant;
    and
(B) in the case of a jointly undertaken
criminal activity (a criminal plan, scheme,
endeavor, or enterprise undertaken by the
defendant in concert with others, whether or
not charged as a conspiracy), all reasonably
foreseeable acts and omissions of others in
furtherance of the jointly undertaken criminal
activity, that occurred during the commission
of the offense of conviction, in preparation
for that offense, or in the course of
attempting to avoid detection or responsibility
for that offense.

U.S.S.G. § 1B1.3, comment. (n.2); see also United States v.

Greenfield, 44 F.3d 1141, 1149 (2d Cir. 1995) (concluding that,

under U.S.S.G. § 1B1.3(a)(1)(B), a co-conspirator shall be held

accountable at "sentencing for 'all reasonably foreseeable acts

and omissions of others in furtherance of the jointly undertaken

criminal activity'").

Thus, in the case of jointly undertaken misconduct, the

Guidelines direct a district court to make two specific

inquiries: first, to "determine the . . . scope of the specific

conduct and objectives embraced by the defendant's agreement,"

and second, to determine whether the conduct of others was "both

in furtherance of, and reasonably foreseeable in connection with,

the criminal activity jointly undertaken by the defendant."

U.S.S.G. § 1B1.3, comment. (n.2).  A defendant who contends that

he should not be held responsible for the "entire range of

misconduct attributable to the conspiracy," bears the burden of

11

demonstrating "lack of knowledge and lack of foreseeability."
United States v. Martinez-Rios, 143 F.3d 662, 677 (2d Cir. 1998).
Once a defendant's relevant conduct is determined, the court must
then make a "reasonable estimate" of the loss amount for the
defendant's offense.  See U.S.S.G. § 2B1.1, comment. (n.3(C)).
United States v. Bryant, 128 F.3d 74, 75-76 (2d Cir. 1997) (the
"Guidelines do not require that the sentencing court calculate
the amount of loss with certainty or precision.").

    **B.  Discussion**

        **1.  The Defendants' Fraud Was the Proximate Cause of
the Victims' Loss of Approximately $21,372,964**

Stitsky argues that the Second Circuit's decision in
United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007), holds
that "the Court must determine the loss caused by the actual
fraud and separate other factors that were not part of the fraud
that could have contributed to the loss." (Br. 6).  Stitsky
reads Rutkoske as supporting his position that the victims' total
loss is not an accurate measure of loss because other factors
(such as legitimate business expenses or shifting real estate
prices) were the proximate cause of Cobalt's assets falling
nearly to zero by the time of the defendants' arrest.  Stitsky is
wrong.

Rutkoske involved a market manipulation scheme.  In
calculating loss, the district court used the difference between
purchase price and value on the "last date for which the parties

12

had 'blue sheets,' reporting forms for market makers.  That date
had no particular relevance to the offense conduct, and in fact
was three months after the end of the charged conspiracy."
Rutkoske, 506 F.3d at 178.  Citing United States v. Ebbers, 458
F.3d 110 (2d Cir. 2006), the Second Circuit concluded that this
method of calculation was improper because "[m]any factors may
cause a decline in share price between the time of the fraud and
the revelation of the fraud."  Rutkoske, 506 F.3d at 179.  The
Circuit then remanded the case because of the district court's
"basic failure at least to approximate the amount of the loss
caused by the fraud without even considering other factors
relevant to a decline in . . . share price. . . ."  Id. at
179-80.  Thus, the Circuit directed the sentencing court to
determine the extent to which Rutkoske's misrepresentations
inflated the price of the stock - a security in which they were
making a market - and, thus, the extent to which they proximately
caused the stock price to decline.

Rutkoske is inapposite to this case.  Unlike in Rutkoske,
Stitsky was not involved in a market manipulation scheme.
Instead, Stitsky was involved in an investment fraud scheme in
which he directly solicited, and therefore proximately caused,
investors to invest over $20 million in Cobalt by lying to
investors about Cobalt's leadership, its track record, and the
properties that Cobalt owned.  All the while, Stitsky knew that

Cobalt's victims would not have invested if they knew the truth.[5]
See generally United States v. Leonard, 529 F.3d 83, 93 (2d Cir.
2008) (deferring to the district court's determination that the
victims "would not have purchased the investment had they known"
the truth about the investment, but holding that the loss does
not equal the entire purchase price of the investment if the
assets had some value greater than zero).

Far more analogous to this case is the Second Circuit's
decision in United States v. Byors, 586 F.3d 222, 226 (2d Cir.
2009).  In Byors, the defendant raised capital for his marble
business by misrepresenting to investors the value of the assets
securing their loans; the number of customer orders for his
product; his ownership of an important patent; the return the
investors would realize on their investment; and the fact that he
was using a substantial amount of the investment money for his
own personal use.  Byors, 586 F.3d at 224.  The district court
determined the loss amount by offsetting from the amount victims
invested any amounts that had been repaid to the victims.  On
appeal, the defendant argued that the district court erred by not
further offsetting the loss by the amount of money he used for

---

[5]     Stitsky lied to Stanley Gruber by saying that Stitsky's name
was not in the PPM because Stitsky "didn't care about titles."
(Tr. 739).  Several victims testified that they would not have
invested in Cobalt had they known Stitsky's criminal past.  (Tr.
920 (Patricia Zebrowski: "I would have never met with him."), Tr.
1147-48 (Arlene Goodman: "We would not have invested."), Tr. 978
(Aimar Dontenville: "Absolutely not").

14

legitimate business expenditures, which he maintained should be treated as "services rendered" to the victims, under Application Note (3)(E).  <u>Id</u>. at 226.

The Second Circuit rejected the defendant's argument, stating that the "Guidelines do not require a loss to be offset by any legitimate expenditures," but rather "by 'value' that has been conferred on victims in the form of money or property returned or services rendered."  <u>Id</u>. at 226.  In Byors' case, his "expenditures, legitimate or not, conferred nothing of value and no benefit on his victims, . . .  He rendered no 'services' to them and failed to deliver any return on their 'investment.'" <u>Id</u>. at 226.  The Court further rejected the defendant's argument that the loss should be offset by the amount of the thing of value that he provided to investors, namely, the amount of money that he spent for the purpose that he had promised investors. <u>Id</u>.  The Court explained that such an offset would be meaningless since the "defendant's victims were left with nothing of value when the fraud was uncovered."  <u>Id</u>.

Similarly, in this case, there is no basis to offset the victims' losses by Cobalt's "legitimate" expenses, such as down payments on properties, employee salaries, or attorneys fees, because those expenses ultimately "conferred nothing of value and no benefit" on Cobalt's victims beyond what the Receiver and the Government have secured for them.  <u>Id</u>.  Accordingly, loss is

15

properly calculated simply by offsetting from the amount victims invested the amount that they ultimately received back from Cobalt.

### 2. The Victims' Loss of Approximately $21,372,964 Was Reasonably Foreseeable to Stitsky

Citing <u>United States</u> v. <u>Studley</u>, 47 F.3d 569 (2d Cir. 1995), Stitsky also argues that the full extent of the victims' loss was not reasonably foreseeable to him. Unlike in <u>Studley</u>, which involved a telemarketing conspiracy in which the defendant had little knowledge of or participation in the fraudulent activities of his co-conspirators, the evidence in the instant case demonstrates that Stitsky worked hand-in-hand with Shapiro and Foster in executing the fraudulent scheme. After all, the essence of the scheme was the raising of money by telling lies about themselves. Stitsky was involved from the start in planning the Cobalt business scheme. (GX 1911, GX 2302). Throughout its operation, he lied to investors and outside counsel about his role in the company, about the company's track record, and about the properties that Cobalt owned. Stitsky was also fully aware of how successful Cobalt was in raising money based on these misrepresentations, since he personally oversaw Cobalt's fundraising arm. Moreover, Stitsky received updates from Foster as to how the spoils of the scheme were being divided amongst the three defendants. (GX 2119). Because Stitsky was fully aware of the most pertinent aspects of the charged fraud, a

16

<u>Studley</u> departure is inappropriate.

**IV.   The Defendant's Scheme Involved the Use of Sophisticated Means**

Stitsky argues that Probation erred in applying the two-level "sophisticated means" enhancement, U.S.S.G. § 2B1.1(b)(9), on the ground that the conspirators' conduct in the fraud scheme was not sophisticated.  (Br. 7).  Stitsky is wrong.

**A.  <u>Applicable Law</u>**

U.S.S.G. § 2B1.1(b)(9)(C) provides for a two-level enhancement of a defendant's offense level if "the offense otherwise involved sophisticated means."  The Application Note to the Guideline explains that "sophisticated means" applies to conduct that is "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and provides examples such as the hiding of assets or transactions through the use of fictitious entities, corporate shells, or offshore bank accounts.  <u>See</u> U.S.S.G. § 2B1.1(b)(9)(C), cmt. n. 8.

Where, as here, a defendant's scheme involved various steps, the enhancement may apply "even if each step in the scheme was not elaborate."  <u>United States</u> v. <u>Jackson</u>, 346 F.3d 22, 25 (2d Cir. 2003), <u>vacated on other grounds sub nom</u>. <u>Lauersen</u> v. <u>United States</u>, 543 U.S. 1097 (2005).  In other words, "[r]epetitive or coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme."  <u>United</u>

17

States v. Finck, 407 F.3d 908, 915 (8th Cir. 2005); see also
United States v. Jackson, 346 F.3d at 25 (upholding enhancement
where "the total scheme was sophisticated in the way all the
steps were linked together so that [defendant] could perceive and
exploit different vulnerabilities in different systems in a
coordinated way"); United States v. Evano, 553 F.3d 109, 113 (1st
Cir. 2009) ("The scheme may be sophisticated even if the
individual elements taken alone are not."); United States v.
Wayland, 549 F.3d 526, 529 (7th Cir. 2008) ("Even if
[defendant's] individual actions could be characterized as
unsophisticated, we would follow the approach of our sister
circuits and affirm [defendant's] sentence on the ground that his
overall scheme, which lasted nine years and involved a series of
coordinated fraudulent transactions, was complex and
sophisticated."); United States v. Lewis, 93 F.3d 1075, 1083 (2d
Cir. 1996) (holding, in tax case, that sophisticated means
enhancement applied even when "each step in the planned tax
evasion was simple, [because] when viewed together, the steps
comprised a plan more complex than merely filling out a false tax
return").

   **B.  Discussion**

        The scheme here was at least as complex as others in which
courts in this Circuit and elsewhere have held the enhancement to
apply.  For example, in Jackson the defendant's scheme, which

18

lasted for less than one year, involved a defendant who targeted
wealthy individuals, obtained personal information about his
targets, and thereafter made expensive purchases over the
internet using that personal information.  <u>Jackson</u>, 346 F.3d at
24-25.  To perpetrate that scheme, the defendant: used the
internet to identify his targets and then purchase certain
personal information, impersonated his targets over the phone
(using pre-paid phone cards to prevent tracking) and contacted
credit card companies to manipulate credit lines or change
certain personal information, e.g., he changed the shipping
address to hotels, and ordered merchandise to be sent to the
hotels where he would pose as the recipient to retrieve his
merchandise.

In <u>United States</u> v. <u>Lewis</u>, 93 F.3d 1075 (2d Cir. 1996), a
tax fraud case, the defendant drew checks on his personal bank
accounts payable to various individuals and entities.  <u>Id.</u> at
1077.  The defendant then deposited these checks into bank
accounts that he opened in the names of the sham entities,
creating the false impression that payments were made to actual
businesses and charities.  <u>Id.</u>  Finally, the money was
transferred from the sham accounts to another set of bank
accounts, from which the money was used for the defendant's
personal expenses.  <u>Id.</u>  Lewis improperly claimed tax deductions
on much of this money.  <u>Id.</u>  In upholding the application of the

sophisticated means enhancement, the Lewis court found that
"there was a three-step scenario that used numerous fictitious
entities and multiple checks . . . ." Id. at 1082.  The Court
noted that the "evasion strategy," which lasted for eight years,
"required as much planning as was involved in some cases deemed
sophisticated."  The Court reasoned:

> the repetitive conduct here is relevant because
> it demonstrates that more than routine planning
> was involved.  By writing so many checks to so
> many different entities, Lewis' actions lent a
> quality of authenticity and a higher level of
> intricacy to the plan than if he had only
> written a few large checks each year to a
> single entity.

Id. at 1083.  See also United States v. Regensberg, Docket 09-
2704 (2d Cir. June 18, 2010)(Summary Order)(upholding an
enhancement for sophisticated means).

     Here, the scope and breadth of the scheme of Stitsky and
his co-conspirators, which lasted for several years, demonstrates
more than routine planning and a careful effort on multiple
fronts to conceal their fraud, by lying to business partners
(such as Kevin Tierney), to their lawyers (such as Phil Chapman
and Martin Unger), and to their investors.  See, e.g., Jackson,
346 F.3d at 25 (noting that the application note for
sophisticated means describes offense conduct "pertaining to the
execution or concealment of an offense.") (emphasis in original).
Stitsky contends that the enhancement is not applicable, among
other reasons, because the scheme did not make use of fictitious

corporate shell companies.  (Br. 7).  The scheme, however, did make use of a fictitious corporate officer -- Foster -- whom the evidence at trial demonstrated was recruited by Shapiro and Stitsky to serve as a front man for Cobalt so that investors would not learn about the truth about Stitsky and Shapiro's criminal pasts and their leadership role at Cobalt.  Without the use of Foster as a fictional corporate officer, the defendants' scheme would have failed from the start.

Another crucial aspect of the scheme involved duping the company's attorneys (both inside and outside counsel) into approving marketing materials for Cobalt that contained material misrepresentations.  For example, the defendants issued the July 2004 PPM, which claimed to investors that it had been approved by outside attorneys Phil Chapman and Alan Kornstein.  (GX 2).  In fact, neither Chapman nor Kornstein had approved the issuance of that PPM or even knew that it was being issued.  (Tr. 2066-67).  Likewise, Stitsky and his co-defendants sent a letter to outside counsel Martin Unger that falsely minimized the scope of Stitsky's role at Cobalt.  (GX 2247).  It was only based on this false information that Cobalt's attorneys approved the disclosures that Cobalt made with respect to Stitsky and Shapiro.  (Tr. 2077-78).

Another critical facet of the scheme involved creating and disseminating marketing publications to investors that contained

material misrepresentations.  (GXs 5, 431, 475-A, 475-B, 475-C, 481).  These materials included, for example, a PowerPoint presentation and a call script that Stitsky circulated to Cobalt's sales force, which contained misrepresentations about how long Cobalt had been in existence, its past track record of success, and the properties that Cobalt owned.  (GXs 431, 2125). Likewise, Stitsky sent emails to his sales force, meant for dissemination to investors, containing false representations about the properties that Cobalt owned.  (GXs 2100, 2203).

In addition, Stitsky directed other Cobalt employees to lie to investors.  For example, Stitsky directed one of his sons, who was reporting to Stitsky, to lie about his work experience on marketing materials that would be sent to potential Cobalt investors. (GX 2120).  Likewise, as Kevin Tierney was staging a noisy withdrawal from Cobalt, Stitsky directed another Cobalt employee to lie to investors about his role at the company.  (GX 2232).

Finally, the scheme involved making misrepresentations about Cobalt's ownership of properties, and then, critically, engaging in numerous, complex steps to lull investors in and avoid detection over a period of years, using false documents and paying back investors when exposure of the scheme was threatened. For example, Stitsky enticed Patricia Zebrowski to invest by promising that Cobalt earned $4 million in revenues from its

22

purported ownership of the "front desk" of the Simone Hotel in
Miami.  (GX 981).  Stitsky, Shapiro and Foster each recruited
Stanley Gruber's $900,000 investment; indeed, to guarantee
Gruber's investment, Gruber was sent a fake financial statement
for Vail Mountain Trust falsely showing that it had significant
assets.  (Tr. 741, 770, 776; GX 634).  Stitsky also lied to
Gruber by saying that Stitsky's name was not in the PPM because
Stitsky "didn't care about titles."  (Tr. 739).  Another
investor, Aimar Dontenville, was paid off at the direction of
Foster when Dontenville threatened to expose the scheme.  (GXs
2034, 1228).  Foster wrote to Shapiro, "Donetenville should be
dealt with ASAP."  (GX 1228).  When one considers collectively
the many steps in which the defendants engaged to originate,
carry out, and conceal the scheme, there can be little doubt that
the enhancement is appropriate.

In short, the scheme which Stitsky and the others led was
deliberate, well-plotted, and demonstrated a higher level of
intricacy than the solo con-man who merely scams a handful of
investors out of money on a short-term basis.  The defendants
used their own expertise as businessmen, bootstrapped with false
documents and fraudulently-induced letters from outside counsel,
to perpetrate a multi-year fraud, swindling numerous investors
out of over twenty million dollars.  An enhancement is clearly
justified on these facts.

23

**V.    Stitsky Was an Organizer or Leader of a Criminal Activity That Involved Five Or More Participants Or Was Otherwise Extensive**

Stitsky argues that Probation erred in applying a four-level enhancement for being a leader or organizer of the charged conspiracy, pursuant to U.S.S.G. § 3B1.1(a).  Stitsky argues that: (1) the charged criminal activity did not involve at least five participants; and (2) he did not exercise a supervisory or organizational role in the conspiracy.  Both of these arguments fail.  As demonstrated below, the four-level enhancement is warranted because Stitsky was an organizer or leader of a criminal activity that involved five or more participants or, alternatively, because the activity here was otherwise extensive.

**A.  <u>Applicable Law</u>**

Section 3B1.1 of the Sentencing Guidelines provides that the sentencing court should increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  The Guidelines define "participant" as a person "criminally responsible for the commission of the offense," regardless of whether the person has been charged or convicted.  U.S.S.G. § 3B1.1, comment. (n.1).  In determining whether there are five participants, the defendant is counted as one of the five.  <u>See</u> <u>United States</u> v. <u>Paccione</u>, 202 F.3d 622,

24

625 (2d Cir. 2000).  While only those criminally responsible may be included in calculating whether the offense involved five or more participants, all participants may be considered when assessing whether the offense was "otherwise extensive." United States v. Carrozzella, 105 F.3d 796, 802-04 (2d Cir. 1997); cf. United States v. Bennett, 252 F.3d 559 (2d Cir. 2001) (fraud is otherwise extensive where it involved the "unknowing services of many outsiders"); United States v. Nolan, 136 F.3d 265, 272-73 (2d Cir. 1998) (approving sentencing court's consideration of unwitting accountants, bank officers, and lawyers used to perpetuate embezzlement scheme with two knowing participants).

In considering whether an offense was "otherwise extensive," the court should ask "whether the criminal scheme was the 'functional equivalent' of a scheme involving five or more knowing participants." United States v. Manas, 272 F.3d 159, 166 (2d Cir. 2001).  In assessing functional equivalence, a sentencing court should consider: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." Id. (citing Carrozzella, 105 F.3d at 803-04). Under this test, "[l]awful services that are not peculiarly tailored and necessary to a particular crime but are fungible

25

with others generally available to the public are not the
functional equivalent of knowing participation." Carrozzella,
105 F.3d at 804.

So long as the criminal activity had a sufficient number
of culpable participants or was sufficiently extensive, a
defendant may qualify for the four level adjustment if he
organized or led at least one other participant. See United
States v. Zichettello, 208 F.3d 72, 107 (2d Cir. 2000).

The Second Circuit has held that "[a] defendant may
properly be considered a manager or supervisor if he 'exercise[d]
some degree of control over others involved in the commission of
the offense . . . or play[ed] a significant role in the decision
to recruit or to supervise lower-level participants.'" United
States v. Birkin, 366 F.3d 95, 101 (2d Cir. 2004) (quoting United
States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002); Paccione, 202
F.3d at 624; see also U.S.S.G. § 3B1.1, comment (n.4) (describing
non-exclusive factors to be used in assessing role).  Among the
indicia of leadership are "the exercise of decision making
authority," "the recruitment of accomplices," and the supervision
of a lower-level participant.  United States v. Greenfield, 44
F.3d 1141, 1146 (2d Cir. 1995).  Evidence of a defendant's
"direct and immediate control" over others "obviously provides
the strongest support for any aggravating role enhancement."  Id.

**B.  Discussion**

26

A four level enhancement is warranted because Stitsky was an organizer or leader of a criminal activity that involved five or more participants.  Similarly, a four level enhancement is warranted because the activity here was otherwise extensive.  The facts support an enhancement on either basis.

As an initial matter, the evidence showed that Stitsky was a principle organizer of the Cobalt business entities.  Between July 2002 and April 2003, well before the first Cobalt entity was formed, Stitsky and Shapiro had discussions about forming Cobalt.  (GX 1911).  As of December 31, 2003, Stitsky, his son Jared Stitsky, Shapiro, Foster, and three others, were listed on a "Cobalt Capital Partners Group Contact List."  (GX 2302).  The "Cobalt Capital Partners Group Contact List" attached a spreadsheet that assigned individuals responsibility for developing the Springfield office and the New York office, which was to be the sales office.  All of the major tasks for starting the New York sales office were assigned to "IS," Irving Stitsky.  These tasks included, among others (1) staffing and setting salaries for the receptionist, sales assistants, and independent contractors, (2) developing the New York office policy and procedure manual to include office hours, dress code, and commission structure, (3) developing sales and office procedures, including brochures, mailings, cold call sales pitches, a "rebuttal" book, and the scheduling of daily sales meetings.  (GX

27

2302).

As of the spring of 2004, the New York office was in full operation -- Stitsky was in charge. (Tr. 148, 154). Under Stitsky's supervision was Adam Swickle, a sales manager, and a group of independent contractors whom Stitsky had primary responsibility for interviewing and hiring. (Tr. 152-53, 162). Thereafter, Cobalt Capital Funding, the Stitsky-led sales division of Cobalt, opened another office in Miami, Florida, which was also headed by Stitsky. (Tr. 162, 184). In New York, for example, Stitsky led the morning meetings with the sales representatives, he assigned and processed the sales commissions for them, he worked with them on sales pitches and rebuttals, and he approved all of the talking-point "scripts" that were used. (Tr. 1220, 1225-26). In short, the evidence convincingly demonstrated that Stitsky was the decision-maker in the New York office. He was both an organizer and a leader of the sales arm of Cobalt, the principle mechanism through which investor money was solicited for the fraud scheme.

The charged criminal activity involved at least five participants. Stitsky, Shapiro and Foster account for three participants. See United States v. Paccione, 202 F.3d 622, 625 (2d Cir. 2000). The evidence showed that Charles "Chick" Hartman, a Cobalt employee involved in acquisitions for Cobalt, was also a participant in the scheme. (Tr. 170). Hartman was

28

involved in the very early stages of Cobalt's formation, having introduced Shapiro to attorney Philip Chapman in the fall of 2003, for the purpose of forming the Cobalt entities. (Tr. 1995). Hartman was also involved in discussions with Shapiro and Chapman about whether Shapiro would be listed in the PPM. (Tr. 2021). On September 2, 2004, in an email titled "investor contact ref", Stitsky writes to Hartman:

> I need you to say that you are a liason to Kevin
> [Tierney] because he is to busy or because of the
> privacy act. Please limit your conversations to just
> the issue at hand, which is simply whether or not we
> are doing business with Kevin's company. Remember
> that less in this case is more. Try not to talk to
> much about what Cobalt Capital Funding, llc is doing
> as a company but more about how excited you are and
> Tierney are about working with us. I want the
> investor to think that you and who ever you are
> representing in this case is an investor as well.
> I'm sure you get my point. Thanks for your help.

(GX 2232). Stitsky plainly instructed Hartman to lie, i.e. to purport to be an outside investor in Cobalt, whereas Hartman, who was listed in the first PPM as a "consultant," was actually working for Cobalt from the very beginning. (GX 1). Similarly, contrary to the instruction Stitsky gave Hartman to "say that you are liason to Kevin," Hartman was not a liason to Kevin Tierney. In another email titled "CHartman," on September 27, 2004, Stitsky requested that Shapiro "have Chick [Hartman] simplify his Cobalt speech down to how we are a valued resource for his institution to invest with and that they as an institution are excited about the different opportunities we have created for

them.  <u>He need not say that he is working for us as of yet</u>."
Stitsky concludes the email by stating that "[t]he people that
call [Hartman] will want to feel comfortable to invest <u>so tell</u>
<u>what they want to hear</u>."  (GX 2248)(emphasis added).  These
emails plainly show that Hartman was an insider, and that Stitsky
was in control of Hartman, and directed Hartman to provide
misleading and false statements for the purpose of marketing
Cobalt to investors.

        Steven Garth, Cobalt's accounting manager, was instructed
by Shapiro to allocate 20% of investor money as management fees
to a separate account.  (Tr. 1359).  Garth knew that under the
terms of the PPM, only 12% was permissible to take as management
fees, and therefore anything beyond 12% was not authorized.  (Tr.
1359).  For several months Garth continued to allocate the excess
fees to the Cobalt Capital Partners account, in fact he
maintained a log book of how much in fees was being stolen as
"excess."  (GX 755).  Garth voiced his concerns about the
misappropriation of company money to both Shapiro and Foster in
the summer of 2005, but was told that "it would all straighten
itself out."  (Tr. 1365-66).  He began looking for another job,
but did not leave Cobalt; instead, he continued to book the
excess fees.  (Tr. 1367).  In the fall of 2005, Shapiro
threatened to fire Garth if he did not continue to follow
Shapiro's instruction to book the 20% in fees.  (Tr. 1371-72).

Therefore, while Garth took efforts along the way to remedy the theft, he went along with the misappropriation for several months at the direction of his supervisors.

In addition, Jared Stitsky, Stitsky's son, was one of the independent contractors who was supervised by Stitsky.  On March 1, 2005, after Stitsky was notified that Jared's biographical information was going to be included in the Cobalt Capabilities Brochure to be sent to potential investors, Stitsky directed his son to "put together a resume that says you were in the mortgage business for longer than you were."  (GX 2120).  Jared Stitsky assisted the Cobalt operations, indeed several investors testified that Jared Stitsky met with them in Florida to discuss the Cobalt properties.  (Tr. 737-38, 980).  Stitsky also sent his son a call script to use with investors.  (GX 2125).  Jared Stitsky, taking direction from his father to falsify his resume, was a participant in the scheme.

Finally, as the Court recalls, Kevin Tierney testified that he lied to Shapiro's probation officer, Jennifer Amato. Tierney's business, Due Diligence LLC, stood to profit handsomely if Shapiro's business venture was successful.  (Tr. 383).  In order to facilitate Shapiro's money-making efforts, and in turn, Tierney's own profit, Tierney misled Probation Officer Amato into believing that Tierney was Shapiro's boss and that Tierney was in charge of Shapiro's travel and business activity, when, in

31

reality, it was Shapiro who was in control of his own activities. (Tr. 383).  Amato testified that it was her understanding that Tierney was Shapiro's boss (Tr. 1896), and that had she known that Shapiro was his own boss, she would have made additional inquiries to determine if there was financial risk to the public, potentially raising the issue to her supervisor and the Court. (Tr. 1981-92).  Because Shapiro could not risk having the Cobalt companies examined under a microscope by the Probation Department, he directed Tierney to lie in order to keep the operation going.

The four level enhancement is also independently warranted because the scheme, in addition to having five or more participants, was otherwise extensive since it was functionally equivalent to a scheme with dozens of participants, at least one of whom was supervised by Stitsky.  See Zichettello, 208 F.3d at 107.  In determining whether a scheme is otherwise extensive, courts look to the following factors: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme."  Manas, 272 F.3d at 166.

First, as set forth above, the Government has already identified many knowing participants in the scheme.  And, at

least two of those participants, Jared Stitsky and Charles
Hartman, were taking direction and leadership from Stitsky.  (GX
2120, GX 2232).  Second, the success of the scheme hinged on the
efforts of, among others, the sales representatives who were
trained and managed directly by Stitsky.  The evidence showed
that there were at least 15 sales representatives in the New York
office, and, because there was a large turnover in staff, new
sales representatives were constantly being hired.  (Tr. 1218,
1225; GX 887, GX 2020A-2020R).  Stitsky provided call scripts and
PowerPoint presentations to the callers that were filled with
misrepresentations which the callers in turn relayed to
investors.  Third, whether or not the sales representatives were
knowing participants, it cannot be disputed that their efforts
were peculiar and necessary to the scheme.  They were trained by
Stitsky about how to make sales pitches, how to rebut responses
from wary investors, and how to close a deal.  Such skills were
specifically tailored to the task at hand, _i.e._ to raise and
secure money by cold-calling investors, and these particularized
activities made the sales representatives the "functional
equivalents" of knowing participants.  Carrozzella, 105 F.3d at
804

        Moreover, there were many other individuals -- in addition
to the callers -- whose specialized functions were necessary for
the venture to succeed, and who each answered to Shapiro, Stitsky

or Foster.  For example, employees in both the New York and
Massachusetts offices were responsible for tasks vital to the
fund raising efforts of the company, including mailing the new
investor letters, brochures, accounts statements and other
marketing materials.  In the Massachusetts office, there were
many individuals enlisted to help run the operation.  Several of
these employees testified at trial.  For example, Jeff Clark was
the Chief Operating Officer, Charles Agule was an in-house
attorney, Steven Garth and Kim McPherson were in the accounting
department, and Erin Baisley was an officer manager.   The
company also employed an information technology support staff, a
public relations manager, and a financial reporting employee,
among others.  (Tr. 188, 209-210).  Many of these positions were
not fungible, rather they were specific to the criminal scheme.
Carrozzella, 105 F.3d at 803-04.

Given the extensive record developed at trial of Stitsky's
leadership role in the scheme, the Government respectfully
submits that under either approach -- a scheme with five or more
participants or that is otherwise extensive -- the four-level
enhancement for leadership is clearly warranted.

VI.   **The Defendant Abused a Position of Private Trust**

Stitsky contends that Probation erred in applying the two-
level "abuse of private trust" enhancement, U.S.S.G. § 3B1.3, on
the ground that he did not hold a position of trust vis-a-vis any

34

of Cobalt's investors as the Guidelines define that term.  (Br. 8).  Stitsky and his two co-conspirators possessed enough managerial discretion at Cobalt to enable them to commit a difficult-to-detect wrong by siphoning money out of Cobalt for their own use.

### A.  **Applicable Law**

A position of "private trust" refers to positions in which an individual has "professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  U.S.S.G. § 3B1.3, comment, (n.l).  As the Second Circuit has explained, the issue of whether a person occupies a position of trust "turns on 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong,'" United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (per curiam) (citation omitted) (finding that an office manager held a position of trust), and "the position of trust must have 'contributed in some significant way to facilitating the commission or concealment of the offense," United States v. Barrett, 178 F.3d 643, 646 (2d Cir. 1999) (quoting U.S.S.G. § 3B1.3).  It does not require "a legally defined duty such as fiduciary duty."  Id.  Moreover, "whether a position is one of

35

'trust' . . . is to be viewed from the perspective of the offense victims and is a question of law for the court, subject to de novo review on appeal." United States v. Wright, 160 F.3d 905, 910 (2d Cir. 1998).

   **B.  Discussion**

   As an initial matter, while application of the enhancement does not require a fiduciary duty, here, Cobalt's PPMs explicitly stated that members of its management team had a fiduciary duty to protect investors' money, to refrain from loaning investors' money to company employees, and to refrain from pledging investors' money for the benefit of company employees.  (GX 2-3; Tr. 1704-06).

   From its inception, the scheme was designed to be difficult to detect.  Shapiro and Foster kept Cobalt's finances secret from other key decision makers such as Chip Agule and Jeff Clark. (Tr. 1337).  Only Shapiro and Foster had authority to sign checks on behalf of Cobalt.  (Tr. 995).  Other than Shapiro and Foster, only Garth and McPherson were also given access to the Quickbook accounting program, so that they could make the appropriate entries.  (Tr. 995).  Neither, though, had decision-making authority.  Stitsky, however, was privy to this information by virtue of his role as a 40% equity partner in Cobalt.  Foster and Shapiro briefed him on how money from the various Cobalt companies was being funneled to each of the three

36

defendants.  (GX 113, GX 2119).  Accordingly, Stitsky, like Shapiro and Foster, was fully in-the-know about how much investor money he and his two partners were stealing.

The evidence plainly demonstrated that Stitsky had the necessary discretionary authority to perpetrate this difficult-to-detect fraud.  There is no question that Stitsky was a high-level manager in the company with discretionary authority.  (Tr. 1340 (describing Stitsky, Shapiro and Foster as "upper management").  He hired and supervised every employee in Cobalt's fundraising arm.  Importantly, even though Stitsky had to request checks from Foster and Shapiro, he enriched himself in other ways by taking various "loans" from Cobalt.  (Tr. 1029, 1041, 1377-78).  He was never questioned about these expenses because the only people who were aware of them were his two co-defendants, along with Garth and McPherson (neither of whom was in a position to do anything to stop it).  To the contrary, the defendants were able to force Garth to remain quiet about their scheme by threatening to fire him if he failed to continue to misappropriate the investor funds as directed.  See United States v. Schiller, 264 Fed. Appx. 44, 45 (2d Cir. 2008) (defendant's position involved managerial discretion "because he supervised the person whose responsibility it was to audit cash boxes and who, because of [the defendant's] position, did not adequately audit his box.") see also Barrett, 178 F.3d at 646 ("even though

Barrett had to request checks from the accounting department, his position at [the company] facilitated his crime because he stated that his 'check requests were not questioned because he was the Vice President of Sales and had the authority to authorize any check on any open account'.").

Stitsky's position as managing partner of the New York office, and 40% equity partner in the Cobalt operation, involved managerial discretion and significantly facilitated his concealment of the offense.  A two-level enhancement for abuse of trust is therefore warranted.

**VII.   Stitsky's Motion For a Downward Departure Should Be Denied**

Stitsky also moves for a downward departure on grounds that the total offense level overstates the seriousness of the offense and to mitigate the "cumulative effects" of overlapping enhancements pursuant to United States v. Lauersen, 348 F.3d 329 (2d Cir. 2003) and United States v. Jackson, 346 F.3d 22 (2d Cir. 2003).  (Br. 24-27).   Stitsky's motion is meritless and should be denied.

Upon a motion for rehearing, the Second Circuit panel that decided Lauersen and Jackson reiterated its original position that:

> when the addition of substantially overlapping
> enhancements results in a significant increase
> in the sentencing range minimum (as it does at
> the higher end of the sentencing table), a
> departure may be considered.  What is present
> to a degree not adequately considered by the

38

> Commission is the combined effect of the
> aggregation of the substantially overlapping
> enhancements and the large increase in the
> sentencing range minimum at the higher end of
> the sentencing table.

United States v. Lauersen, 362 F.3d 160, 164 (2d Cir. 2004)

(emphasis in original), judgment vacated in light of Booker by

Lauersen v. United States, 543 U.S. 1097 (2005).  The Second

Circuit, however, emphasized that "not many combinations of

enhancements will be substantially overlapping."  Id. at 167.

For example, the court made clear that enhancements for

leadership role and abuse of trust do not substantially overlap

with each other.  Id. at 168 n.12.

The Government respectfully submits that the enhancements

applicable in this case are not "substantially overlapping,"

inasmuch as no two such enhancements are triggered by the same

facts.  Indeed, fraud offenses such as this one do not

necessarily involve five or more participants.  Accordingly,

there is no "substantial overlap" between Stitsky's loss/gain

enhancement and the enhancement for organizing and leading the

offense.  Nor do fraud cases applying an enhancement based on

loss or gain necessarily involve officers of companies, such as

here where Stitsky was one of three principals of the company and

served as head of Cobalt's fund-raising operations.  Similarly,

the fact that Stitsky's crimes resulted in losses to more than

250 victims has independent significance separate and apart from

39

the loss in this case.  Moreover, the high level of
sophistication present in this scheme is not seen in all
financial fraud cases where the loss amount drives the guideline
analysis.  Finally, the fact that Stitsky's high-level position
at Cobalt involved managerial discretion that afforded him great
deference to commit the fraud is an independent circumstance from
the sophisticated nature of the scheme, the victim scope of the
scheme, and its magnitude in loss.  In short, because Stitsky's
sentencing enhancements do not substantially overlap, a departure
under Lauersen and Jackson is unwarranted.

**VIII. Section 3553(a) Factors**

In determining a reasonable sentence, the sentencing judge
is required to consider the factors set forth at 18 U.S.C.
§ 3553(a).  These factors include, among others, the nature and
circumstances of the offense; the history and characteristics of
the defendant; the need for the sentence to reflect the
seriousness of the offense, to promote respect for the law, and
to provide just punishment; and the need for deterrence and to
protect the public from further crimes of the defendant.  See 18
U.S.C. § 3553(a).

**A.  Nature and Circumstances of the Offense, History and
Characteristics of the Defendant**

Under Section 3553(a)(1), the sentencing court must first
consider "the nature and circumstances of the offense and the
history and characteristics of the defendant."  18 U.S.C.

40

§ 3553(a)(1).  Section 3553(a)(2)(A) sets forth a related proposition that the sentence should "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense."

### 1.  Nature and Circumstances of the Offense

As the Court is aware, the defendant's crimes have had a devastating impact on hundreds of investor-victims, several of whom testified at trial.  Patricia Zebrowksi, for one, told Stitsky that she was a widow who needed to conservatively invest her savings in order to pay for college tuition for her two children.  (Tr. 901).  Stitsky convinced Zebrowski to invest based on false statements that Cobalt owned the Simone Hotel in South Beach.  (Tr. 903).  Zebrowksi ultimately lost her entire $50,000 investment in Cobalt.  (Tr. 920).  Likewise, Arlene Goodman, was a retired New York City school teacher.  (Tr. 1138).  Based on Stitsky's false representations that Cobalt owned the Simone Hotel, Ms. Goodman and her husband invested $100,000 of their retirement money in Cobalt; all of which they ultimately lost.  (Tr. 1140-42; 47).  Victim Mary Ann Santorella wrote in her February 1, 2010 letter to the Court, that she invested in Cobalt, and lost, all of the money that she had received from her late husband's life insurance policy.  In their December 14, 2009 letter to the Court, victims Charles and Andrea Binstok write how, as a result of the loss of the money they invested in

41

Cobalt, they can no longer afford to pay their mortgages and have resorted to selling jewelry and other family heirlooms in order to make ends meet.  In total, more than 300 investors lost more than $23 million through their investment in Cobalt.

2.   **History and Characteristics of the Defendant**

Nothing about the defendant's background or the nature and circumstances of this offense weighs in favor of mitigating Stitsky's sentence by varying from the applicable guideline range.  To the contrary, Stitsky is a recidivist who committed the present crime while he was serving a term of supervised release.  Indeed the proof demonstrated that he was plotting the Cobalt venture with Shapiro while he was serving time for underlying securities fraud and false statement convictions in the Southern and Eastern Districts of New York.

As the Court may recall, Stitsky's 2002 criminal convictions were not the only sanctions Stitsky has been dealt in the securities arena.  In or about June 1998, the National Association of Securities Dealers, Inc. (NASD) permanently barred Stitsky from the securities industry.  (Ex. B, 1).  Then, in August 1998, the United States Securities and Exchange Commission (SEC) issued an order barring Stitsky from association with any broker-dealer, investment company, investment advisor or municipal securities dealer.  (Ex. B, 1).  Neither the NASD nor SEC bars imposed in 1998, nor the criminal sentences imposed in

42

2002, deterred Stitsky from once again conning money from victims by selling securities through false representations.

He has demonstrated an inability to function in society without reflexively resorting to criminal methods.

### 3.   **Stitsky's Family Circumstances**

Stitsky's sentencing memorandum contains a number of poignant letters written on his behalf by his children, his wife, and other family members.  These letters make clear that Stitsky's incarceration has and will impose significant financial and emotional hardships on his family and suggest that Stitsky deserves a lesser term of imprisonment because of his family circumstances.  The Government submits that in evaluating this claim, the Court should consider the law related to the extraordinary family circumstances departure pursuant to the Sentencing Guidelines.  Stitsky's situation fails to meet the high threshold to qualify for a family circumstances departure.

Under the Sentencing Guidelines, "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  U.S.S.G. § 5H1.6.  A downward departure based on family circumstances is therefore impermissible unless those circumstances are "extraordinary."  Id.  The Second Circuit has stressed that the cases in which it has upheld such a departure involved "exceptional circumstances" where "the family was

43

uniquely dependent on the defendant's ability to maintain
existing financial and emotional commitments." United States v.
Faria, 161 F.3d 761, 762 (2d Cir. 1998) (per curiam) (quoting
United States v. Sprei, 145 F.3d 528, 535 (2d Cir. 1998)).

Under established Second Circuit precedent, Stitsky cannot
show that his family circumstances warrant a downward departure.
See United States v. Cornielle, 171 F.3d 748, 754 (2d Cir. 1999).
While those circumstances may be sympathetic, nothing
distinguishes this defendant from any other incarcerated
defendant with a family.  To the contrary, there are other
individuals, including Stitsky's current wife, who can continue
to provide the care to those the defendant now looks after.  That
point is made abundantly clear by the numerous cases in which
downward departures have been denied on similar or more
compelling facts than these.  See, e.g., United States v.
Madrigal, 331 F.3d 258 (2d Cir. 2003) (reversing departure based
on family circumstances even though defendant's youngest child,
who had a learning disability, was having difficulty in school,
her eighteen-year-old son had cut classes and failed to graduate,
and her youngest daughter, who was then twenty-two years old, had
suffered from major depressive disorder with psychotic features
and had attempted suicide); United States v. Rybicki, 96 F.3d
754, 759 (4th Cir. 1996); United States v. Allen, 87 F.3d 1224,
1225-26 (11th Cir. 1996); United States v. Goff, 20 F.3d 918, 921

44

(8th Cir. 1994); <u>United States</u> v. <u>Rushby</u>, 936 F.2d 41, 42-43 (1st Cir. 1991).

    While the Government does not seek to minimize the difficulties that may be faced by Stitsky's family due to his incarceration, it respectfully submits that his family's suffering, though plainly unfortunate, is indistinguishable from the "common collateral damage of imprisonment" inflicted on the families of hundreds of other defendants prosecuted in this district. <u>Madrigal</u>, 338 F.3d at 260.

    In addition, Stitsky is not a first time offender and prior judges already have provided him with a second chance to be a better person for his family.  Indeed, during the sentencing in connection with one of his earlier convictions (attached as Exhibit C), Stitsky then pointed to his family in need as a main reason for the district court to impose a lesser sentence.  (Ex. C, 9-13).  At his January 7, 2002, sentencing, Stitsky apologized to his family for "jeopardiz[ing] my children and their well-being" and for "creat[ing] this mental anguish for my parents and my sisters".  (Ex. C, 9).  Stitsky spoke about how, during his term of incarceration in advance of sentencing, he "helplessly witnesses my family fall apart."  Stitsky pointed to hardships that his mother had encountered; his former wife's battle with alcohol and drugs; his elder daughter's drug addiction; difficulties experienced by his younger son and daughter who were

45

at home taking care of their mother; and the car accident
suffered by his elder son.  (Ex. C, 10-12).  Stitsky concluded
his remarks by "begging" the district court for "lightest
possible sentence based on all the circumstances so I may
complete my time and get back to my children and start this new
life."  (Ex. C, 13).

Despite his earlier promises, Stitsky's professed desire
to be present for his family did not dissuade him from engaging
in the present criminal conduct.  To the contrary, the evidence
at trial demonstrated that not only did Stitsky plan out the next
scheme while in jail, but upon release he then brought two of his
sons to work with him at the Great Neck boilerroom that he ran,
and he advised at least one of them to lie on marketing materials
that would be sent to potential Cobalt investors.  (GX 2120).

### B. The Need To Reflect The Seriousness Of The Offense, Promote Respect For The Law And Provide Just Punishment For The Offense/ The Need To Afford Adequate Deterrence To Criminal Conduct

The offense at issue here was an extensive and elaborate
scheme that Stitsky perpetrated for several years.  This was not
aberrational conduct for Stitsky.  Obviously, Stitsky's prior
involvement with the criminal justice system, or the fact that he
was on supervised release, did not serve to deter him from
committing the instant offense.  Given Stitsky's recidivism, and
given his propensity to lie when it serves his interest – whether

to the FBI[6] or to an investor -- a significant sentence is
necessary to protect the public from future fraudulent activity
by Stitsky.

　　　As for the need to deter criminal conduct, should Stitsky,
who perpetrated a $23 million fraud while capitalizing on the
trust of those around him, be spared a substantial sentence of
incarceration, it would send a woefully inadequate message to
others contemplating similar behavior.

---

[6]　　In a post-arrest statement, Stitsky told Special Agent
William Slattery of the FBI that Stitsky was a "consultant" for
Cobalt and that he did not have direct contact with new
investors.  (Tr. 932-33).

## Conclusion

For the reasons set forth above, the Government submits that, based on the factors set forth in Section 3553(a), a significant sentence of incarceration should be imposed. Stitsky's greed, his history of recidivism, and his indifference to the harm he has wrought upon his victims, all weigh in favor of a sentence of a significant term of imprisonment that will ensure the financial safety of the community and accomplish the other factors set forth in Title 18 United States Code, Section 3553(a).

Dated:     New York, New York
           June 18, 2010

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney


                  By:   _____/s/_____
                        Alexander J. Willscher/Marc P. Berger
                        Assistant United States Attorneys
                        (212) 637-2736/2207

48

## <u>CERTIFICATE OF SERVICE</u>

MARC P. BERGER deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York, and that on June 18, 2010, he caused a copy of the within Sentencing Memorandum to be served electronically on Denis P. Kelleher, counsel for Irving Stitsky, by causing a copy of same to be served and filed via the Court's electronic case filing system.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated:    New York, New York
          June 18, 2010


                    _____/s/_____
                    MARC P. BERGER

49