2178STIS                                                                    1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                              00 CR 620 (AGS)

 5   IRVING STITSKY,

 6                   Defendant.

 7   ------------------------------x     Sentence

 8                                       New York, N.Y.
                                         January 7, 2002
 9                                       11:45 a.m.

10   Before:

11                    HON. ALLEN G. SCHWARTZ,

12                                       District Judge

13                          APPEARANCES

14   MARY JO WHITE
15        United States Attorney for the
          Southern District of New York
16   JAY MUSOFF
          Assistant United States Attorney
17
     ROGER BENNET ADLER
18        Attorney for Defendant

19

20

21

22

23

24

25
```

2178STIS                                                                1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         00 Cr. 620 (AGS)

5   IRVING STITSKY,

6                   Defendant.

7   ------------------------------x        Sentence

8                                          New York, N.Y.
                                           January 7, 2002
9                                          11:45 a.m.

10  Before:

11                 HON. ALLEN G. SCHWARTZ,

12                                         District Judge

13
                        APPEARANCES
14
    MARY JO WHITE
15       United States Attorney for the
         Southern District of New York
16  JAY MUSOFF
         Assistant United States Attorney
17
    ROGER BENNET ADLER
18       Attorney for Defendant

19

20

21

22

23

24

25

2178STIS

Sentence

2

1      (Case called)

2      THE DEPUTY CLERK:  Counsel, please state your names

3  for the record.

4      MR. MUSOFF:  Good morning.  Jay Musoff for the

5  government.

6      MR. ADLER:  Good morning, your Honor.  Roger Bennet

7  Adler, 225 Broadway, New York, New York, for defendant Irving

8  Stitsky, present before the court.

9      THE COURT:  Mr. Adler, are you and your client

10  prepared for sentence today?

11      MR. ADLER:  We are, your Honor.

12      THE COURT:  You and Mr. Stitsky have each read the

13  presentence report, correct?

14      MR. ADLER:  We have.

15      THE COURT:  You have either noted or had the

16  opportunity to note any comment or objection you had to the

17  contents of the report?

18      MR. ADLER:  Yes.

19      THE COURT:  I also have received from you, Mr. Adler,

20  your submission dated December 20, 2001, including the

21  Exhibits A through D, I have the government's letter,

22  Mr. Musoff's letter, that's dated January 2, 2002, and I also

23  have your letter dated January 2, 2002 and the letter that you

24  faxed to me Friday dated January 4, 2002.  I want you to know

25  that I have read all of those materials and all the exhibits

2178STIS                                                    3
                              Sentence

1    annexed to them.

2              Do you wish to be heard on behalf of Mr. Stitsky?

3         MR. ADLER:  I do.

4         THE COURT:  Would you please approach the microphone.

5         MR. ADLER:  Thank you, your Honor.  If it please the

6    court, in the autumn of 1995, efforts which began in the

7    summer of that year to initiate a business venture with Paul

8    Burton, which is to say the opening of an OSJ branch of

9    Monitor Securities, began to move forward.

10             We are here today because during the life of Monitor

11   Securities and DMN, bribes were paid, stocks were promoted,

12   and investors were victimized by those brokerage concerns.

13   The indictment and paragraph 130, on, I believe, page 22 of

14   the PSI report confirms that the primary role that my client,

15   Irving Stitsky, played in connection with those activities was

16   in response to the need for stockbrokers to work at Monitor,

17   to get the word out, and, indeed, he recruited pursuant to

18   that agreement and understanding a number of brokers, two of

19   whom are significant for sentencing purposes here today.  They

20   are Mark Burton, not to be confused with Paul Burton, and Mark

21   Burton's partner, colleague, Ken Fuina.  My comments will be

22   limited as to them.  I am mindful that the court will deal

23   with that situation at another time and, most significantly,

24   under different circumstances.

25             However, during the period of time that Mark Burton

2178STIS                                                          4

Sentence

1   and Ken Fuina, who got their jobs on the recommendation of

2   Irving Stitsky, became involved in representing a client named

3   Gary Fettman, and during the period of time that's relevant to

4   the sentence your Honor will impose this morning, unbeknownst

5   to Gary Fettman, the brokerage house and Mark Burton and Ken

6   Fuina received various bribes, various inducements, which were

7   not disclosed insofar as they relate to two entities that are

8   the subject of sentencing here today, International Nursing,

9   which was involved in the summer of 1995, more than six years

10  ago, and another entity called Beach Port.

11          Confining myself to the terms of the plea agreement

12  which permit me to call facts to your attention but go no

13  further as an advocate for Mr. Stitsky, let me simply say that

14  the PSI report represents to your Honor, and the chart is

15  found at paragraph 125, at pages 20 to 21 of the PSI report,

16  that Mr. Stitsky received approximately $57,000 in connection

17  with these activities at Monitor over a period of several

18  months, and the stipulated range of relevant conduct as

19  presented to the court is between 800,000 and 1,500,000.

20          In terms of the figures for both Ken Fuina and Mark

21  Burton, they are significantly lower, and I call the court's

22  attention to that in the PSI report.  I urge the court to

23  consider the figures in determining an appropriate guideline

24  range.

25          The second topic I would like to speak to, the second

SOUTHERN DISTRICT REPORTERS   (212) 805-0300

2178STIS                                                              5
                              Sentence

1    and final, deals with extraordinary family circumstances.

2    With the court's permission, the court is aware the audience

3    in this courtroom is filled today with family members of the

4    Stitsky family.  There is one individual whom I would, if the

5    court will permit him to speak briefly to this issue because I

6    would like to speak about it, but I think that as the famous

7    saying went, "from the mouths of babes," Irving's eldest son,

8    Jarrett Stitsky, who is here during intercession between the

9    fall and spring semesters from the University of Miami where

10   he earned an academic scholarship following his graduation

11   from Jericho High School in June of 2001, I believe can speak

12   most poignantly to the circumstances.

13            THE COURT:  Mr. Adler, let me interrupt you to say

14   that I have read his letter and I have read all of the

15   letters, and the letters written by the children are, to put

16   it mildly, poignant and significant, and I sympathize with

17   them, but I don't intend to hear the children speak today,

18   including Jarrett.  I expect that you will speak and say

19   whatever there is to be said with regard to this issue.

20            MR. ADLER:  Yes, sir.

21            As the court is aware from the probation report that

22   Mr. Steele has prepared, the parties were divorced but in an

23   unusual situation, and there are many unusual circumstances

24   that exist in the affairs of men and women in our society

25   today, they live together in the Muttontown residence, which

Sentence

1    is to say, Andrea and Irving and the children.  And Jarrett,

2    who is here today, up until he left for school in August to

3    attend the University of Miami, lived in the home until that

4    time.  He is back there now during intercession.

5         Irving resided in the home and I think can best be

6    described, as the letters from not merely the defendant's

7    children but, I hate to use the word strangers, but I will

8    call them strangers in the sense that teachers, principals,

9    others who interacted with Mr. Stitsky for years in terms of

10   him being the primary caregiver, the primary individual within

11   the Stitsky family, who ensured that the tasks of growing up

12   were approached in a focused way as best as he could.

13        The reason that I had asked the court to permit

14   Jarrett to speak was not to make the job of judging more

15   difficult than it already is.  I have no doubt, knowing you

16   professionally as I do, that this has got to be the worst part

17   of the job, and I don't mean that in a flippant way.  But

18   particularly of late, and when I use the term "particularly of

19   late," I mean particularly in the last several months, in the

20   fall of 2001, and particularly into the holiday period, the

21   inability of Andrea Stitsky to cope with her responsibilities,

22   manifested by an apparent alcohol, an apparent drug problem,

23   she is, as I understand it, currently being interviewed today

24   by an arm of the court in Nassau County called TASC, whose

25   function is to advise the court about possible drug abuse

Sentence

1   programs, particularly for people who can benefit from forms

2   of rehabilitation in the areas to which I spoke.

3        My purpose in raising this is not to shift focus from

4   Irving to something else.  This is not a variation on the dog

5   ate the homework type of an excuse.  It is simply to call to

6   the court's attention an unusual circumstance that exists and

7   has existed and has accelerated to exist over the last several

8   months, and particularly the last several weeks, that the

9   children have been confronted with that goes beyond what I

10  will call the ordinary family circumstances that a family is

11  required to cope with when a defendant is convicted of a crime

12  and faces a term of incarceration.

13       One of the troubles that I have with the somewhat

14  clinical approach that the Probation Department has taken is

15  that it is detached from, to the point that it has not

16  consisted of interviews with the children and a development of

17  the facts that I think put meat on the proverbial bones for

18  the court to assess the nature and circumstances of why this

19  is extraordinary, meaning not ordinary.

20       The two remaining children who live at home, Eliza

21  who is age 10 -- Eliza, can you stand up for a minute?  Thank

22  you.  Brett, are you here?  Jarrett, are you here?  Thank

23  you -- have lived under these difficult circumstances.  I feel

24  it is important for the court to factor them in in an

25  appropriate way.

2178STIS                                                                        8

Sentence

1           I am not seeking to trivialize the offense conduct.

2   I am not seeking to trivialize or divert attention away from

3   the court's function here today.  But as I noted in my final

4   letter to the court on January 4, referencing the court to a

5   recent Law Review article that your colleague John Martin

6   published in the Brooklyn Law Review, The Need for Measured

7   Departures under Appropriate Circumstances, whether it's a

8   significant departure or something more in the nip-and-tuck

9   departure, I think it is called for in this case.

10          I call the court's attention, and I am now proceeding

11  to the final portion of my presentation, to the fact that the

12  Probation report tells us that the combined earnings, illicit

13  earnings of Mark Burton and Ken Fuina are in the range of

14  $70,000 to $120,000.  I call the court's attention to the fact

15  that if the court were to add to that figure the moneys that

16  Mr. Stitsky earned during the period of time that we are

17  talking about, the court would be at the guideline range of

18  less than 350,000, but more than 200,000.  It would be a step

19  up of eight guideline levels in the 2F1.1 total for a net

20  offense level of 13 and a guideline range of not less than 12

21  months nor more than 18 months.

22          I urge the court to temper justice with mercy in

23  sentencing my client Irving Stitsky here today.

24          I know Mr. Stitsky wanted to address the court at the

25  appropriate time.

Sentence

1          THE COURT:  Mr. Stitsky, do you wish to be heard?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  You may also approach the microphone if

4    you wish.

5          THE DEFENDANT:  I would like to start off by making a

6    number of an apologies.  First to the court for the time

7    needed to conclude this case.  Next to the government for the

8    expenses imposed on them in order to complete the case.  And

9    last but not least to my family, my loved ones, who depended

10   on me and I let down.

11         The fact that I went into a business venture with

12   Jeff Pokross and his associates and received a total of

13   $57,000 over a period of a few months while I waited for my

14   license to clear, so I hoped run a branch office for them, and

15   then later realized this money was for the brokers I referred

16   who bought and sold their stocks.  It was wrong and I am sorry

17   for that.  After my license didn't clear, I went on to a

18   different business.  Today I realize that no matter how much

19   money is involved, it's not worth the sacrifices that come

20   with it.

21         To jeopardize my children and their well-being, to

22   create this mental anguish for my parents and my sisters, I

23   can't apologize enough.  I have not only exposed myself to a

24   sentence imposed by this court, but I have sentenced them as

25   well, and for this I am truly sorry.

Sentence

1    Your Honor, my children are my life and they depend

2    on me day to day, almost hour to hour, and I have clearly let

3    them down.  During these past six months while incarcerated at

4    MDC, I have helplessly witnessed my family fall apart.  I

5    truly believe that if I was there, even under home

6    confinement, I could have prevented a lot of what has

7    happened.  I have seen my mother age and become ill due to the

8    stress caused by an investment into a retail optical business

9    where I worked six to seven days a week.  My mother took a

10   loan to help me and, unfortunately, misrepresentations of

11   financials were made and a tremendous amount of money was

12   lost.  The way I handled myself in that situation was wrong,

13   and for that I am sorry.

14    I have witnessed my former wife Andrea completely

15   self-destruct and deteriorate by her abusive use of alcohol

16   and drugs, her desire to patronize bars and local Long Island

17   singles hangouts and be a part of a whole new social life.

18   This has had a negative impact on her responsibilities to our

19   children, as well as her daily responsibilities of a

20   homemaker.  She's tried to work at two different jobs and has

21   failed and been let go.  My children have visited me at MDC

22   and cried to me that they need me not just because they miss

23   their father, because they need parental guidance and some

24   form of discipline, someone they can count on during troubled

25   times.

2178STIS                                                              11

Sentence

1          My 20-year-old daughter, Shara, who is on her way to

2     recovery from abusive drug use by going to NA and AA has had a

3     terrible time since my incarceration.  Her relationship with

4     her mother has almost become a competitive environment.  Her

5     mother's desire to socialize with her daughter's friends to

6     the point of dating some of her own daughter's ex-boyfriends

7     has sent my daughter into a rebellious frizzy which has caused

8     her to face the courts of Nassau County and be ordered into a

9     rehabilitation program.

10          My 10-year-old daughter Eliza finds herself in an

11     awkward position.  She's not sure if she's the mom or the

12     child.  If she's not nursing her mother through one of her

13     episodes, she's lying awake worried if or even when her mother

14     is coming home from a night out.  These frequent escapades

15     have forced her own 16-year-old son to act as her daughter's

16     parent helping with homework and getting her off to school in

17     the morning.  This behavior has caused her to miss an

18     inordinate amount of school and has jeopardized her education.

19          My 16-year-old son Brett is a junior in high school

20     who has become completely withdrawn since my incarceration.

21     He went from a B plus student to barely passing.  And finally,

22     he is finding his teenage time disappearing because he is

23     looking after his sister or mother and worried about them

24     both, all of which I believe will have a dramatic impact on

25     his future and growth as a young man.

Sentence

1          My 18-year-old son Jarrett is a freshman at the

2    University of Miami on an academic scholarship.  He has

3    recently suffered a near fatal accident which has hospitalized

4    him for two weeks and he is currently requiring extensive

5    rehabilitation.  Due to his mother's recent neglect, he has

6    not been to his required follow-up visits, which if I was

7    there I know he would be looked after.  He just recently told

8    me he was taking a leave of absence from school so he can help

9    at home.  This alone has broken my heart since I know how he

10   has worked to get to college.

11          Your Honor, my time at MDC and the recent events of

12   September 11 have allowed me to assess life from a completely

13   different perspective.  Certain things that I took for granted

14   should and will be looked at a lot closer and much more

15   carefully and appreciated a lot more, kind of a wake-up call

16   to see what is important and what is really not.

17          It made me realize that the postulate "crime does not

18   pay" says a lot, and the true meaning means more to me than

19   anything.  I have learned that your freedom and ability to

20   make choices regardless of your financial wherewithal, be it

21   rich or poor, is truly a most valuable commodity a person

22   possesses.  To be with your family in the privacy of your own

23   home, having dinner together, able to discuss the events of

24   the day, just being there to enjoy the good and help with the

25   bad, moments like when you authorized me yourself to travel

Sentence

1   with my boy's high school basketball team to a tournament in

2   Florida, those are the moments treasured the most.  These are

3   the times and moments that are worth more than any amount of

4   money you can ever make.

5           This time at MDC has also extended me the opportunity

6   to reflect upon my future.  How can I afford to support my

7   children in a lawful manner and hope to make a positive

8   difference?  I would like to continue my education so I may

9   work with teenage children and possibly help guide them from

10  right and wrong and maybe just, maybe can save one child from

11  making the terrible mistakes I have.

12          So, your Honor, I am asking you here today, no, sir,

13  I am begging you, that you will impose the lightest possible

14  sentence based on all the circumstances so I may complete my

15  time and get back to my children and start this new life.

16          Thank you for your time.

17          THE COURT:  Mr. Musoff, anything you wish to say?

18          MR. MUSOFF:  Yes, your Honor.

19          Let me first address Mr. Adler's comments briefly

20  regarding the loss amount.

21          THE COURT:  Why don't you also go to the microphone

22  so everyone can hear you.

23          MR. MUSOFF:  Yes, your Honor.

24          Your Honor, first turning to Mr. Adler's comments

25  regarding the loss amount, I don't think it's at all disputed

2178STIS                    14

                        Sentence

1   that the stipulated loss amount in this case is between

2   $800,000 and $1.5 million, and it's clear that that number is

3   not the sum total of the bribes paid to either Mr. Stitsky or

4   the brokers he has recruited but that is the value of the

5   benefit conferred upon DMN Capital and its partners for the

6   securities transactions that those brokers were recruited to

7   engage in.

8            It needs to be clear, your Honor, that Mr. Stitsky

9   had come from Stratton Oakmont, and I don't believe it's

10  disputed that securities fraud was rampant.  He was later

11  barred from the industry based on his conduct at Stratton

12  Oakmont and then he and his partner Paul Burton were tasked

13  with recruiting these sorts of brokers, primarily from

14  Stratton Oakmont, to perpetrate securities fraud at a new

15  firm, Monitor Investment and Associates.  So Monitor was

16  created for the sole purpose of engaging in securities fraud.

17           After his brief association with Monitor, I don't

18  believe it is disputed that he continued to engage in

19  securities fraud, and he was convicted of that conduct before

20  the Eastern District which he awaits sentencing on.

21           So unless your Honor has any questions regarding how

22  the loss amount was calculated, and I believe it's stipulated,

23  the fact that he personally received an amount less doesn't

24  factor at all into the offense guidelines calculation.  But if

25  your Honor sees fit to view it in terms of where within the

2178STIS                                                          15
                          Sentence

1    sentencing range, the government does want to point out that

2    Mr. Stitsky enjoyed a position in the Monitor firm above that

3    of his brokers.  So he was in relationship with the DMN

4    Capital partners and he, in turn, recruited these brokers.  To

5    the extent the brokers have a limited role, that is because it

6    was Mr. Stitsky who stood as the one who had the relation with

7    DMN Capital and he in turn was the one who was organizing

8    Monitor along the same fraudulent lines as Stratton Oakmont.

9           Turning to what I believe is the main argument today,

10   which is whether a downward departure based on family

11   circumstances is appropriate, as it is clear, the disruption

12   of a defendant's family life is an obvious and an unavoidable

13   consequence of incarceration.  The fact that a defendant's

14   family life will be disrupted and that truly innocent victims,

15   meaning the defendant's children, may be affected alone is not

16   grounds for a downward departure.  While I don't believe the

17   government has been bottom feeding, as I believe was

18   characterized in the most recent letter to the court, I

19   believe it is clear that even single parents whose children

20   are placed in foster care repeatedly courts have found that is

21   not an extraordinary family circumstance.  Here it's a

22   two-parent household and the children certainly are not being

23   placed in foster care.

24          The other thing that the government pointed out in

25   its letters, these are not incredibly young children.  Granted

Sentence

1    the youngest is 10 years old, but the others are either in

2    high school or the oldest are 18 and 20 years old.  They are

3    in college.  So it's a situation of extremely young children

4    left at home.

5            I think the thrust of the government's response truly

6    deals with the fact that this defendant's family is fortunate

7    enough to have the support of, as they call it themselves, a

8    tight-knit and supportive family.  This is a situation where

9    both sets of grandparents are involved.  The defendant's

10   wife's parents, as well as the defendant's mother, and I

11   believe his father has passed away, his stepfather are all

12   enormously supportive, supportive both emotionally and, as set

13   forth in the PSI, they have given hundreds of thousands of

14   dollars over the year to support the defendant's family.

15           In addition, closer to home, the defendant also has

16   two sisters who are also enormously supportive, and it appears

17   that the defendant's children's aunts and uncles stand ready

18   and willing to continue to provide that support to their

19   nieces and nephews and they, too, have provided tens if not

20   hundreds of thousands of dollars to this defendant's family.

21           I think it needs to be noted, your Honor, that the

22   defendant's family does enjoy a lifestyle quite unusual to

23   many other defendant's families.  As pointed out in the PSI, I

24   believe at paragraph 177, the defendant lives in a six-bedroom

25   home on three acres in an affluent section of Long Island.

                                Sentence

1   They have a three-car garage, tennis court and swimming pool.

2   This lifestyle continues to be enjoyed by them.  They suffer

3   obviously somewhat because the defendant is not able to

4   provide any financial support, but it appears they continue to

5   live in this home and enjoy clearly an above-average

6   lifestyle.  Maybe not the lifestyle they were accustomed to

7   when the defendant was making $2 million when he was working

8   at Stratton Oakmont, but as we all know, Stratton Oakmont was

9   engaged in securities fraud.  I think it needs to be pointed

10  out that this defendant over the years has not provided

11  legitimate financial support to his family, he has engaged in

12  securities fraud, and by that means he has provided financial

13  support to his family.

14          Finally, your Honor, when the defendant appeared to

15  have engaged in a line of business other than securities

16  fraud, when he entered into a business arrangement with his

17  mother involving Sterling Optical stores, that too was tinged

18  by criminal activity.

19          As your Honor knows, this summer the defendant was

20  remanded into custody because the defendant physically

21  threatened the individual who had loaned money for the

22  purchase of these stores.  This was supposed to be the

23  defendant turning a new leaf, in a legitimate business.

24  Instead, the defendant brings along two men to threaten this

25  person with physical injury if he continued in pursuing what

                                   Sentence

1    was a legitimate business loan to the defendant.  Throughout,

2    this defendant has engaged in criminal activity such as to

3    support the family's lifestyle.

4          The other point I want to turn to is something that

5    has been commented on much by Mr. Adler in his submissions, is

6    that while it appears that the defendant's wife does suffer

7    from substance abuse problems, the defendant too has his own

8    substance abuse problems.  I am not saying that this somehow

9    makes him a better or worse father.  The letters of support

10   speak for themselves.  But this court should take notice that

11   the defendant has his own set of substance abuse problems,

12   that he himself has been abusing drugs on and off for the past

13   25 years, including cocaine, Quaaludes, Ectasy and alcohol.

14   The defendant has never completed a rehabilitation program and

15   it's unclear what sort of treatment and what his current

16   status is with respect to that substance abuse and how that

17   would affect his parental duties.

18          So, in sum, all these cases, your Honor, with respect

19   to family circumstances obviously portray families disrupted

20   and suffering, for what in this case the children's father has

21   done and brought upon himself.  But in this case, your Honor,

22   these children enjoy a supportive family that provides

23   emotional and financial support, and this case, unlike even

24   cases where single parents are incarcerated and their children

25   are left as wards of the state, these children will not suffer

2178STIS                                                                    19

                                    Sentence

1    a fate even close to that.  For those reasons, your Honor,

2    this is not an extraordinary case that warrants any sort of

3    downward departure.

4              THE COURT:  Let me ask you a question, Mr. Musoff.

5              You have asked the court to set a date within 90 days

6    after sentencing for purposes of setting restitution in this

7    case, correct?

8              MR. MUSOFF:  Yes, your Honor.

9              THE COURT:  How far advanced are you in the exercise

10   of putting together your restitution request?

11             MR. MUSOFF:  I have spoken to my colleagues who are

12   also involved in this case with the other codefendants and my

13   understanding is that since the terrorist attacks in the World

14   Trade Center, the SEC documents with respect to this case were

15   destroyed.  With respect to the restitution portion, I

16   understand that they are putting it together through alternate

17   means, and the government would request, and I have spoken to

18   Mr. Adler, that a date be set some 45 or 60 days from today.

19   I expect to have a number which I would like to discuss with

20   Mr. Adler two weeks before the sentencing date, so hopefully,

21   your Honor, Mr. Adler and the government can discuss what is

22   the appropriate and accurate restitution amount and we can

23   come to the court prepared at that time with hopefully an

24   undisputed amount.  The government would respectfully request

25   a date set 60 days from now.

2178STIS                                                                    20

Sentence

1          THE COURT:  I understand.

2          Let me ask you this.  Have you done anything with

3    regard to listing how many victims there were?

4          MR. MUSOFF:  Yes, your Honor.  It's my understanding,

5    because we have limited for purposes of this plea agreement

6    the victims, the victims are the customers of the two brokers

7    that Mr. Adler mentioned, Mark Burton and Ken Fuina.  It's my

8    understanding there were only two primary customers and one

9    main customer and that that customer's losses were

10   approximately $800,000.  So it's not a multitude of victims.

11   We are trying to assess more the value of the loss than the

12   number of victims.

13         THE COURT:  Thank you.

14         Mr. Adler, you were on your feet.  Did you want to

15   say something?

16         MR. ADLER:  Just briefly and simply factually by way

17   of clarification.

18         Irving Stitsky was not an officer or had any equity

19   interest in Monitor or any of those companies.  The brokers

20   that were recruited, as the indictment alleged and indeed as

21   the allocution confirmed, went to work and received their

22   instructions and made their decisions concerning what they did

23   and why they did it and how they conformed to SEC regulations

24   without the guiding hands of Irving Stitsky.

25         Accordingly, to the extent, particularly where the

2178STIS                                                           21

Sentence

1   one individual who has been identified, Mr. Fettman, became a

2   customer of Burton and Fuina afterwards, the court has already

3   heard, and indeed the probation report has reported on how

4   Burton and Fuina's loss total is computed, or gain total, I

5   guess I should say, because the basis is bribery, I ask the

6   court to keep that in mind particularly where the Probation

7   Department talks about the fairness and equity.

8           Lastly, in terms of lifestyle and extraordinary

9   family circumstances, the house that you have heard about was

10  contemplated to be sold.  Attempts have been made to sell it

11  to get Florence Nathan, who is Irving's mom, to recoup the

12  moneys and to take her off the mortgage.  The house, as I

13  understand, is currently in foreclosure and attempts have been

14  made, none of it has been helpful because of the downturn in

15  the economy result of the events of September 11, but this

16  house will probably end up, at best, as a break-even

17  proposition and the family will only know, and a lot of this

18  has been delayed, as I understand it, in order to see what is

19  going to happen in terms of the sentencing.

20          In terms of Sterling Optical, I think it's a tragic

21  situation that the perceptions were that the seller of the

22  stores that took back notes had been less than candid with

23  regard to credit card receipts and the like.  It clearly

24  was -- and that's why it was prosecuted as a 1001 violation

25  and not in any other significant way.  It was recognized as a

2178STIS                                                          22

Sentence

1    spontaneous and unfortunate response to the perception that

2    his mom was being ripped off and not for other continuation of

3    any form of criminality, although he has accepted

4    responsibility for his role completely in that situation and

5    will be sentenced before Judge Seidler because of it.

6              However, I would point out this is a defendant who

7    understands the work ethic.  He was working some 60-plus hours

8    a week to learn the business.  I know he was learning the

9    business.  He was prepared and indeed that manifested a

10   recognition that the securities field was certainly a field

11   that was no longer appropriate to have any involvement in.

12             To the extent that the court imposes a sentence today

13   and reserves on the issue of restitution for the reasons the

14   government has made clear, just to comment on that, I

15   indicated to Mr. Musoff it might be most helpful for the court

16   if the government were able to make 45 days as an

17   approximation.  If they will get me those figures, I will

18   confer with --

19             THE COURT:  Mr. Musoff indicates that's what he has

20   indicated.

21             MR. ADLER:  I want you to know we have spoken about

22   it, and in order to make the job less adversarial and more

23   collegial, if we can agree, we will.  If we can agree in part,

24   we will.  We will come back at some other time for that

25   housekeeping portion of the case.

2178STIS                                                              23
Sentence

1          I do believe that the circumstances here are

2     extraordinary.   Some people when they think about departures

3     believe that a lawyer is asking the court to impose a

4     noncustodial sentence.   That's not what this approach is

5     about.   I think that there is a family and the family is doing

6     what it can under difficult circumstances.   I am simply saying

7     that a measured departure, which is not insignificant, that's

8     why I called the court's attention to the combined loss totals

9     or the combined gain totals because I think that is a figure

10    that the court can rely upon should it be so inclined, could

11    point the way towards tempering justice with mercy.   It sends

12    the message that conduct of this kind will not be tolerated

13    and victims will be protected, at the same time it also sends

14    a message that we cannot turn our backs on our children who

15    are the next generation.   Again, I ask the court to temper

16    justice with mercy.

17          THE COURT:   Any legal reason why sentence should not

18    now be imposed?

19          MR. ADLER:   No, sir.

20          THE COURT:   Mr. Musoff?

21          MR. MUSOFF:   No, your Honor.

22          THE COURT:   The defendant may remain seated.

23          The defendant, Irving Stitsky, has pled guilty

24    pursuant to a written plea agreement to Count 5 and Count 7 of

25    the indictment to the crimes of conspiracy to commit

2178STIS                                                        24
                           Sentence

1    securities fraud, wire fraud, and to use interstate facilities

2    to commit commercial bribery, both of which crimes are

3    punishable under 18 United States Code, Section 371, and they

4    are Class D felonies.

5         These two counts under the sentencing guidelines are

6    grouped, and the base offense level for these crimes as set

7    forth in 2F1.1(a) of the guidelines is 6, to which there are

8    added 11 levels as a result of the fact that the value of the

9    improper benefit to be conferred in return for the bribes

10   received by Mr. Stitsky was more than $800,000 but less than

11   $1.5 million.  The offense level is also increased by two

12   levels because these crimes involved more than minimal

13   planning.  There was more than one victim.

14        The result of these increases is to place the

15   adjusted offense level at 19.  Mr. Stitsky has accepted

16   responsibility for his crimes and, therefore, is entitled to a

17   three-level reduction, which places the total offense level at

18   16.

19        He is in Criminal History Category I, a most

20   favorable Criminal History Category.  As a result, his

21   guideline imprisonment range is 21 months to 27 months; his

22   guideline supervised release range is two to three years;

23   probation is not authorized under the sentencing guidelines at

24   these levels; his guideline fine range is $5,000 to $50,000;

25   and there is a mandatory special assessment of $100 per count

2178STIS                                                                25
                              Sentence

1    for a total of $200.

2              The defendant has noted objections to the presentence

3    report and these are adequately addressed at page 31 of the

4    presentence report.  The defendant has submitted substantial

5    materials from his family, friends, others, with regard to his

6    character, his involvement with his children, the difficulties

7    that his family experiences, the need to have the defendant

8    with his children.  It's a complicated set of circumstances

9    here.

10             The substance of this case, going back to the case

11   itself, is that the defendant participated in what are called

12   pump-and-dump schemes as a registered representative, and he

13   also recruited certain stockbrokers to the firm, which has

14   been mentioned, Monitor, from November 1995 through March of

15   1996, who would receive secret, undisclosed bribes for

16   recommending certain securities to their retail clients, and

17   Monitor was most recently controlled by DMN Capital which paid

18   the bribes to the defendant and others.

19             The facts of this case I think ought to be more

20   specifically laid out on the record here and so I am going to

21   refer to what has been provided in the presentence report and

22   in the government's letter, Mr. Musoff's letter dated January

23   2 and, in part, in the submissions made by Mr. Adler on behalf

24   of Mr. Stitsky.

25             In substance, going back to 1995, DMN Capital, which

2178STIS                                                    26
                            Sentence

1   was a financial advisory firm that was corrupt -- it was

2   founded as a joint venture of the five La Cosa Nostra crime

3   families in New York -- orchestrated a series of stock

4   manipulation schemes that fraudulently induced investors at

5   numerous brokerage firms into buying certain securities by, as

6   I have described, among other fraudulent means, paying secret

7   bribes to stockbrokers to cause their retail customers to buy

8   and hold certain securities.  In connection with its

9   fraudulent scheme, DMN Capital controlled various brokerage

10  firms, including Monitor Investment Group, the firm that's

11  being mentioned here.

12          The DMN firm recruited certain stockbrokers to work

13  at Monitor through an agreement with Mr. Stitsky and his

14  partner Mr. Burton, Paul Burton, whereby Stitsky and Burton

15  arranged for several licensed and unlicensed brokers to work

16  at Monitor and receive secret, undisclosed bribes for what the

17  government calls aggressively pushing certain securities.  I

18  don't have to go through the names of the companies.

19          Mr. Stitsky recruited many of these brokers from

20  another fraudulent place, Stratton Oakmont, where fraudulent

21  sales practices had been used.  Mr. Stitsky from August 1990

22  to July 1995 had been employed by Stratton Oakmont, which was

23  a boiler room operation, and there he was making up to $2

24  million a year.

25          In August of 1998, Mr. Stitsky was barred by the

Sentence

1   Securities and Exchange Commission from association with any

2   broker-dealer investment company, investment advisory or

3   municipal securities dealer because of his alleged involvement

4   with securities fraud associated with Stratton Oakmont.

5           Now having left Stratton Oakmont, he was employed by

6   Monitor, and at Monitor recruited many of the brokers that

7   were at Monitor, which was this fraudulent operation.  He

8   recruited them from Stratton Oakmont and from other places

9   where fraudulent sales practices were used.

10          Then, as I referred earlier, the secret bribes were

11  paid to the brokers who had been recruited by Mr. Stitsky and

12  these bribes were calculated on the basis of the total volume

13  of certain securities purchased and held by those brokers'

14  retail customers.

15          This case is a very serious case.  Mr. Stitsky is one

16  defendant out of 26 defendants in the case before me, and

17  there are several other cases in this court involving

18  approximately the same number of defendants in this massive

19  securities fraud scheme.

20          The fact is that Mr. Stitsky, as I pointed out, has

21  pled guilty pursuant to a written plea agreement.  This is a

22  negotiated plea.  He pleaded guilty to two counts that I have

23  referred to.  He stipulated in the written plea agreement that

24  he signed, and Mr. Stitsky is a sophisticated business person,

25  he stipulated that the improper benefit conferred in return

2178STIS                                                                28
Sentence

1   for the bribes which were paid to the brokers that he

2   recruited exceeded $800,000.  He further stipulated that this

3   improper benefit referred to the value of the securities

4   transactions which were affected in return for the bribes paid

5   to these brokers and to Mr. Stitsky.

6          Mr. Stitsky, in addition to the fact that he has the

7   Stratton Oakmont situation and this situation, has also pled

8   guilty to one count of securities fraud in connection with his

9   indictment in the Eastern District of New York, in Brooklyn,

10  and Long Island, and that offense related to a separate

11  conspiracy to manipulate securities in at least eight

12  companies for his own benefit in connection with fraudulent

13  representations made to an Internet company.

14         He also pled guilty in the Eastern District court,

15  federal court, to charges relating to threatening an

16  individual with physical injury if that individual attempted

17  to collect a legitimate business debt from Mr. Stitsky.  He

18  pled guilty to one count of making false statements to the

19  government when he was subsequently questioned about the

20  event.  In other words, Mr. Stitsky, even though he is in

21  Criminal History Category I, has a, I will call it, checkered

22  history.  He presents a very sympathetic case for a downward

23  departure, and specifically he claims that his wife is unfit

24  to care for his children due to her abuse of alcohol and drugs

25  and, what is clearly implicit in these papers, her substantial

Sentence

1    emotional problems.  He says that his family circumstances are

2    extraordinary and that, given the circumstances that he finds

3    himself in and his children are in, that the court ought to

4    downwardly depart from the guidelines, the sentencing

5    guidelines, which dictate a sentence within a specific

6    sentence range.

7          The sentencing guidelines make reference to family

8    ties and responsibilities in Section 5H1.6 as follows.  It

9    states:  Family ties and responsibilities and community ties

10   are not ordinarily relevant in determining whether a sentence

11   should be outside the applicable guideline range.  In fact,

12   the cases indicate that family circumstances are a discouraged

13   basis for departure, and the reason is obvious, that

14   defendants who have families, who have children, who appear

15   before the court on sentence, are commonly in a situation

16   where the family is seriously adversely affected by the

17   removal of a parent from the home.  This is a circumstance

18   that courts and judges deal with every day of the year in

19   courts throughout the United States.  It's a reason why

20   judges, contrary to what people in the public may believe,

21   find sentencing so difficult and, in fact, painful.

22          In this case, the defendant has a difficult case to

23   make because he has four children who are not infants.  It's

24   true that the youngest of the children is 10, but he has

25   children who are age 20, 18 and 16, children who have already

2178STIS                                                    30
                          Sentence

1   moved along through their childhood into young adulthood.   The

2   sentencing guidelines indicate that a downward departure

3   certainly can be granted if the factor that is presented to

4   the court, in this case extraordinary family circumstances, is

5   presented to an exceptional degree or in some other way makes

6   the case different from the ordinary case where the factor is

7   present.

8        There really has to be exceptional and extraordinary

9   circumstances.  The mere disruption of the defendant's life

10  and the resulting effect on those who are dependent on the

11  defendant is in fact, as I indicated, inherent in the

12  punishment of incarceration for all defendants who appear

13  before this court, and courts have spent a great deal of time,

14  districts courts and circuit courts, in analyzing these

15  circumstances, and the singular question to be addressed is

16  whether the case is outside the heartland of the cases that

17  appear before the court.

18        In this case we have a complexion of facts which

19  indicate the following:  The children in Mr. Stitsky's

20  household are, without doubt, significantly older than those

21  cases in which downward departures commonly are granted.   It

22  is the experience of this court and other judges of this court

23  and courts throughout the United States that not uncommonly

24  single parents, women whose children are going into foster

25  care, appear before this court and courts viewing these cases

                                Sentence

1    and the volume of them have occasionally downwardly departed

2    but have looked to the entirety of the circumstances to see

3    what else the family consists of and what else is available

4    for the children and who else can be looked to to step in in

5    the place of the defendant before the court.  And parsing

6    these cases, it is clear to me, again as I indicated a few

7    moments ago, that under the test of whether this case is

8    outside the heartland or extraordinary or unique, I don't

9    think that the defendant can establish that, and I find that

10   this case is not outside the heartland and, in my discretion,

11   would decline to downwardly depart and do so for these

12   reasons.

13            In this case, unlike many other cases, and

14   notwithstanding my acceptance of what has been stated with

15   regard to Mr. Stitsky, this defendant, unlike many, many other

16   defendants, have other family members who are available and

17   who have stepped in thus far to provide support, emotional and

18   financial support, to the children while Mr. Stitsky is

19   incarcerated.  In this particular case, as I review the facts

20   here, it is clear that Mr. Stitsky has two sisters in this

21   area, in the metropolitan area.  He has two parents.  He has

22   Mr. Stitsky's two parents.  These people have all been

23   supportive and the indication is will continue to be in this

24   tight-knit close family that is before us in the form of

25   Mr. Stitsky, the father.

2178STIS

Sentence

1        Since 1995, Mr. Stitsky's sisters have already

2   provided over $80,000 in financial assistance to the family.

3   Mr. Stitsky's mother and stepfather have provided both

4   emotional and financial support for the family, as have the

5   sisters, and they have provided, the mother and stepfather,

6   more than $200,000 to support the family.  And Mr. Stitsky's

7   in-laws, the parents of his wife, Mr. and Mrs. Minsky, have

8   provided a quarter of a million dollars to the family since

9   1995.

10        I say this not to diminish the arguments made by the

11   defendant so much as to point out that this case is different

12   from so many other cases that are before us where a mother or

13   father, the only person in the home, are about to be sentenced

14   and don't have anyone out there to step forward and provide

15   emotional and financial support for children.

16        In this case, as unfortunate and tragic as this case

17   is, and it is, there are people in the family who have been

18   and are available to provide emotional and financial support,

19   and that, in my judgment, is a serious factor that removes

20   this case from the argument that it is outside the heartland.

21   It is a case that is not unique.  It is in the heartland of

22   cases.  It is a case in which fortunately there are others who

23   are available to provide the specific items for the children.

24        It is also interesting to me that this situation, in

25   which the defendant and his wife are divorced, at least since

2178STIS                                                          33

Sentence

1   last March, finds the defendant and his wife living in the

2   same home with the children.  Withdrawn.  Finds his wife

3   continues to live with the children in the same home they

4   lived in as husband and wife even though they had joint

5   custody, and that Mr. Stitsky has not yet, at least according

6   to what I have seen, made any application to a court for sole

7   custody of the children or at least sought to have his

8   children live with him rather than his wife despite all these

9   difficulties his wife is experiencing.

10          This is not to say that I am not sympathetic to the

11  children.  I am very sympathetic to the children, extremely,

12  and I wish there was a way that I can find a solution to both

13  sides of the equation that would not impact on the children as

14  I know this sentence does.

15          Mr. Stitsky and his wife both, it seems to me, have

16  problems with alcohol and drugs, which itself is a tragedy,

17  and I think that both of them are in serious need of

18  treatment.  But that doesn't, again, change the facts that I

19  have indicated, which are that this case is not outside the

20  heartland of cases.  This case is not uncommon.  Parents who

21  are being sentenced commonly come before this court with

22  severe alcohol and drug abuse problems and the children are

23  the affected parties.

24          The substance of this is that the court declines in

25  its discretion to downwardly depart for extraordinary family

2178STIS                                                            34
                              Sentence

1  circumstances because as serious as I find this case to be,

2  this case is not outside the heartland of cases and is not to

3  this court extraordinary.

4          The court also notes that the arguments that have

5  been made by Mr. Adler, who has done a superb job for the

6  defendant, by the way, require a response.  Mr. Adler points

7  out that Mr. Stitsky received only $57,000 as his part of the

8  payments that were made here.  However, the fact is, as I

9  indicated at the outset, there is a written plea agreement in

10  this matter, in which it is said by the parties they agree

11  that the improper benefit conferred in return for the bribes

12  paid to the brokers that Mr. Stitsky recruited exceeded

13  $800,000, and the improper benefit referred to the value of

14  the securities, referred to the value of the securities

15  transactions which were effected in return for these bribes.

16          The fact is that Mr. Stitsky has agreed in his plea

17  agreement not to seek a departure from the stipulated

18  guidelines range on any grounds but the sole exception of his

19  family circumstances, which I have now alluded to, and he

20  further agreed he would not otherwise suggest a departure or

21  adjustment was warranted.  It is in the plea agreement.

22          The fact is under the sentencing guidelines, even if

23  we accept, and I do accept Mr. Adler's argument that Mr.

24  Stitsky had a benefit, a financial benefit personally of only

25  $57,000 rather than the stipulated amount of 800,000 to a

2178STIS                                                          35
                              Sentence

1   million and half, under the guidelines, and the defendant's

2   individual profit is not the measure of the loss, because the

3   fact is that Mr. Stitsky participated in a conspiracy, in a

4   jointly undertaken activity that resulted in the stipulated

5   loss amount of between 800,000 and a million and a half

6   dollars.  For sentencing purposes, under the guidelines, it is

7   the improper benefit that was conferred in return for the

8   bribes that is the loss amount that the court uses in

9   calculating the guidelines.  That's the law.  That's also what

10  the parties agreed to, and certainly we are dealing here with

11  a sophisticated defendant and a very sophisticated and very

12  experienced lawyer.

13        The net result of which is that I find that the

14  guideline calculations that were made here in the presentence

15  report and as stipulated to by the parties is correct and

16  appropriate and I believe that they are the ones that should

17  be applied and I do intend to apply them.

18        With all of this in mind, and recognizing that I have

19  sentenced many defendants now in this 26-defendant case, some

20  of whom have sentences which are well in excess of the

21  sentences that are confronting Mr. Stitsky here, in trying to

22  balance the sentencing considerations, I do now sentence

23  Mr. Stitsky to the lowest level under the guidelines in this

24  case and remand him to the custody of the Bureau of Prisons

25  for a term of 21 months, to be followed by a term of three

2178STIS                                                                    36

Sentence

1    years' supervised release.  The supervised release is to be

2    subject to the mandatory conditions that he not commit another

3    federal state or local crime; that he not illegally possess a

4    controlled substance; that he not possess a firearm or

5    destructive device.

6           He is also subject to the standard conditions of

7    supervision 1 through 13, with the special conditions that he

8    provide the probation officer with access to any requested

9    financial information; that he not incur new credit charges or

10   open additional lines of credit without the approval of the

11   probation officer unless Mr. Stitsky is in compliance with the

12   installment payment schedule.

13          He is to participate in a program approved by the

14   United States Probation Office for substance abuse, which

15   program may include testing to determine whether Mr. Stitsky

16   has reverted to the use of drugs or alcohol.  Mr. Stitsky will

17   be required to contribute to the costs of services rendered as

18   a copayment in an amount to be determined by the probation

19   officer based on his ability to pay or the availability of

20   third-party payment.  He shall participate in an alcohol

21   aftercare treatment program under a copayment plan which may

22   include urine testing at the direction and discretion of the

23   probation officer.

24          He is to report to the nearest probation office

25   within 72 hours of his release from custody.  His supervision

Sentence

1    under the supervised release is to be conducted in the

2    district of his residence.

3         I am not imposing any fine here because I do not find

4    that he has the ability to pay a fine and also to pay the

5    restitution, which will be set on a date to be set 60 days

6    from now.   I do impose, however, the mandatory assessment of

7    $200, $100 on each count, which is due and payable

8    immediately.

9         I am imposing this sentence in light of the

10   considerations which are set forth in the law.   That is, that

11   the sentence address the seriousness of the crimes and deters

12   the defendant and others and to protect the public.

13        There are outstanding counts.   Are you requesting

14   them to be dismissed?

15        MR. MUSOFF:   Yes, your Honor.

16        THE COURT:   That motion is granted.

17        The defendant has the right to appeal the sentence or

18   any part thereof.   Should he determine to do so, I ask you,

19   Mr. Adler, if you're available, to assist him on any such

20   appeal.   If you are not available to assist him and he cannot

21   afford counsel and he wishes to appeal, the court will appoint

22   counsel to represent him free of charge.

23        In your letter to the court, Mr. Adler, you ask that

24   the court make a recommendation, if it does sentence

25   Mr. Stitsky to incarceration, to make a recommendation to the

2178STIS                                                                    38
                            Sentence

1   Bureau of Prisons that Mr. Stitsky be permitted to serve his

2   sentence at the Otisville facility.

3           MR. ADLER:  Yes, Judge.  I did so because there is a

4   particular rabbi who I have had some dealings with and I just

5   want to say that I found that his efforts in terms of dealing

6   with defendants was proper and useful, and the defendant --

7           THE COURT:  I am prepared to make the recommendation.

8           MR. ADLER:  Thank you.

9           THE COURT:  Particularly because I do want Mr.

10  Stitsky to be in this area of the country, to be close to his

11  children and maintain and continue to have contacts with his

12  children that I think are critical to their needs and

13  important to Mr. Stitsky's.

14          I will also say if the Bureau of Prisons measures how

15  many people they have and what their needs are and capacities

16  are, and they are not bound by the court's recommendation, I

17  am going to also suggest if they don't have facility for him

18  in Otisville that he be sentenced to a facility as close to

19  the metropolitan area as possible where he can maintain

20  contact with his children.

21          MR. ADLER:  I appreciate that, Judge.

22          THE COURT:  That is the sentence of the court.

23          Anything further, Mr. Adler?

24          MR. ADLER:  I was just going to suggest purely by way

25  of housekeeping, just looking for round dates, if, pursuant to

2178STIS

Sentence

1    Mr. Musoff's information, if the government might be able to

2    get me some figures by the week of February 25.  I didn't know

3    if the court wanted to select a date of perhaps Monday, March

4    18, as a target date, on the assumption whatever date Mr.

5    Musoff selected, the week of February 25, if that was

6    convenient for him, we can return to address the issue of

7    restitution.

8         THE COURT:  Can we set this down for March 18?

9         MR. MUSOFF:  With the convenience of the court and

10    Mr. Adler, if we can do it the week of March 11.

11        THE COURT:  We will get the government to get the

12    papers by February 25 and we will put it down for March 11.

13        MR. ADLER:  Yes, sir.

14        THE COURT:  Let's make it March 11.  Let's make it 11

15    o'clock on March 11.

16        MR. ADLER:  Thank you, your Honor.

17        THE COURT:  Anything further?

18        MR. ADLER:  No, sir.

19        MR. MUSOFF:  No, your Honor.  Thank you.

20        THE COURT:  Thank you both.

21        (Adjourned)

22

23

24

25