Katherine Alfieri, Esq.
Cal. State Bar No. 132536
LAW OFFICES OF KATHERINE ALFIERI
260 Madison Avenue, #800
New York, N.Y 10016
Telephone:     646.706.7270
P.O. Box 460238
San Francisco, CA 94146.0238
Telephone:     415.337.5100
Facsimile:     415.337.1177

Ethan A. Balogh, Esq.
Coleman & Balogh LLP
Cal. State Bar No. 172224
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone:     415.391.0440

Attorneys for Defendant/Petitioner
MARK ALAN SHAPIRO

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


| UNITED STATES OF AMERICA, | CR-06-0357-2-KMW |
|---|---|
|     Plaintiff/Respondent, | CV-15- |
| v. | |
| MARK ALAN SHAPIRO, | |
|     Defendant/Petitioner. | |
| _____/ | |


**MARK ALAN SHAPIRO'S MOTION PURSUANT TO 28 U.S.C. §2255 TO VACATE,
<u>SET ASIDE OR CORRECT JUDGMENT AND SENTENCE</u>**

Movant, MARK ALAN SHAPIRO, #13354-014 ("Shapiro" or "Petitioner"), a prisoner in the custody of the Bureau of Prisons, by and through his attorney, moves this Court for an order vacating, setting aside, or correcting his judgment and sentence under 28 U.S.C. § 2255 on grounds they were imposed in violation of the United States Constitution and/or the laws of the United States, the Court was without jurisdiction to impose such sentence, and/or the sentence was in excess of the maximum authorized by law and is otherwise subject to collateral attack.

By this verified pleading, Mark Alan Shapiro states:

1.     He  is currently a prisoner in custody at the U.S. Prison in Otisville, New York pursuant to a sentence and judgment entered on October 25, 2010 in the U.S. District Court for the South-ern District of New York, Case No. 1:06-cr-00357-KMW. (Docket[1] 324.)

2.     **BACKGROUND**.  In 1998, Shapiro created Two Elk Trust ("TET"), with himself and his three minor children as beneficiaries, to purchase, hold, and develop real estate in Miami-Dade County, Florida. (Exh. A.[2])  Through TET, Shapiro acquired and developed several properties on Miami Beach, including the Simone Hotel, Madison Hotel, and Mercury Hotel Condominium Unit No. 303. (See GX 34, 35, 38; Exh. B; see also detailed sections on each property, *infra*.)

3.     On December 9, 1998, Shapiro was charged by information with bank fraud and con-spiracy to commit tax fraud in the U.S. District Court for the District of Connecticut. (Docket 1, Case No. 3:98-cr-00242-AVC.)  On May 21, 2001, Shapiro was sentenced to 30 months impris-

---

[1]     Rather than inundate this Court with documents that are part of the Court file, Shapiro shall reference such items by docket number and trial transcripts by "RT" (Reporter's Transcript) and page number.  All docket references are to Case No. 1:06-cr-00357-KMW unless otherwise stated.

[2]     All such referenced Exhibits are attached hereto.

onment and was incarcerated at F.C.I Allenwood. (Docket 87, Case No. 3:98-cr-00242-AVC; Shapiro's Presentence Report ["PSR"], ¶¶ 16-17; Docket 286 at 5-6.)

4.　　While in custody, Shapiro constructed a real estate investment business plan that focused on the purchase of multifamily real estate in Miami Beach, with advice and support from his longtime friend and mentor, Bill Foster. (Docket 286 at 5-6.)  Around the same time, Shapiro met Irv Stitsky, who was also serving time at Allenwood, and the two talked about Stitsky running the sales office of the envisioned business. (RT 1936-37; Docket 286 at 7.)  Shapiro was released from federal custody in September 2003. (PSR ¶ 93.)

5.　　In November 2003, Shapiro and Foster created the Cobalt Capital Companies ("Cobalt").[3] (Docket 286 at 6; Exh. GGG, Declaration of Anthony M. Bracco ["Bracco Decl."], ¶ 14.) Together, Shapiro and Foster retained lawyers, opened offices in Springfield, Massachusetts, hired employees, and formed several LLCs. (*Id.*)

6.　　In December 2003, Cobalt Capital Partners I, LLC ("CCP, LLC") issued a Private Placement Memorandum ("PPM I") offering 20 Units of Class A Limited Liability Company Membership Interests ("Units"). (Dockets 92-8; 286 at 6.)

7.　　In January 2004, Shapiro created Vail Mountain Trust ("VMT"), appointing attorney Robert Cohen as Trustee. (Exh. C.)

8.　　In the spring of 2004, Stitsky established Cobalt's sales office in Great Neck, New York. (RT 148, 154; Docket 286 at 7.)

---

[3].　　All references to "Cobalt" shall include all companies, partnerships, and corporate entities formed under the Cobalt umbrella.

9.     In April 2004, Shapiro and Foster formed Cobalt Multifamily Investors I, LLC ("CMFI");

Cobalt Multifamily Co. I, LLC; and Cobalt Capital Companies, LLC. (Exh. GGG, Bracco Decl., ¶¶

13, 14.)

10.     In July 2004, CMFI issued a second Private Placement Memorandum ("PPM II") offering

250 Units of Class A Limited Liability Company Membership Interests. (Docket 92-3.)  In Decem-

ber 2004, CMFI issued a third Private Placement Memorandum ("PPM III") offering 250 Units of

Class A Limited Liability Company Membership Interests. (Docket 92-6.)

11.     **THE COBALT PROPERTIES**.  As of the two relevant dates, November 30, 2005/December

1, 2005 and March 27, 2006, Cobalt owned (or was in contract to own) a substantial portfolio of

properties.

12.     **The TRIO.**  The TRIO is an Art Deco apartment complex in Miami Beach, Florida, com-

prised of three contiguous buildings, containing a total of 54 apartment units converted into

condominiums. (Exh. D.)  On June 22, 2005, CMF South Beach Acquisition I, LLC purchased the

TRIO for 5.2 million dollars. (Exh. E.)

13.     Cobalt's plan for the TRIO was to create modern, upscale, and market-leading condo-

miniums in a "retro style." (Exh. F.)  As of March 2006, architectural and design plans for the

property had been completed, condo conversion documents filed, a contractor selected, a mar-

keting plan developed, a model unit completed, and condo sales were underway with 38 of 54

units (or 70 percent) sold and additional sales pending. (*Id.*)

14.     **The Springfield Properties**.  The Springfield Properties are within a 22-unit commer-

cial/office condominium building, located in Springfield, Massachusetts. (Exh. G.)  In addition to

its own corporate offices, as of March 2006, Cobalt owned 11 of the 22 units, or 42 percent of

the complex, for a total of 10,784 square feet, i.e., Units 109, 207, 208, 300B (a.k.a. 302), 304, 305, 401, 402, 404, 406, and 408. (Exhs. H-O.)

15. **The Texas Tax Credit Properties ("TTCP").** The TTCP consist of eight tax credit properties throughout the State of Texas totaling 1,162 units, as follows: (a) High Pointe Plaza, Lufkin, Texas, 72 units; (b) Meadowbrook Plaza, Houston, Texas, 220 units; (c) Mockingbird Lane Plaza, Victoria, Texas, 160 units; (d) Pineridge Plaza, Cleveland, Texas, 70 units; (e) Simmons Garden Senior Citizen Housing, Houston, Texas, 120 units; (f) Sunset Arbor, Abilene, Texas, 220 units; (g) Villa Del Rio, Laredo, Texas, 226 units; and (h) Waller-Hillside Plaza, Waller, Texas, 74 units. (Exh. EEE, Declaration of Richard L. Spencer ["Spencer Decl."], ¶ 7; Exh. FFF, Declaration of Steven J. Kurtz ["Kurtz Decl."], Appraisal Reports for TTCP attached thereto.) Each property was owned by a limited partnership, which was syndicated with a tax credit syndicator/limited partner ("LP"). (Exh. EEE, Spencer Decl. ¶ 10.a. and Exh. 2-B thereto.)

16. In January 2005, CMF Texas Acquisitions TC, LLC purchased the general partner ("GP") interest in each of these entities from Donald W. Sowell. (*Id*. at ¶¶ 10.a. through e. and Exhs. 2-G and 2-B thereto.) All of the properties were in need of rehabilitation. Cobalt planned to provide the funds necessary to renovate and stabilize the properties, improve their occupancy, and strengthen their financial conditions. (Exh. P at 2.)

17. WNC was the LP for Sunset Arbor, and the Richman Group ("TRG") was the LP for the other seven properties. (Exh. EEE, Spencer Decl., ¶ 10.c. and Exh. 2-B attached thereto.) Cobalt quickly secured approval for the GP transfer from WNC for the Sunset Arbor property. (Exh. Q.)

18. With regard to TRG, as more fully set out in Claim Three herein, under the Texas Revised Limited Partnership Act (Tex. Rev. Civ. Stat. Ann. Art. §§ 6132a-1 *et seq.*) and the express terms

of the partnership agreements, "TRG tacitly, effectively and by operation of law consented to [Cobalt] as their new General Partner." (Exh. EEE, Spencer Decl. ¶ 18.) Therefore, Cobalt was the GP of the TTCP. (Exh. EEE, Spencer Decl. ¶ 24.)

19. **The Houston City Properties ("Houston Properties").** The Houston Properties consist of four multifamily apartment complexes in Houston, Texas, totaling 93 buildings and 1,672 units on 54.14 acres, as follows: (a) Hobby Place, 48 buildings, 596 units; (b) Maxey Village, 8 buildings, 404 units; (c) Versailles, 28 buildings, 292 units; and (d) Green Oak Village, 9 buildings, 380 units. (See Exh. R.)

20. In December 2004, CMF Houston Acquisition I, LLC acquired 100 percent of both the GP and LP interests in all four properties. (Exhs. S-U.)

21. In July 2005, Cobalt had the south side of Versailles under contract for 3.6 million dollars with the local community college, and the remaining 145 units on the north side were to be converted to condominiums and sold as part of a first-time home buyer program. (Exh. V at 7.) For the other three properties, Cobalt planned to reposition and stabilize the complexes in an 18 to 24-month time frame at which point they would be refinanced, and the entire debt, equity, and some profit would be cashed out. (*Id*. at 8.) Cobalt had also completed architectural designs for all four properties (Exh. W) and secured financing (Exh. X).

22. Based on Cobalt's acquisitions of the TTCP and Houston Properties, in June 2005, Cobalt signed a ten-year lease for an office in Houston and began remodeling and furnishing the space. (Exhs. Y-AA.)

23. **The Madison.** The Madison, also known as The Simone Beach Club West Condo Hotel, is a landmark hotel located in the Art Deco district of South Beach, at 304 and 312 Ocean Drive

in Miami Beach, Florida. It consists of two abutting apartment buildings, which were to be joined, extensively renovated, and converted to a full service resort "hotel-condominium." (Exh. BB.)

24.     On May 23, 2005, CMF Simone Beach Club Acquisitions, LLC acquired The Madison for five million dollars. (Exh. CC.)

25.     In October 2005, Hurricane Wilma virtually destroyed the building at 312 Ocean Drive, and it was razed pursuant to a City of Miami Beach demolition order. (Exh. DD.) Cobalt filed a claim with its insurance carrier for demolition expenses, reconstruction costs, and engineering expenses totaling 1.45 million dollars. (Exh. GGG, Bracco Decl. ¶ 50 and Exhs. 5 and 14 thereto; Exhs. EE-GG.) The resolution of the claim is unknown.

26.     By March 2006, Cobalt had retained an architect and completed preliminary architectural and design plans, cleared the lot for new construction, prepared condominium conversion documents for submission, submitted a permit application to the City of Miami Beach for construction of a sales center and model unit at 304 Ocean Drive with an opening planned for spring 2006, and was in the process of marketing and selling the units. (Exh. DD at 3.)

27.     **The Mercury.** The Mercury is a condominium unit located at 100 Collins Avenue, No. 303, Miami Beach, Florida. On December 31, 1999, TET, by Trustee Robert Cohen, took title to the property. (Exh. HH.)

28.     **The Icon.** The Icon is a condominium unit located at 450 Alton Road, No. 2101, Miami Beach, Florida. On June 10, 2005, VMT, by Trustee Robert Cohen, purchased the property. (Exh. II.)

29.   **The Carli**.  The Carli consists of three adjacent South Beach properties with 162 apart-ment and hotel units in Miami Beach, Florida, as follows: (a) Barclay Hotel, 66 units; (b) London House, 54 units; (c) Allen Hotel, 42 units; and (d) new construction to be built in 2007 with 42 estimated units. (Exh. JJ.)  Cobalt planned to fully renovate and restore the existing Art Deco buildings and sell the units as condominiums in a "condominium-hotel" complex. (*Id.*)

30.   Cobalt Capital Companies, LLC ("CCC, LLC") was in contract to  purchase The Carli, with minor lapses, from February 22, 2005 through November 30, 2005, as follows: (a) 12.8 million dollar agreement dated February 2, 2005, with six amendments extending closing to September 8, 2005 (Exh. KK); (b) First Addendum dated August 31, 2005, extending closing to September 15, 2005 and amending purchase price to 12.275 million dollars (Exh. LL); (c) Second Addendum dated October 11, 2005, extending closing to October 31, 2005 with an option to extend in writ-ing to November 15, 2005 (Exh. MM); and (d) Third Addendum dated November 18, 2005, ex-tending closing to November 30, 2005 and amending purchase price to 13.275 million dollars (Exh. NN).

31.   On November 8, 2005, CCC, LLC entered into a 50-50 joint venture agreement for The Carli project with National Commercial Ventures, LLC, owned and operated by Richard Nathan. (Exh. OO.)

32.   On November 30, 2005, the seller sought to rescind the sale due to a priority of mort-gage issue. (Exh. PP.)  From December 2005 through March 2006, Cobalt and the seller negoti-ated extensions and terms for a fourth addendum to the purchase agreement, and on March

27, 2006, they were in the final stages of executing such an agreement with a closing date of April 11, 2006, but it is unclear whether the agreement was executed.[4] (Exhs. QQ-SS.)

33.     **The Isabella**.  The Isabella was previously known as the Barclay Apartments, which was part of The Carli (described above), and is located in Miami Beach, Florida. (Exh. TT.)  CCC, LLC entered into a contract to purchase this property for three million dollars by agreement dated June 14, 2005. (Exh. UU.)  Documentation indicates that the closing date was extended several times by agreements dated October 5, 2005, November 15, 2005, and January 12, 2006. (Exh. VV.)  There is reason to believe that there was an agreement executed in early March 2006 with a sales price of 3.55 million dollars that extended the closing date to April 7, 2006, but it is unclear whether the agreement was fully executed. (*Id*.; Exh. BBB.)

34.     In addition, at the time of Shapiro's arrest in March 2006, Cobalt was negotiating joint ventures ("JV") with two potential partners, Bridge Capital and the Peebles Corporation, in order to guarantee and expedite the financing of its planned developments, i.e. the Madison, Carli, and Isabella projects. (Exhs. WW and XX.)

35.     **THE CRIMINAL CASE**.  On  November 30, 2005, FBI Special Agent Jennifer May submitted an application for a warrant to search the premises known and described as Suite 350 South, 98 Cutter Mill Road, Great Neck, New York ("Great Neck Premises"). (Docket 57-1.)  On that same date, FBI Special Agent Christopher Dillon submitted an application for a warrant to search the premises known and described as 155 Maple Street, Suites 401, 402, 404, 406, and 408, Springfield, Massachusetts ("Springfield Premises"). (Docket 57-2.)  Agent Dillon's affidavit replicated Agent May's affidavit. (*Id.*)

---

[4]     The seller provided evidence of clear title on March 27, 2006. (Exh. SS and Attachment B thereto.)

36.     Agent May's affidavit averred violations of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 1341, 1343, 1957, and 371.  Shapiro was charged with and convicted of all of these same offenses, save for section 1957 (money laundering). (Docket 57-1 at ¶ 4; Docket 198.)

37.     The May affidavit factually averred that  Cobalt principals and their employees made false and misleading representations and omitted material facts to investors, in part by issuing PPMs that misrepresented or failed to disclose (a) Cobalt's ownership of properties in Miami Beach (most specifically The Simone), (b) Shapiro and Stitsky's prior convictions and their involvement in the investment scheme, (c) Shapiro's educational background, and (d) where initial investments were to be held in an escrow account.  The affidavit further alleged that Cobalt principals misappropriated investor funds to their own accounts for personal use, including a VMT account controlled by Shapiro.  Finally, the affidavit alleged that Shapiro was responsible for Cobalt's bank accounts and day-to-day operations. (Docket 57-1, *passim.*)  These factual averments were again alleged in the indictment. (Docket 198.)

38.     On December 1, 2005, the search warrants were executed at both the Great Neck Premises and the Springfield Premises, and the government seized virtually all documents and computer records present. (¶ 43 *supra*).

39.     On December 8, 2005, Agent May obtained a seizure warrant for various Cobalt bank accounts held at Wachovia Bank, N.A. (Exh. CCC.)

40.     On March 21, 2006, a sealed Criminal Complaint was filed against Shapiro, Stitsky, and Foster in SDNY Case No. 1:06-cr-00357. (Docket 1.)  On March 27, 2006, Shapiro, Stitsky, and Foster were arrested. (See Docket for 03/27/2006; Exh. DDD.)

41.     On April 24, 2006, Shapiro, Stitsky, and Foster were charged in a two-count indictment with: (1) Count One, Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud in violation of 18 U.S.C. §§ 371, 1343, 1341; 15 U.S.C. §§ 78j(b) and 78ff; and 17 C.F.R. § 240.10b-5; and (2) Count Two, Securities Fraud in violation of  15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. (Docket 16.)

42.     On February 23, 2007, attorneys Lee Alan Ginsberg, ("Counsel") and Louis Freeman, of Freeman, Nooter & Ginsberg, New York, NY, were appointed CJA counsel for Shapiro. (See Docket for 02/23/2007.)

43.     Beginning in July 2007 and continuing through trial, the government produced voluminous discovery to Counsel consisting of numerous disks, some containing scans of 80 boxes of paper material seized from Cobalt offices, and hard drives containing mirror images of 19 Cobalt computers. (Dockets 113, 142; RT 5/4/2006, p. 3; RT 6/14/2007, pp. 4-5.)  Every document cited in or attached to this motion, save for expert declarations and their created exhibits, was obtained from this discovery production and/or was present in Counsel's file. (Exh. HHH, Declaration of Sean D. Shopes ["Shopes Decl."], ¶ 8.)

44.     On August 31, 2009, Shapiro, Stitsky, and Foster were charged in a five-count superseding indictment with: (1) Count One, Conspiracy to Commit Securities Fraud, Wire Fraud, and Mail Fraud in violation of 18 U.S.C. §§ 371, 1343, 1341; 15 U.S.C. §§ 78j(b) and 78ff; and 17 C.F.R. § 240.10b-5; (2) Count Two, Securities Fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; (3) Count Three, Securities Fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; (4) Count Four, Wire Fraud in violation of 18 U.S.C. § 1343; and (5) Count Five, Mail Fraud in violation of 18 U.S.C. § 1341. (Docket 198.)

45.     On November 2, 2009, a jury trial commenced.  After 16 trial days, the jury returned guilty verdicts against all defendants on all five counts in the indictment. (See Docket for 11/02/2009.)

46.     **SENTENCING PROCEEDINGS**:  On July 6, 2010, this Court held a sentencing hearing for Stitsky. (Docket 300.)  Stitsky averred that he should not be held accountable for the total loss amount because it was not foreseeable to him; instead, he argued that the appropriate estimate of loss was the amount of excessive fees, i.e., 1.3 million dollars obtained by CCP, LP. (Dockets 280, 300; RT 7/6/2010, pp. 4-7.)  This Court disagreed, and determined: "With respect to the loss amount, Mr. Stitsky contends that he should not be accountable for a loss amount over $20 million because Cobalt owned properties that had been legitimately purchased with investors' money. However, those amounts cannot be deducted where investors, as is the case here, were left with nothing of value when the fraud was uncovered. Here the units of CMFI and CCP were not merely sold at a misrepresented value, they conferred no value at all on the investors. The few buildings that Cobalt purchased were all highly leveraged with multiple mortgages. Cobalt did not have the funds or ability to renovate these properties, and it thus never created any value for its shareholders." (RT 7/6/2010, p. 17.)  Stitsky was sentenced to 85 years imprisonment. (*Id.* at 22.)

47.     On September 22, 2010, this Court held a sentencing hearing for Foster. (Docket 325.) In his sentencing memorandum, Foster noted that the value of any assets remaining when Cobalt went into Receivership, i.e., on March 27, 2006—including all Cobalt properties, bank accounts, etc.—should be deducted from the loss calculation. (Docket 286.)  However, he primarily averred that the loss could not be reasonably determined because "numerous causes other

than fraud contributed to the loss of money invested." (*Id*. at 10.)  Foster contended that because it was "virtually impossible to determine  how much of the loss was attributable to the operations of the company, market forces, and other causes besides fraud, the amount of loss under section 2B1.1(b)(1) should be the amount of gain that resulted from the offense." (*Id*. at 11.)  This Court  sentenced Foster to three years imprisonment. (Docket 325.)

48.     On March 31, 2010, the Probation Department issued Shapiro's Presentence Investigation Report ("PSR"), which calculated his offense level as follows: (a) Base Offense Level per U.S.S.G. §2X1.1(a) established at seven; (b) 22 levels added for a loss of more than 20 million dollars and less than 50 million dollars per U.S.S.G.  §2B1.1(b)(1)(L); (c) six levels added for more than 250 victims per U.S.S.G. §2B1.1(b)(2)(C); (d) two levels added for sophisticated means per U.S.S.G. §2B1.1(b)(10)(C); (e) four levels added for being an organizer or leader per U.S.S.G. §3B1.1(a); and (f) two levels added for abuse of position of trust per U.S.S.G. § 3B1.3, for a total offense level of 43. (PSR ¶¶ 75-88.)

49.     The PSR calculated Shapiro's Criminal History Category as a III: (a) three points for Shapiro's single prior federal felony conviction for Bank Fraud per U.S.S.G. §§4A1.1(a) and 4A1.2(e)(1); (b) two points because the instant offense was committed while Shapiro was imprisoned per U.S.S.G. §4A1.1(d); and (c) one point because the instant offense was committed less than two years after Shapiro's release from custody per U.S.S.G. §4A1.1(e), for a total of six Criminal History Points. (PSR ¶¶ 90-96.)

50.     Counsel did not register a single legal or factual objection to anything in the PSR. (PSR at 25.)  Except for his general joinder in co-defendants' objections, Counsel also did not register

any specific factual objections to the PSR's loss calculation in his sentencing memorandum or at the sentencing hearing. (Dockets 318 and 329; RT 10/21/2010.)

51.     On October 1, 2010, Counsel submitted a sentencing memorandum that began by stating: "[W]e do not concede the loss amount or enhancements that are stated in the PSR; however, we are also mindful that You [sic] Honor has heard arguments and made determinations as to most of these factors. Accordingly, while we will briefly address these issues in this submission, we will not repeat every argument that was advanced by co-counsel in their respective memoranda. However, we do join in and adopt their arguments to the extent that they apply to Mr. Shapiro and we request that the court entertain them anew." (Docket 318 at 1.) The entirety of the loss argument was confined to two paragraphs wherein counsel noted that Shapiro did not intend to cause a loss and that the downturned market likely contributed to the loss. (*Id*. at 2-3.)

52.     On October 21, 2010, the Court held a sentencing hearing for defendant Shapiro. (Docket 329, attached hereto as Exh. AAA.) Counsel began his sentencing presentation by asking this Court to make its "determination as to the guidelines calculation and the appropriateness of our objection and what the enhancements are before we speak to the ***principal issue***?" (Exh. AAA at 3, *emphasis supplied*.) Counsel stated, "I think it would make more sense, and I've tried to make my submission along those lines given the fact that I'm aware of your Honor's previous determination of codefendants' sentencings. If we could resolve that part of the sentencing process, then I can speak directly to what I feel is an appropriate sentence." (Exh. AAA at 4.) Counsel conceded that this was an unusual strategy and that he didn't "normally approach a sentencing this way." (Exh. AAA at 9.)

53.    The Court obliged, ruled in conformity with the PSR, and found loss between 20 million and 50 million dollars based on a total amount invested of approximately 23,152,000 dollars. (*Id*. at 4.)  The loss amount of 23 million dollars resulted in a 22-level increase in Shapiro's offense level per U.S.S.G. §2B1.1(b)(1)(L), from level 21 with a sentencing range of 46 to 57 months to a total offense level of 43, Life. (PSR ¶¶ 75-88.)  The Court sentenced Shapiro to 85 years—the statutory maximum. (Exh. AAA.)

54.    On October 25, 2010, final judgment was entered. (Docket 324.)  Shapiro was ordered to pay restitution of 22,075,631 dollars (Docket 322), and to forfeit 23,152,235 dollars (Docket 323).

55.    On October 28, 2010, Shapiro filed a timely notice of appeal, designated as Second Circuit Court of Appeal Case No. 10-4426-cr. (Docket 327.)

56.    On January 19, 2011, Counsel (attorney Ginsberg) was relieved as counsel for Shapiro. (Exh. YY, see entry 21.)

57.    On October 17, 2013, the Second Circuit Court of Appeal entered a Summary Order affirming Shapiro's convictions and sentence ("Summary Order"). (Exh. YY, see entry 174.)

58.    On November 20, 2013, Shapiro timely filed a Petition for Rehearing and Suggestion for Rehearing En Banc (Exh. YY, see entry 191), which was denied on April 15, 2014 (*id.*, see entry 204).

59.    On July 2, 2014, Shapiro timely filed a Petition for a Writ of Certiorari in the United States Supreme Court. (Exh. YY, see entry 207.)

60.    On October 6, 2014, the Supreme Court entered an order in Case No. 14-5035 denying Shapiro's Petition for Writ of Certiorari. (Exh. YY, see entry 210.)

61.   **SHAPIRO'S POST-SENTENCE REHABILITATION EFFORTS.**  Shapiro has made good use of his time in custody.  He has participated in a variety of rehabilitation programs in an effort to come to terms with his actions and make amends.

62.   For example, he completed the GOGI ("Getting Out by Going In") self-corrective education study group on March 20, 2015, and a drug education program on February 24, 2011. (Exh. ZZ.)  He has also actively pursued religious education throughout his incarceration, completing a 14-hour course entitled "Duties of the Heart – Trust in G-D" on July 20, 2015; a 36-hour course entitled "Birchas Kohanim – The Priestly Blessings" on June 10, 2015; three sessions of a 48-hour course entitled "Life Lessons of the Weekly Torah Portion" on June 22, 2013, July 6, 2014, and June 8, 2015; and nine sessions of a 36-hour course entitled "Tanya – Chassidic Philosophy" on May 4, 2012, October 8, 2012, February 14, 2013, June 17, 2013, October 21, 2013, February 24, 2014, June 30, 2014, November 10, 2014, and March 23, 2015. (*Id.*)  He has also been very involved in Otisville's fitness programs, completing 65 hours of spinning class instructor training and earning an achievement award for a Plyometrics Fitness Class. (*Id.*)  He has worked hard to change himself and help others.

63.   **INCORPORATION.**  Shapiro hereby incorporates by reference each and every paragraph of this motion, whether numbered or unnumbered, in each and every claim presented as if fully set forth therein.  Shapiro also incorporates each and every exhibit filed in support of this motion into each claim presented as if fully set forth therein.  Shapiro's claims in this motion are predicated upon the motion, the attached memorandum of points and authorities, the attached exhibits, the complete record below (including the voluminous discovery materials provided by the Government, i.e., disks, hard drives, paper copies, etc.), all records, documents,

exhibits, and pleadings on file in this action, and on such other evidence as will be presented in this action.

64.     **TIMELINESS.**  The Supreme Court's order denying Shapiro's Petition for Writ of Certiorari was entered on October 6, 2014.  Shapiro's section 2255 motion filed on or about September 29, 2015 is thus timely.

65.     **GENERAL ALLEGATION.**  Shapiro makes the following general allegation with reference to the entire motion and incorporates it into each claim in this motion: Shapiro was deprived of his right to the effective assistance of counsel and to a fair and reliable determination of sentence and judgment as a result of Counsel's prejudicially deficient performance.

66.     **FIRST GROUND FOR RELIEF.** The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's multiple failures, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to legally and factually challenge the PSR's loss calculation and failure to research, investigate, obtain, adduce, present, aver, assert, file pleadings or in any other way provide this Court with: (a) the citation to relevant, precedential sentencing authority, i.e. the United States Sentencing Guidelines, case law, directing that (i) the loss must be the result of the fraud; (ii) the loss must be calculated at the time the fraud is uncovered, and (iii) the loss must be reduced by the value of  the investors' retained interest; and (b) readily available, reliable, critical evidence demonstrating that the fraud alleged was uncovered in this case on November 30, 2005/December 1, 2005 or alternately on March 27, 2006, alone and in combination with Claims Two through Four, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

67.     Counsel did not register a single legal or factual objection to anything in the PSR.  Except for his general joinder in co-defendants' objections, Counsel also did not register any specific factual objections to the PSR's loss calculation in his sentencing memorandum or at the sentencing hearing. (¶ 50, *supra*.)

68.     Counsel was well aware of this Court's loss findings in co-defendants' prior sentencings. (¶¶ 46, 47, *supra*; Docket 321.)  Counsel did not register legal or factual objections to the Court's prior factual findings regarding loss in his sentencing memorandum or at the sentencing hearing. (¶ 50, *supra*.)  Counsel's sentencing presentation conceded the loss issue. (¶¶ 51-53, *supra*.)

69.     According to precedential, reliable, legal authority readily available at the time Shapiro was sentenced on October 21, 2010, it was well-settled that in calculating loss under U.S.S.G. §2B1.1(b)(1), "[t]he loss must be the result of the fraud," and that "[l]osses from causes other than the fraud must be excluded from the loss calculation." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006), citing *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); *United States v. Leonard*, 529 F.3d 83, 92 n. 11 (2d Cir. 2008); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196-97 (2d Cir. 2003); *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 340 (2005); *United States v. Gushlak*, No. 03-CR-833 NGG, 2011 WL 3159170, at *4-8 (E.D.N.Y. July 26, 2011);*see also United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998); *United States v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000); *United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir. 1994); *United States v. Turk*,  626 F.3d 743, 748 (2d Cir. 2010); U.S.S.G. §2B1.1 App. Note 3(A)(1).  Counsel failed to cite, rely upon, discuss, present, or advance this legal authority or any additional,

available authority in his sentencing memorandum or at the sentencing hearing. Constitutionally competent counsel would have cited, advanced, and relied upon the above authority at sentencing.

70.     According to precedential, reliable, legal authority readily available at the time Shapiro was sentenced, it was well-settled that the time for calculating loss is when the fraud was uncovered. See, e.g., *United States v. Moskowitz*, 215 F.3d 265 (2d Cir. 2000), rev'd on other grounds by *Crawford v. Washington*, 541 U.S. 36 (2004); *United States v. Eyman*, 313 F.3d 741 (2d Cir. 2002); *United States v. Hotte*, 189 F.3d 462, *4 (2d Cir. 1999) (unpublished); *United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013); *United States v. Bakhit*, 218 F.Supp.2d 1232, 1238 (C.D.Cal. 2002); *United States v. Forbes*, No. 3:02-CR-264 (AHN), 2007 WL 141952 (D. Conn. Jan. 17, 2007) (unpublished); accord, U.S.S.G. §2B1.1, App. Note 3(F)(ix); see also *United States v. Grabske*, 260 F.Supp.2d 866, 869-71 (N.D.Cal. 2002); *In re Mego Financial Corporation Securities Litigation*, 213 F.3d 454, 460 (9th Cir. 2000); *United States v. Boyers*, 586 F.3d 222, 226 (2d Cir. 2009); *Brudi v. United States*, No. 14-CV-962 JPO, 2014 WL 6390302, at *6 (S.D.N.Y. Nov. 17, 2014); *Shenko v. United States*, No. 5:05-CV-00600, 2007 WL 642580, at *2 (N.D.N.Y. Feb. 26, 2007); *United States v. Sparks*, 88 F.3d 408, 409 (6th Cir. 1996); *United States v. Stoddard*, 150 F.3d 1140, 1146 (9th Cir. 1998); *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996). Counsel failed to cite, rely upon, discuss, present, or advance this legal authority or any additional, available authority in his sentencing memorandum or at the sentencing hearing. Constitutionally competent counsel would have cited, advanced, and relied upon such authority at sentencing.

71.    Nonetheless, this Court appeared to rely on such authority during the sentencing of co-defendant Stitsky in finding that the investors had been left with "nothing of value when the fraud was uncovered". (¶ 46, *supra*; RT 7.6.2010 p. 17)

72.    The Second Circuit stated in its Summary Order that the relevant time for measuring the value of any retained interest is "the time the fraud was uncovered." *United States v. Stitsky*, 536 Fed. Appx. 98, 111-112 (2nd Cir. Oct. 17, 2013). ["Accordingly, because investors received nothing of value ***at the time the fraud was uncovered***,." *Id*., at 112 (*emphasis added*).]

73.    According to precedential, reliable, legal authority readily available at the time Shapiro was sentenced, it was well-settled that loss must be reduced by the value of the investors' retained interest, that is, where the units or securities retain some net worth, the loss is reduced by that amount. *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008); *United States v. Munoz*, 233 F.3d 1117, 1126 (9th Cir. 2000); *United States v. Zolp,* 479 F.3d 715, 719-20 (9th Cir. 2007).  Counsel failed to cite, rely upon, discuss, present, or advance this legal authority or any additional, available authority in his sentencing memorandum or at the sentencing hearing. Constitutionally competent counsel would have cited, advanced, and relied upon the above authority at sentencing.

74.    Readily available, reliable evidence provided by the Government in discovery and evidence that was in Counsel's possession demonstrates that the fraud alleged was uncovered on November 30, 2005/December 1, 2005.  Agent May's Affidavit, which was attested to on November 30, 2005, was the blueprint for the indictments in this case. (¶¶ 35-38).  Thus, the May affidavit compels the conclusion that the fraud alleged was uncovered on November 30,

2005/December 1, 2005.[5]  Constitutionally competent counsel would have adduced the above evidence at sentencing.

75.     Alternatively, there was readily available, reliable evidence demonstrating that the latest possible date that the fraud alleged could have been uncovered was March 27, 2006, the date Shapiro was arrested and Cobalt was turned over to a third party receiver.  (¶ 40, *supra*).  Constitutionally competent counsel would have adduced this evidence at sentencing.

76.     There was readily available precedential authority directing that the loss must be the result of the fraud alleged, must be calculated at the time the fraud alleged was uncovered and must be reduced by investors' retained interests.  Further, there was readily, available, critical evidence demonstrating that the time the fraud alleged in this case was uncovered was clearly on December 1, 2005 or alternately, on March 27, 2006.  Counsel's failure to adduce such legal authorities and evidence throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, alone and in combination with Claims Two through Four, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

77.     **SECOND GROUND FOR RELIEF.**  The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's failure, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to legally and factually challenge the PSR's 23 million dollar loss calculation, failure to investigate, retain, obtain, timely disclose, adduce and or present readily available, reliable, favorable evidence necessary to establish the accurate value of "the Units", accurate loss amount

---

[5].     The dates November 30, 2005 and December 1, 2005 are used interchangeably.

sustained by investors and accurate restitution amount at the time the fraud alleged was un-

covered, including but not limited to documentary evidence and the testimonies, affidavits and

or declarations of readily available, qualified experts who would have attested to the value of

each Cobalt Property at the time the fraud alleged was uncovered, and failure to aver that

these assets and values should have been calculated in the sentencing loss and restitution

analyses, alone and in combination with Claims One, Three and Four, deprived Shapiro of the

effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amend-

ment Right to Counsel.

78.     Qualified MAI expert Steven Kurtz's declaration attested to under penalty of perjury

with attached exhibits, including in-depth appraisal reports for each Cobalt property, is filed

with this motion.  (Exh. FFF).  A list of the documents Mr. Kurtz relied upon is attached as Ex-

hibit B to his declaration.  All of the documents Mr. Kurtz relied upon were readily available to

Counsel as they consist of Government trial exhibits, documents provided to Counsel in discov-

ery and documents in Counsel's file. (Exh. HHH, Shopes Decl., ¶¶ 3, 4.) The entirety of Mr.

Kurtz's declaration, including exhibits, is incorporated by reference as though fully set out

herein.

79.     Mr. Kurtz conducted independent appraisals for each property, which are contained in

individual narrative appraisal reports attached to this motion.  Mr. Kurtz's summary evaluations

are laid out in his declaration as follows:

   a.   "I conducted an independent appraisal of the condominium units located at 155

        Maple Street, Springfield, MA contained in a single narrative appraisal report. My

conclusion of the "retrospective" market values of these units as of December 1, 2005 and March 27, 2006 are presented in the schedule below:

| Unit Code | Unit Size (SF) | Value Rounded |
|---|---|---|
| 109 | 780 | $43,000 |
| 207 | 517 | $28,500 |
| 208 | 1,167 | $64,000 |
| 302 | 1,115 | $72,500 |
| 304 | 1,216 | $79,000 |
| 305 | 1,105 | $72,000 |
| 401 | 1,067 | $80,000 |
| 402 | 1,300 | $97,500 |
| 404 | 494 | $37,000 |
| 406 | 1,147 | $86,000 |
| 408 | 879 | $66,000 |
| **Total** | | **$725,500** |

b. I conducted an independent appraisal of the Trio condominium redevelopment project located at 1550, 1560 and 1568 Pennsylvania Avenue, Miami Beach, Florida. My conclusion of "retrospective" aggregate market value of the subject as of December 1, 2005 was $7,500,000, which was the same value estimate on March 27, 2006.

c. I conducted an independent appraisal of High Pointe Plaza Apartments located at 3507 N. John Redditt Dr, Lufkin, TX. My conclusion of "retrospective" market value of this property as of December 1, 2005 was $2,300,000, which was the same value estimate on March 27, 2006.

d. I conducted an independent appraisal of the Meadowbrook Plaza Apartments located at 600 East Little York Road, Houston, TX. My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $9,700,000.

My conclusion of retrospective market value of this property as of March 27, 2006 was $10,000,000.

e.  I conducted an independent appraisal of the Mockingbird Lane Plaza Apartments located at 2501 Mockingbird Land, Victoria, TX.  My conclusion of the "retrospective" market value of this property as of December 1, 2005 was $6,100,000. My conclusion of the "retrospective" market value for this property as of March 27, 2006 was $6,400,000.

f.  I conducted an independent appraisal of Pine Ridge Plaza Apartments  located at 1301 Nevell Road, Cleveland, TX.  My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $2,300,000. My conclusion of the "retrospective" market value of the subject as of March 27, 2006 was $2,350,000.

g.  I conducted an independent appraisal of Simmons Gardens Senior Housing project located at 10225 Scott Street, Houston, TX.  My conclusion of the "retrospective" market value for this property as of December 1, 2005 was $2,900,000, which was the same value estimate for the property as of March 27, 2006.

h.  I conducted an independent appraisal of Sunset Arbor Apartments located at 3033 West Lake Road, Abilene, TX.  My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $6,550,000. My conclusion of the "retrospective" market value for the property as of March 27, 2006 was $6,800,000.

i.   I conducted an independent appraisal of Villa Del Rio Apartments located at 409 Riverhill Loop, Laredo, TX.  My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $5,200,000, which was the same value estimate for the property as of March 27, 2006.

j.   I conducted an independent appraisal of Waller Hillside Plaza Apartments located at 19610 FM Road 362, Waller, TX.  My conclusion of the "retrospective" market value of this property as of December 1, 2005 was $3,000,000, which was the same value estimate for the property as of March 27, 2006.

k.   I conducted an independent appraisal of Hobby Place Apartments located at 600 East Little York Road, Houston, TX.  My conclusion of the "retrospective" market value of the subject as of December 1, 2005 was $16,000,000, which was the same value estimate for the property as of March 27, 2006.

l.   I conducted an independent appraisal of Maxey Village project located at 600 Maxey Road, Houston, TX.  My conclusion of the "retrospective" market value for this property as of December 1, 2005 was $10,000,000, which was the same value estimate for the property as of March 27, 2006.

m.   I conducted an independent appraisal of Versailles Apartments  located at 8001 Fulton Street, Houston, TX.  My conclusion of the "retrospective" market value of this property as of December 1, 2005 was $8,750,000, which was the same value estimate for the property as of March 27, 2006.

n.   I conducted an independent appraisal of Green Oak Village Apartments located at 3400 Campbell Road, Houston, TX.  My conclusion of the "retrospective" mar-

ket value of the subject as of December 1, 2005 was $10,250,000, which was the same value estimate for the property as of March 27, 2006.

o.  I conducted an independent appraisal of the Simone West condominium redevelopment project located at 304 and 312 Ocean Drive, Miami Beach, Florida. My conclusion of the "retrospective" market value of the subject as of December 1, 2005 was $12,500,000, which was the same value estimate for the property as of March 27, 2006.

p.  I conducted an independent appraisal of the Carli/Barclay Hotel condominium redevelopment project located at 1940 Park Avenue, Miami Beach, Florida.  My conclusion of the "retrospective" market value for this property as of December 1, 2005 was $6,000,000, which was the same value estimate for the property as of March 27, 2006.

q.  I conducted an independent appraisal of the Carli/London House condominium redevelopment project located at 1965-1975 Washington Avenue, Miami Beach, Florida.  My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $5,000,000, which is the same value estimate for the property as of March 27, 2006.

r.  I conducted an independent appraisal of the Carli/Allen condominium redevelopment project located at 2001 Washington Avenue, Miami Beach, Florida.  My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $4,000,000, which is the same value estimate for the property as of March 27, 2006.

s.  I conducted an independent appraisal of the Isabella condominium redevelopment project located at 1941-1951 Park Avenue, Miami Beach, Florida.  My conclusion of the "retrospective" market value of the property as of December 1, 2005 was $3,350,000, which is the same value estimate for the property as of March 27, 2006.

t.  I conducted an independent appraisal of Unit #2101 in the Icon condominium project located at 450 Alton Road, Miami Beach, Florida.  My conclusion of the "retrospective" market value of the individual unit as of December 1, 2005 was $1,700,000, which is the same value estimate for the unit as of March 27, 2006.

u.   I conducted an independent appraisal of Unit #303 in the Mercury condominium project located at 100 Collins Avenue, Miami Beach, Florida.  My conclusion of the "retrospective" market value of the individual unit as of December 1, 2005 was $270,000, which is the same value estimate for the unit as of March 27, 2006."

(Exh. FFF, Kurtz Decl., ¶16 (a)- (u).)

80.    In sum, Mr. Kurtz's appraisals indicate that Cobalt owned approximately 68 million dollars' worth of real estate, held a General Partnership interest in more than 36 million dollars' worth of real estate and had 18 million dollars' worth of real estate in contract at the time the fraud alleged was uncovered. (Exh. FFF, Kurtz Decl., ¶16 (a)- (u).)

81.    Because many of Cobalt's assets were in the form of real properties, obtaining an Appraiser, MAI or Appraisal Expert to assess the value of those assets at the time the fraud alleged was uncovered was one of the critical first steps in contesting the PSR's 23 million dollar loss

calculation and establishing the accurate value of the Units, loss amount and restitution amount. Counsel's failure to obtain such an expert and adduce such evidence was constitutionally deficient.

82.     Accordingly, Counsel's failure to legally and factually challenge the PSR's 23 million dollar loss calculation, failure to investigate, retain, obtain, timely disclose, adduce and or present readily available, reliable, critical evidence necessary to establish the accurate value of the Units, accurate amount of loss sustained by investors and accurate restitution amount at the time the fraud alleged was uncovered, including but not limited to documentary evidence and the testimonies, affidavits and or declarations of readily available, qualified experts who would have attested to the value of each Cobalt Property at the time the fraud alleged was uncovered, and failure to aver that these assets and values should have been considered and calculated in the sentencing loss and restitution analyses, alone and in combination with Claims One, Three and Four, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

83.     **THIRD GROUND FOR RELIEF.** The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's failure, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to legally and factually challenge the PSR's 23 million dollar loss calculation, failure to investigate, retain, obtain, timely disclose, adduce and or present readily available, reliable, favorable, critical evidence necessary to establish the accurate value of the Units, accurate amount of loss sustained by investors and accurate restitution amount at the time the fraud alleged was uncovered, including but not limited to documentary evidence and the testimonies, affidavits

and or declarations of readily available, qualified experts who would have attested that Cobalt was the rightful General Partner of the eight Texas Tax Credit Properties and as such held substantial assets at the time the fraud alleged was uncovered, and failure to aver that these assets should have been considered and calculated in the sentencing loss and restitution analyses, alone and in combination with Claims One, Two and Four, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

84.     Qualified Texas Real Estate Attorney and Expert Richard Spencer's declaration, attested under penalty of perjury, with attached exhibits is filed with this motion.  (Exh. EEE). A list of the documents Mr. Spencer relied upon is attached as Exhibit B to his declaration.  Further, Mr. Spencer attaches individual documents as exhibits to his declaration.  All of the documents Mr. Spencer relied upon were readily available to and in the possession of Counsel as they consist of Government trial exhibits and documents provided to Counsel in discovery. (Exh. HHH, Shopes Decl., ¶ 3.) The entirety of Mr. Spencer's declaration, including Exhibits, is incorporated by reference as though fully set out herein.

85.     According to qualified Texas Real Estate Expert Richard Spencer's Declaration, at the time the fraud alleged was uncovered, Cobalt was the rightful General Partner of the eight Texas Tax Credit Properties.  (Exh. EEE, Spencer Decl., ¶24.)   Mr. Spencer attests:

     a.  Sowell's sale or transfer of his GP interest to Cobalt on December 31, 2004, was a valid assignment or transfer. (Exh. EEE,¶¶ 15, 27)

     b.  For 14 months, from December 31, 2004 through March 27, 2006, with TRG's knowledge, encouragement and consent, Cobalt performed all of

the duties of general partner. Cobalt managed all of the properties, met and negotiated with all lenders and ultimately obtained all lenders' approval of Cobalt as the General Partner, sought, spent substantial resources and obtained a loan commitment to refinance the properties and spent substantial sums on the properties. (Exh. EEE, ¶10 f.-l.)

c.   Sometime in February/March 2006, TRG sought to repudiate its consent. (Exh. EEE,¶10 m.)

d.  As to the sole GP partnerships, under the Tex. Rev. Civ. Stat. Ann. Art. 6132a-1 et. seq., the Texas Revised Limited Partnership Act, (the "*Act*"), the express terms of the Partnership Agreements, and in fact,  "…TRG tacitly, effectively and by operation of law consented to Purchaser as their new General Partner."  (Exh. EEE,¶18)

e.  As to all partnerships, "TRG, by their conduct, also waived the right to object to Purchaser becoming the General Partner of the Partnership." (Exh. EEE,¶19)

f.  As to all partnerships, "Additionally, in my opinion, various legal theories found in principles of equity bar TRG, by their conduct, from asserting that the Purchaser was not the General Partner of the Partnership. Specifically applicable are the theories of promissory estoppel and laches." (Exh. EEE,¶20)

g.  "It is my reasoned opinion that pursuant to relevant Texas statutory authority as well as waiver, estoppel and laches legal doctrine, the trans-

fer of the General Partnership interest from Sowell to Purchaser was valid

and TRG consented to that transfer.  It is also my opinion that a Texas

court of law would so hold if the issue were presented on these facts."

(Exh. EEE, ¶24)

86.     Mr. Spencer further attests that as General Partner, Cobalt inherited the General Part-

nership development fees and was entitled to various other fees, at the time the fraud alleged

was uncovered: "I have also reviewed Sowell's assignment of his interests in the Partnerships to

Purchaser (Exhibit 2-G) These assignments constituted a complete transfer of all of Sowell's

General Partnership interests, rights, etc., to Purchaser without exception.  These rights in-

cluded, among other things, the right to receive the Developers' fees provided for in Section

8.10 of the Partnership Agreements and the Partnership Administration fee and credit monitor-

ing fee under Section 8.11.  Pursuant to the waterfall provisions previously discussed, these

fees are in line for payment after secured creditors." (Exh. EEE, Spencer Decl., ¶27.)

87.     Finally, Mr. Spencer attests that any funds Cobalt advanced to the TTCP are treated as

loans that are paid first:  "…Section 8.16(a) of the partnership agreements which treats funds

contributed by the General Partner to the properties as a loan that is first in line to be paid

from available funds wherever they may reside." (Exh. EEE, Spencer Decl., ¶ 26.)

88.     Mr. Spencer's declaration and testimony is critical because it establishes that: (i) Prior

GP Sowell validly transferred the GP interest to Cobalt; (ii) Cobalt was the rightful GP of TTCP at

the time the fraud alleged was uncovered; (iii) All of the prior GP's rights and assets, without

exception, were transferred to Cobalt; (iv) Those assets included the right to receive remaining

development fees and annual administrative fees; (iv) the Partnership Agreements' waterfall

provisions make said fees payable right after secured creditors; and (v) disbursements made by the GP to the properties are treated as loans that are first in line for repayment from available funds wherever they may reside. (Exh. EEE, Spencer Decl., *passim*). Counsel's failure to obtain such an expert and adduce such critical evidence was constitutionally deficient.

89.     Next, according to qualified MAI expert Steven Kurtz, the value of each TTCP on December 1, 2005/March 27, 2006 was: (a) High Pointe Plaza: 2,300,000; (b) Meadowbrook Plaza: $9,700,000/$10,000,000; (c) Mockingbird: $6,100,000/$6,400,000; (d) Pine Ridge Plaza: $2,300,000/$2,350,000; (e) Simmons Garden: $2,900,000; (f) Sunset Arbor: $6,550,000/ $6,800,000; (g) Villa Del Rio: $5,200,000; (g) Waller Hillside Plaza: $3,000,000. (Exh. FFF, Kurtz Decl., ¶ 16 c – j .)

90.     Mr. Kurtz's testimony is similarly critical as the value of the properties determines whether there was sufficient equity to reach the payment of fees.  Counsel's failure to obtain such an expert and adduce such critical  evidence was constitutionally deficient.

91.     Qualified accounting expert Anthony Bracco's declaration, attested under penalty of perjury, with attached exhibits is filed with this motion.  (Exh. GGG, Bracco Decl.)  A list of all of the documents Mr. Bracco relied upon is attached as Exhibit B to his declaration.  Further, Mr. Bracco attaches specific documents as Exhibits to his declaration.  All of the documents Mr. Bracco relied upon were readily available to and in the possession of Counsel they consist of Government trial exhibits, documents provided to Counsel in discovery. (Exh. HHH, Shopes Decl., ¶ 3.) The entirety of Mr. Bracco's declaration, including Exhibits, is herein incorporated by reference as though fully set out herein. (Exh. GGG, Bracco Decl.)

92.     Qualified accounting expert Anthony Bracco attests in his declaration that his analyses, calculations and findings establish that:

    a.  The amount of TTCP development fees due Cobalt on December 1, 2005/March 27, 2006  was $3,811,254/$3,783,849. (Exh. GGG, ¶47 and Exh. 12 attached thereto.)

    b.  The amount in TTCP Partnership Administrative fees due Cobalt on December 1, 2005/March 27, 2006  was  $767,708/$1,046,875.  (Exh. GGG, ¶48 and Exh. 13 attached thereto.)

    c.  There was a $500,000 acquisition price of the Texas Tax Credit Properties, (Exh. GGG, ¶33); and

    d.  Cobalt put $242,000 into the TTCP. (Exh. GGG,¶ 33)

93.     Mr. Bracco's testimony is also critical because his articulation of Cobalt's assets in the TTCP total $5,320,961/$5,572,724 on December 1, 2005/March 27, 2006. Counsel's failure to obtain such an expert and adduce such evidence was constitutionally infirm.

94.     Thus, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, there was readily available evidence, documents and expert testimonies, declarations and affidavits that convincingly establish that Cobalt was the rightful, legal GP of the TTCP on December 1, 2005/March 27, 2006 and Cobalt's GP interest had a value of more than five million dollars.  The adducement of this evidence at sentencing was critical to refute the PSR's 23 million dollar loss calculation and to establish the accurate value of the Units, accurate loss amount sustained by investors and accurate restitution amount at the time the fraud alleged was uncovered.  Counsel's failure to obtain, adduce and or present this evi-

dence at sentencing and failure to aver that these assets should have been calculated in the sentencing loss and restitution analyses, alone and in combination with Claims One, Two and Four, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

95.     **FOURTH GROUND FOR RELIEF.**  The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's failure, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to legally and factually challenge the PSR's 23 million dollar loss calculation, failure to investigate, retain, obtain, timely disclose, adduce and/or present readily available, reliable, favorable evidence necessary to establish the accurate value of the Units, accurate loss amount sustained by investors and accurate restitution amount at the time the fraud alleged was uncovered, including but not limited to documentary evidence and the testimonies, affidavits and or declarations of qualified experts who would have established, calculated and attested to the amount of unit and non-unit investor funds received by Cobalt, Cobalt's assets and liabilities, the value of each Class A Membership Security Unit, the overall loss sustained by investors, and the restitution amount at the time the fraud alleged was uncovered, and failure to aver that all of this evidence should have been considered and calculated in the loss and restitution analyses,  alone and in combination with Claims One through Three, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

96.     Qualified accounting expert Anthony Bracco analyzed "…the financial records of various business entities in which Mr. Shapiro was involved, from September 2003 through the date of

Mr. Shapiro's [arrest] in this case, approximately March 27, 2006." (Exh. GGG, Bracco Decl.,

¶11.)

97.      Mr. Bracco was asked to determine:  "(a) the amount of Investor Funds received by the

Cobalt Companies as of December 1, 2005 and March 27, 2006, (b) the amount of Investor

Funds returned to investors by the Cobalt Companies as of December 1, 2005 and March 27,

2006, (c) the net amount of Investor Funds invested in the Investor Entities as of December 1,

2005 and March 27, 2006, (d) the amount of funds received from non-Unit investors Gruber

and Pappas, (e) the amount of funds seized from the Investor Entities and Management Entities

by the Government on December 1, 2005 and March 27, 2006, (f) the amount of Investor

Funds, if any, that were put into various properties located in Texas that were acquired by the

Investor Entities (the "Texas Tax Credit Properties") between December 31, 2004 and March 27,

2006, (g) the amount of Investor Funds on deposit for any properties that were in contract (but

not yet closed) on December 1, 2005 and March 27, 2006, (h) the amount of appreciation on

properties that were in contract (but not yet closed) from the contract date through December

1, 2005 and March 27, 2006, (i) the amount of debt on each of the properties owned by the Co-

balt Companies as of December 1, 2005 and March 27, 2006, (j) the amount of equity in the

properties owned by the Cobalt Companies as of December 1, 2005 and March 27, 2006, and

(k) the net equity available to the Unit Investors via each Unit on December 1, 2005 and March

27, 2006."  (Exh. GGG, Bracco Decl., ¶ 12.)

98.      Mr. Bracco attests in his declaration that his analyses, calculations and findings establish

that:

a. The "Cobalt Companies received Investor Funds in the amount of $17,871,455 as of December 1, 2005." (Exh. GGG, Bracco Decl.,¶20 and Exh. 1 attached thereto.)

b. Cobalt Companies returned $581,841 to investors as of December 1, 2005. ( Exh. GGG, ¶21 and Exh. 1 attached thereto.)

c. The net amount of Unit Investor Funds invested in the Investor Entities as of December 1, 2005 was $17,289,614. (Exh. GGG, ¶22)

d. Cobalt Companies received Investor Funds in the amount of  $21,388,028 as of March 27, 2006. (Exh. GGG, ¶20 and Exh. 1 attached thereto.)

e. Cobalt Companies returned $944,736 to investors as of March 27, 2006 (Exh. GGG, ¶21 and Exh. 1 attached thereto.)

f. The net amount of Unit Investor Funds invested in the Investor Entities as of March 27, 2006 was 20,443,292. (Exh. GGG, ¶ 22)

99.     Readily available subscription documents establish that each Class A Membership Security Unit was to be paid 8% interest biannually. (Exh. GGG, Bracco Decl., Exh. 4 attached thereto.)

100.     Mr. Bracco attests that his analyses, calculations and findings establish that "...as of December 1, 2005 and March 27, 2006, the Investor Entities had 175.65 and 209.08 Units outstanding, respectively." (Exh. GGG, Bracco Decl., ¶23.)

101.     Mr. Bracco attests that his analyses, calculations and findings establish that non-Unit investor Luis Pappas invested a net total of $1,967,802 in CCPLP in February 2006.  (Exh. GGG, Bracco Decl., ¶¶ 26-28.)

102. Mr. Bracco attests that his analyses, calculations and findings establish that non-Unit investor Stanley Gruber invested a net total of $317,079. (Exh. GGG, Bracco Decl., ¶ 29.)

103. Mr. Bracco attests that the appraisals of MAI Steven Kurtz combined with his analyses, calculations and findings establish that "… the Investor Entities owned properties (excluding the Texas Tax Credit Properties) valued at approximately $68 million on December 1, 2005 and March 27, 2006, with net equity of approximately $11.3 million and $11 million as of December 1, 2005 and March 27, 2006, respectively." (Exh. GGG, Bracco Decl., ¶ 42.)

104. Mr. Bracco attests that his analyses, calculations and findings establish that on December 1, 2005/March 27, 2006 there were TTCP development fees payable to Cobalt of $3,811,254/$3,783,849 and Partnership Administrative fees payable to Cobalt of $767,708/$1,046,875. (Exh. GGG, Bracco Decl., ¶¶ 47, 48 and Exhibits 12 & 13 attached thereto.)

105. Mr. Bracco attests that his analyses, calculations and findings establish that the amount of Investor funds put into the Texas Tax Credit Properties consist of the $500,000 acquisition price and $242,000 in payments to the properties. (Exh. GGG, Bracco Decl., ¶ 33.)

106. Mr. Bracco's analyses, calculations and findings establish that the Government seized a total of $892,000 in investors' funds between December 21, 2005 and March 26, 2006. (Exh. GGG, Bracco Decl., ¶¶ 30, 31 and Exhs. 5 & 6 attached thereto.)

107. Mr. Bracco attests that his analyses, calculations and findings establish that as of December 1, 2005 and March 27, 2006, there was a total of $450,000 in investor funds on deposit in the Carli and the Isabella. (Exh. GGG, Bracco Decl., ¶ 34.)

108.     Further, the declaration of MAI Steven Kurtz combined with Mr. Bracco's analyses, calculations and findings establish that the 1.75 million dollar positive difference between the contract price and the fair market value of the Carli on December 1, 2005, is an asset of the contract holder, i.e., the Investor entities. (¶¶ 29-32 *supra*; Exh. FFF, Kurtz Decl., ¶¶ 16 p-r, 29 h.) Similarly, Mr. Bracco establishes that the $350,000 positive difference between the contract price and the fair market value of the Isabella on December 1, 2005, is an asset and the likely $200,000 negative difference on March 27, 2006 is a liability. (¶ 33 *supra*; Exh. FFF, Kurtz Decl., ¶¶ 16s, 29h.)

109.     The Carli and Isabella were properties in contract that did not close. (¶¶ 29-33, *supra*.) The documentation is reasonably sufficient to aver that both of these properties were in contract on November 30, 2005/December 1, 2005. (*Id*.). However, the properties' March 27, 2006 contract status is uncertain as the documentation is inconclusive.[6] (*Id*). Thus, Mr. Bracco provides his March 27, 2006 calculations with and without the assets of the Carli and Isabella.

110.     Mr. Bracco attests that "…we recorded an asset for insurance proceeds receivable in the amount of approximately $1.4 million for damage sustained by the property owned by the Simone Beach Club West LLC… I have prepared an analysis both with and without this claim." (¶ 41 *supra*; Exh. GGG, Bracco Decl., ¶ 50 and Exh. 14 attached thereto.)

111.     Mr. Bracco attests that his analyses, calculations and findings establish that: "The Consolidated Balance Sheet of the Investor Entities as of December 1, 2005 reflects total assets of approximately $21 million (including the insurance claim) and total liabilities of approximately $900,000, resulting in net equity available to Unit holders of approximately $20.1 million. Based

---

[6]. It is Petitioner's intent, with this Court's permission, to determine the status of these properties' contracts through discovery.

on 175.65 Units outstanding, there was $114,657 of net equity available per Unit at December 1, 2005 (*Exhibit 15*)." (Exh. GGG, Bracco Decl., ¶ 51.)

112.    Utilizing Mr. Bracco's above analyses establishing net equity available to Unit holders of 20.1 million, based on the 209.08 Units outstanding on March 27, 2006, there was $96,135 of net equity available per Unit on December 1, 2005.

113.    Mr. Bracco attests that his analyses, calculations and findings establish that: "The Consolidated Balance Sheet of the Investor Entities as of December 1, 2005 reflects total assets of approximately $19.6 million (excluding the insurance claim) and total liabilities of approximately $900,000, resulting in net equity available to Unit holders of approximately $18.7 million.  Based on 175.65 Units outstanding, there was $106,418 of net equity available per Unit at December 1, 2005 (*Exhibit 16*)." (Exh. GGG, Bracco Decl., ¶ 52.)

114.    Utilizing Mr. Bracco's above analyses establishing net equity available to Unit holders of 18.7 million, based on the 209.08 Units outstanding on March 27, 2006, there was $89,439 of net equity available per Unit on December 1, 2005.

115.    Mr. Bracco attests that his analyses, calculations and findings establish that: "The Consolidated Balance Sheet of the Investor Entities as of March 27, 2006 reflects total assets of approximately $21 million (including the insurance claim and deposits and appreciation on the Carli and Isabella) and total liabilities of approximately $1.7 million, resulting in net equity available to Unit holders of approximately $19.3 million.  Based on 209.08 Units outstanding, there was $92,320 of net equity available per Unit at March 27, 2006 (*Exhibit 17*). (Exh. GGG, Bracco Decl., ¶ 53.)

116.     Mr. Bracco attests that his analyses, calculations and findings establish that: "The Consolidated Balance Sheet of the Investor Entities as of March 27, 2006 reflects total assets of approximately $19.5 million (including deposits and appreciation on the Carli and Isabella and excluding the insurance claim) and total liabilities of approximately $1.7 million, resulting in net equity available to Unit holders of approximately $17.8 million.  Based on 209.08 Units outstanding, there was $85,398 of net equity available per Unit at March 27, 2006 (*Exhibit 18*)." (Exh. GGG, Bracco Decl., ¶ 54.)

117.     Mr. Bracco attests that his analyses, calculations and findings establish that: "The Consolidated Balance Sheet of the Investor Entities as of March 27, 2006 reflects total assets of approximately $19 million (including the insurance claim and excluding deposits and appreciation on the Carli and Isabella) and total liabilities of approximately $1.7 million, resulting in net equity available to Unit holders of approximately $17.3 million.  Based on 209.08 Units outstanding, there was $82,874 of net equity available per Unit at March 27, 2006 (*Exhibit 19*)." (Exh. GGG, Bracco Decl., ¶ 55.)

118.     Mr. Bracco attests that his analyses, calculations and findings establish that: "The Consolidated Balance Sheet of the Investor Entities as of March 27, 2006 reflects total assets of approximately $17.6 million (excluding deposits and appreciation on the Carli and Isabella and excluding the insurance claim) and total liabilities of approximately $1.7 million, resulting in net equity available to Unit holders of approximately $15.9 million.  Based on 209.08 Units outstanding, there was $75,952 of net equity available per Unit at March 27, 2006 (*Exhibit 20*). (Exh. GGG, Bracco Decl., ¶ 56.)

119.     Of ultimate import, Mr. Bracco establishes that the overall loss, as of the plainly opera-

tive date of December 1, 2005 is $2.59 million including insurance proceeds and $4.04 million

excluding insurance proceeds.   (Exh. GGG, Bracco Decl., ¶ 60 and Exh. 21 attached thereto.)

Further, on December 1, 2005 the value of each $100,000 Unit based on 175.65 Units, including

the insurance claim was $114,657 and excluding it was 106,418. (*Id*., at ¶¶ 51, 52.)  Moreover,

on December 1, 2005, the value of each $100,000 Unit based on 209.08 Units, including the in-

surance claim was $96,135 and excluding it was $89,439. (¶¶ 112, 114 *supra*)

120.     Mr. Bracco establishes that the overall loss on the alternate date of March 27, 2006 is

$3.43 million including insurance proceeds and $4.87 million excluding insurance proceeds.

(Exh. GGG, Bracco Decl., ¶ 60.)  If the Carli and Isabella were not in contract, the overall loss

would be 5.4 million with the insurance proceeds and 6.85 million without the  insurance pro-

ceeds. (*Id*., at ¶ 60 and Exh. 21 attached thereto.)  The March 27, 2006 value of each $100,000

Unit: (i)  including the insurance claim, Carli & Isabella was $92,320; (ii)  including the Carli &

Isabella and excluding the insurance claim was $85,398; (iii) including the insurance claim, and

excluding the Carli & Isabella was $82,874; and (iv) excluding the insurance claim, Carli &

Isabella was $75,952. (*Id*., at ¶¶ 53-56.)

121.     Thus, Mr. Bracco establishes that the best/worst case overall loss on the operative date

is 2.59/4.04 million dollars.  Even utilizing the plainly inapposite alternate date establishes an

overall loss of 3.43/6.85 million dollars.  In sum, regardless of dates or components the overall

loss ranges from 2.59 to 6.85 million and greatly impacts the loss calculation and Shapiro's

Guideline calculation and range.

122.    Here, the loss amount of 23 million dollars resulted in a 22-level offense level increase per U.S.S.G. §2B1.1(b)(1)(L), from level 21 with a sentencing range of 46 to 57 months to a total offense level of 43, Life.  This Court imposed the *Apprendi* constrained statutory maximum of 85 years.

123.    Both the December 1, 2005 overall loss of 2.59/4.04 million dollars and the alternate March 27, 2006 overall loss of 3.43/6.85 million dollars results in an 18-level increase in Shapiro's offense level per U.S.S.G. §2B1.1(b)(1)(J) for a total offense level of 39 with a sentencing range of 324-405 months (27-33.75 years).  Such a range is more than 50 years less than the sentence imposed.

124.    Alternately, the properly calculated loss amount is less than 20 million dollars, resulting in a reduced offense level, a reduced Guidelines sentencing range and a reduced sentence.

125.    Mr. Bracco's testimony is unmistakably critical to disproving the 23 million dollar loss calculation, establishing the accurate loss amount and calculating Shapiro's Guideline sentence. Counsel's failure to obtain such an expert and adduce such evidence was constitutionally deficient.

126.    Thus, there was readily available, favorable evidence: (i) establishing and calculating the long list of Cobalt's assets and liabilities at the time the fraud alleged was uncovered; (ii) establishing that on the operative date of December 1, 2005 the value of each of the $100,000 Units was $114,657/$106,418 or $96,135/$89,439 and the overall loss was $2.59/$4.04 million; and (iii) establishing that on the alternate date, the value of each of the $100,000 Units was $92,320/$85,398/$82,874/ $75,952 depending on components and that the overall loss was 3.43/4.87/5.4/6.85 million dollars depending on components.  This evidence, establishing the

accurate value of each Unit and a 2.59 to 4.04 (alternatively 3.43- 6.85) million dollar overall loss range, was critical to negating the PSR's 23 million dollar loss calculus, substantially reducing the loss enhancement by four levels thereby reducing Shapiro's Guideline range from Life to 324-405 months.   Counsel's failure to adduce such evidence was constitutionally infirm.

127.    Counsel's failure, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to legally and factually challenge the PSR's 23 million dollar loss calculation, failure to investigate, retain, obtain, timely disclose, adduce and or present readily available, reliable, critical evidence necessary to establish the accurate value of the Units, accurate loss amount sustained by investors and accurate restitution amount at the time the fraud alleged was uncovered, including but not limited to documentary evidence and the testimonies, affidavits and or declarations of qualified experts who would have established, calculated and attested to the amount of unit and non-unit investor funds received by Cobalt, Cobalt's assets and liabilities, the value of each Class A Membership Security Unit, the overall loss sustained by investors, and the restitution amount at the time the fraud alleged was uncovered, and failure to aver that all of this evidence should have been considered and calculated in the sentencing loss and restitution analyses, alone and in combination with Claims One through Three,  deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

128.    **FIFTH GROUND FOR RELIEF.**  The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's failure to legally and factually challenge the PSR's loss calculation and failure to retain, obtain, timely disclose, adduce and or present throughout the post-conviction proceedings, particularly prior to sentenc-

ing, at sentencing and post sentencing, reliable, favorable evidence in support of accurately establishing the loss which was the result of the fraud alleged and restitution amount, including but not limited to the testimony, affidavit and or declaration of a qualified expert to attest to the extraordinary downturn in the real estate market between 2007 and 2010, the period during which the Cobalt properties were sold, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

129.     According to the declaration of MAI expert Steven Kurtz, (already incorporated fully by reference) the Great Recession of 2007-2010, "...spared no one and affected everyone - from the consumer to the retailer, Wall Street to the U.S. banking system, public and private investors, and the residential and commercial real estate markets." (Exh. FFF, Kurtz Decl., ¶¶ 27-28.) Mr. Kurtz's declaration provides compelling, in-depth, factual information demonstrating the effect the downturn in the real estate market had on diminishing the monetary value of all real properties, including Cobalt's real properties. (*Id*.)

130.     Counsel's failure, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to legally and factually challenge the PSR's loss calculation and failure to retain, obtain, timely disclose, adduce and or present available, reliable, critical evidence including but not limited to documentary evidence and the testimony, affidavit and or declaration of a qualified expert who would have attested to the extraordinary downturn in the real estate market between 2007 and 2010, the period during which the Cobalt properties were sold, and the market downturn's effect on the value of Cobalt's Properties, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

131.   **SIXTH GROUND FOR RELIEF.**   The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's failure to obtain, adduce and present throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, easily available, reliable, critical, persuasive evidence, cases and case law, demonstrating that Shapiro's 85 year sentence is grossly disproportionate to similarly situated defendants sentences, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

132.   Counsel filed a sentencing memorandum wherein he: (i) contended that the application of the Guidelines created unwarranted and unreasonable disparities in sentences for financial crimes and cited *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y.  2008), and *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), in support thereof; and (ii) averred that there was disparity in Shapiro's sentence pursuant to a money to sentence ratio and cited *United States v. John Rigas,* 490 F.3d 208 (2nd Cir. 2007) [200 million dollar plus loss and 15 year sentence] and  *United States v. Ebbers*, 458 F. 3d 110 (2nd Cir. 2006) [100 million dollar plus loss and 25 year sentence] in support thereof. (Docket 321).

133.   However, Counsel failed to cite and rely upon the additional mountain of cases demonstrating that the 85 year sentence imposed upon Shapiro for his participation in a 20 million dollar fraud is grossly disproportionate to defendants convicted of similar financial crimes both locally and nationally.

134.   In  one of the four cases Counsel cited,  *United States v. Parris*, *supra,* at 756, the district court conducted a national statistical analysis of sentences rendered to non-cooperating defen-

dants in 18 financial fraud cases between 2001 and 2007. Counsel did not at any time mention the *Parris* court's national statistical analysis nor the cases cited therein.

135. The *Parris* Court cited eleven cases, none of which Counsel cited to bolster his disparity analysis, wherein the defendants went to trial, were convicted, the following loss amounts were proven and the following sentences were imposed: *United States v. Forbes*, (D. Conn. 2007) 14 Billion dollar loss and 10 year sentence; *United States v. Skilling* (S.D. Tex. 2006) 1 billion dollar loss and 24 year sentence [later reduced to 14 year sentence]; *United States v. John Rigas, supra* (2nd Cir. 2007) 200 million dollar plus loss and 15 year sentence;  *Bennet v. United States,* 252 F.3d 559 (2nd Cir. 2001) 100 million dollar loss and 22 year sentence; *United State v. Olis*, *supra* (5th Cir. 2006) 76 million dollar loss and 6 year sentence; *United States v. Hotte*, (2nd Cir. 1999)  67  Million dollar loss and 108 month sentence; *United States v. Cushing* (2nd Cir. 2004), 24 million dollar loss and 97 month sentence;  *United States v. Rutkoske*, *supra* (2nd Cir. 2002) 12 million dollar loss and 108 month sentence, and; *United States v. Surgent*, (EDNY 2004) 6 million dollar loss and 14 year sentence.

136. The *Parris* Court cited three cases, none of which were cited or relied upon by Counsel in his disparity analysis, wherein the loss amount exceeded 20 million dollars, the defendants pleaded guilty but did not cooperate and the following sentences were imposed: *United States v. Rigas, supra* (2nd Cir. 2007) 200 million dollar loss and 20 year sentence; *United States v. Kumar*, (E.D.N.Y. 2006) 2.2 billion dollar loss amount and 12 year sentence; and *Ferrarini v. United States*,  (S.D.N.Y. 2002) 25 million dollar loss amount and 145 month sentence.

137. The cases cited in *Parris*, and not cited or relied upon by Counsel, convincingly demonstrated that in trial and guilty plea cases in amounts of loss sustained in the billions of dollars,

the highest sentence imposed did not exceed 25 years. These cases convincingly make the case that Shapiro's 85 year sentence for a 20 million dollar loss is grossly disproportionate to defendants convicted of similar financial crimes both locally and nationally.

138.    Finally, in addition to the readily accessible, easily retrievable, compelling, critical disparity cases cited in *Parris*, there was a wealth of additional, readily accessible, easily retrievable, compelling, critical disparity cases demonstrating that the 85 year sentence imposed upon Shapiro for his participation in a 20 million dollar fraud is and was grossly disproportionate to defendants convicted of similar financial crimes both locally and nationally, including but not limited to: *Formisano v. United States*, No. 03 CR. 362 (DC), 2005 WL 1423350 (S.D.N.Y. June 16, 2005) $9.8 million dollar loss and 78 month sentence; *Smirlock v. United States,* No. 04 CIV. 9670 (GEL), 2005 WL 975875 (S.D.N.Y. Apr. 25, 2005) 12.6 million dollar loss and 48 month sentence; *United States v. Betts, Feeny, Chavrat, Tursi, Scuteri, Rueb, Abish, Turney, Kearney* (S.D.N.Y. 2002) Loss and Sentences: (i) $1.3 million and 366 days; $75,000 and 3 years' probation; $1.1 million and 6 months; $1.1 million and 41 months; $2.5 million and 21 months; and $1.3 million and 51 months;  *United States v. Kohler, Khan, Ziegler,* Case No. 07-cr-20446-PCH, (S.D.Fla.) $826 million loss and 5 years; *United States v. Trupin*, 475 F.3d 71 (2d Cir. 2007), cert granted and judgment vacated, 128 S. Ct. 862 (2008) $6 million unreported income and 7 months, and; *United States v. Earls*, 157 Fed. Appx. 421 (2d Cir. 2005) (summary order) $20 million-plus and 125 months.

139.    Constitutionally competent counsel would most certainly have adduced, presented, argued, relied upon, and cited  the persuasive, compelling cases cited in *Parris* as well as the many other cases, including those cited herein, to present, argue and aver a compelling dispar-

ity analysis. There was no strategic or tactical reason not to adduce these cases and Counsel's failure to do so was constitutionally inadequate.

140.     Counsel's failure to research, investigate, obtain, adduce and in any way present to this Court, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, readily available, reliable, objective, persuasive evidence demonstrating that  Shapiro's 85 year sentence is grossly disproportionate to similarly situated defendants sentences, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

141.     **<u>SEVENTH GROUND FOR RELIEF</u>.**   The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's failure to investigate, obtain, timely disclose, adduce and or present throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, readily and easily available, reliable evidence, pursuant to 18 U.S.C. §3553(a) including but not limited to the testimonies, affidavits and or declarations of qualified experts, witness testimony and documentary and other evidence demonstrating Shapiro's history and characteristics and the nature and circumstances of the offense, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

142.     Counsel failed to adduce readily available evidence which described  the nature and circumstances of the offense and Shapiro's history and characteristics as articulated in paragraphs 2-34 herein. Constitutionally competent counsel would have adduced such evidence at sentencing.

143.     Counsel's failure to investigate, retain, obtain, timely disclose, adduce and present throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, readily and easily available, reliable evidence, pursuant to §3553(a) including but not limited to the testimonies, affidavits and or declarations of qualified experts, witness testimony and documentary and other evidence demonstrating the nature and circumstances of the offense and Shapiro's history and characteristics, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

144.     **EIGHTH GROUND FOR RELIEF.**  The judgment and sentence was imposed, rendered and sustained in violation of the United States Constitution in that Counsel's multiple failures, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to meet his constitutionally mandated sentencing obligations to challenge the information in the PSR, investigate, present all available information favorable to Shapiro to this Court, request the guidance of experts or specialists if needed, adduce expert testimony and evidence,  and or request an evidentiary, i.e., *Fatico*, hearing to present relevant evidence that impacts sentencing, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

145.     As demonstrated in Claims 1-5, Counsel did not challenge any of the information in the PSR and did not adduce favorable loss calculation evidence at sentencing.

146.     As demonstrated in Claim 6, Counsel did not adduce favorable disparity evidence and in Claim 7, Counsel did not adduce favorable 3553(a) information at sentencing.

147.    Counsel's legally anemic sentencing memorandum and sentencing hearing presentation and implicit capitulation to the PSR's Guidelines Calculation calling for a Life sentence, made clear his belief that Shapiro's receipt of an 85 year sentence, just like the one previously imposed on Stitsky, was a foregone conclusion.  Rather than investigate and adduce evidence that convincingly negated the single item which drove the 85 year sentence, i.e., the PSR's 23 million dollar loss calculus, Counsel sought to distinguish Shapiro from Stitsky with a forensic psychologist's report, engaged in a discussion of white collar sentencing and made a plea for a non-life sentence. (Exh. AAA.)  In sum, Counsel abandoned the crucial legal issues at sentencing.

148.    Counsel was in possession of virtually each and every document, spreadsheet, deed, etc., relied upon in this motion, except the expert's affidavits and their produced exhibits. (Exh. HHH, Shopes Decl., ¶ 8; *See* Exhibits Filed in Support of this motion.) Counsel did not adduce one such favorable document to this Court.  Such a course of action  defies reason.

149.    Counsel also failed to obtain or retain necessary experts.  As demonstrated in Claims Two through Four, an MAI or appraisal expert, an Accounting Expert and a Real Estate Attorney Expert were absolutely necessary to adduce critical, relevant, evidence refuting the PSR's 23 million dollar loss determination. (See ¶¶ 80, 81, 88, 90, 93, 122 *supra*.)

150.    Counsel failed to make a request of this Court that fully, factually and legally substantiated the constitutional necessity for CJA funding to hire constitutionally mandated experts, i.e., an MAI or appraisal expert, Accounting Expert and Real Estate Attorney Expert in order to adduce critical, relevant, evidence at sentencing.

151.    Counsel further failed to request and substantiate the need for a *Fatico* or other sentencing hearing wherein critical facts could have been adduced. (*Docket* 311, *passim*)

152.    Counsel's multiple failures, throughout the post-conviction proceedings, particularly prior to sentencing, at sentencing and post sentencing, to meet his constitutionally mandated sentencing obligations to challenge the information in the PSR, to investigate, to present all available information favorable to Shapiro to this Court, to request the guidance of experts or specialists if needed, to adduce expert testimony and evidence and to request an evidentiary, i.e., *Fatico*, hearing to present relevant evidence that impacts sentencing, deprived Shapiro of the effective assistance of counsel and therefore constituted a denial of Shapiro's Sixth Amendment Right to Counsel.

153.    **NINTH GROUND FOR RELIEF**.  Shapiro joins the *Johnson v. United States*, 135 S. Ct. 2551 (2015), claim advanced by co-defendant Stitsky's individual 28 USC § 2255 motion to the extent that it avers that the sophisticated means, abuse of trust, role in the offense, number of victims and other Guidelines enhancements imposed upon Shapiro are unconstitutionally vague.

154.    **TENTH GROUND FOR RELIEF.**   The convictions were obtained and sustained and the judgment and sentence imposed and rendered in violation of the United States Constitution in that Counsel's additional errors and omissions, which may only be discovered and established via a full and fair discovery process, constituted ineffective assistance of counsel and therefore a denial of Shapiro's Sixth Amendment Right to Counsel.

    Wherefore:

155.    Shapiro is currently a prisoner in custody at the U.S. Prison in Otisville, New York pursuant to a sentence and judgment entered in the U.S. District Court for the Southern District of New York, in case CR-06-0357-2-KMW.

156.     Shapiro claims the right to be released from custody upon the ground that his sentence and judgment was imposed and sustained in violation of the Constitution and/or laws of the United States, and/or that the Court was without jurisdiction to impose such sentence and judgment, and/or that the sentence was in excess of the maximum authorized by law and/or that the sentence and judgment is subject to collateral attack.

157.     Shapiro moves this Court, which imposed judgment and sentence, to vacate, set aside or correct his judgment and sentence.

158.     Shapiro has no other plain, speedy or adequate remedy at law.

159.     No prior application for a writ of habeas corpus or §2255 Motion concerning Mark Alan Shapiro has been made to this or any other court.

160.     None of the claims presented herein were presented on appeal.  Claims 1-8 are predicated upon the denial of Petitioner's Right to the Effective Assistance of Counsel, a matter better left for 28 USC § 2255 proceedings. *Massaro v. United States,* 538 U.S. 500, 504 (2003).  Petitioner's joinder, in Claim 9, is predicated upon new Supreme Court authority.

161.     Shapiro prays that this Court grant him all relief to which he may be entitled in this proceeding.

162.     Shapiro herein respectfully reserves the right to supplement or amend this §2255 motion up until the statute of limitations.

163.     Shapiro respectfully requests this Court's permission pursuant to 28 U.S.C.§2255, Rules 7(a) and (b) to expand the record to include all of the evidence submitted with this Motion.

164.     Shapiro does not waive any applicable rights or privileges by filing this motion and the accompanying exhibits and, in particular (but without limitation), Shapiro waives neither the

attorney-client privilege nor the work-product doctrine. Petitioner hereby requests that any waiver of a privilege be deemed to have occurred only after a hearing with sufficient notice and the right to be heard regarding whether a waiver has occurred and, if so, the scope of that waiver.

165.    Shapiro herein respectfully requests the opportunity to seek this Court's authorization via Leave of Court, upon a showing of good cause, to conduct discovery under the Federal Rules of Criminal or Civil Procedure, or in accordance with the practices and principles of law.

166.    Shapiro further respectfully submits that an evidentiary hearing will  be necessary to resolve all claims raised herein.

Dated:  September 28, 2015                    Respectfully submitted:

*Katherine Alfieri*

_____
KATHERINE ALFIERI
Attorney for MARK ALAN SHAPIRO

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September 2015 at Otisville, New York.

Mark Alan Shapiro